## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERFAITH CENTER ON
CORPORATE RESPONSIBILITY,
475 Riverside Drive, Suite 1842
New York, NY  10115

JAMES McRITCHIE,
9295 Yorkship Court
Elk Grove, CA  95758

AS YOU SOW,
2150 Kittredge Street, Suite 450
Berkeley, CA  94704

     Plaintiffs,
  v.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,
100 F Street NE
Washington, D.C.  20549

     Defendant.

No. _____

## COMPLAINT

Plaintiffs Interfaith Center on Corporate Responsibility ("ICCR"), James McRitchie, and As You Sow, by their attorneys MoloLamken LLP, bring this Complaint against defendant United States Securities and Exchange Commission ("SEC" or the "Commission"), alleging as follows:

## NATURE OF THE PROCEEDING

1. This is an action under the Administrative Procedure Act challenging the Securities and Exchange Commission's recent amendments to Rule 14a-8.  That rule allows shareholders to submit proposals for inclusion in a company's proxy statement that ask the company to consider additional disclosures, policies, or governance changes.  Shareholders typically submit such

proposals in the belief that they will benefit the company and increase or protect shareholder value. Shareholder proposals are an important engine of corporate democracy, permitting shareholders to raise concerns with corporate management, to manage risk, and to create and protect long-term value.

2.      The SEC's recent amendments to Rule 14a-8 severely impair shareholders' access to the proposal process. The amendments dramatically increase the amount of stock a shareholder must own to be eligible to submit a proposal, including a more than ***ten-fold increase*** for investments held for only one year. The amendments also prohibit shareholders from aggregating their holdings to meet the new requirements. Those changes will have a disproportionate impact on Main Street investors, for whom the proposal process is a critical mechanism for raising concerns.

3.      The amendments also interfere with shareholders' ability to submit proposals through representatives. Shareholders often rely on experienced and knowledgeable representatives to draft and submit proposals on their behalf. The new rules hamstring that process by prohibiting representatives from acting for more than one shareholder for any given meeting, and by requiring shareholders to personally meet with management rather than relying on their representatives to act for them.

4.      Finally, the amendments make it much more difficult to resubmit a proposal that was previously submitted in an earlier year. Rule 14a-8 has long imposed "resubmission thresholds" that prohibit shareholders from resubmitting a proposal unless it achieves certain minimum support. The amendments, however, dramatically increase those thresholds. Emerging issues often require a period of education and discussion to achieve widespread support. The

increased thresholds frustrate shareholders' ability to build support gradually for a proposal that may ultimately prompt important change.

5.     The Commission's purported justifications for the amendments were flawed at every turn.  The Commission recognized that it had a legal obligation to provide an economic analysis of the costs and benefits of the proposed rule.  But it made no serious attempt to do so.

6.     For one thing, the Commission made no meaningful effort to analyze the number of shareholder proposals that would be excluded by its new ownership requirements – an essential building block for any cost-benefit analysis.  The Commission claimed it could not properly quantify that impact because it lacked data on how long shareholders typically held their shares.  But the Commission did in fact have that data:  Broadridge Financial Solutions, Inc., the firm that distributes the vast majority of proxy materials to investors, had submitted a trove of anonymized shareholder data for tens of millions of investor accounts that enabled the SEC to estimate those holding periods.  The Commission nonetheless concealed that data from the public, belatedly disclosed it only after the comment period ended, and then arbitrarily refused to incorporate the data based on minor quibbles that were both unfounded and inadequate to justify the Commission's decision.

7.     The Commission's cost-benefit analysis was also deficient in many other respects.  Commenters pointed to the rich empirical literature documenting how shareholder proposals enhance shareholder value.  Proposals often raise issues that present material or even existential threats to a company.  Yet the Commission arbitrarily refused to quantify the benefits that proposals achieve by promoting greater awareness and responsiveness to such threats.  That failure left the Commission fundamentally unable to weigh those benefits against the cost savings its new

rule would supposedly achieve.  The Commission then compounded that problem by invoking unreliable data to determine those cost savings with no serious scrutiny.

8.     Finally, the Commission imposed arbitrary new restrictions on ownership aggregation and the use of representatives to submit proposals.  The Commission justified those amendments largely on the ground that they would reduce the number of shareholder proposals. But the Commission offered no rational justification for singling out those particular proposals from any others.  As with much of its rule, the Commission seemingly pursued a policy of reducing shareholder proposals by any means necessary.

9.     The Commission's sharp restrictions on shareholder rights undermine efforts in the investor community to ensure greater management responsiveness to the shareholders whose interests they supposedly represent.  The Commission's new rule guts the shareholder proposal process in exchange for minuscule and largely hypothetical cost savings.

10.     The SEC's final rule was arbitrary, capricious, and not in accordance with law.  The Commission also exceeded its statutory authority, and it disregarded basic procedural requirements by concealing the critical Broadridge data until long after the comment period ended.  Plaintiffs accordingly seek a judgment declaring the SEC's final rule unlawful under the Administrative Procedure Act and vacating that rule in its entirety.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78a *et seq.*

12.     This Court has federal question jurisdiction under 28 U.S.C. § 1331.

13.     Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

14.     Plaintiff Interfaith Center on Corporate Responsibility is a coalition of more than 300 institutional investors collectively representing over $4 trillion in assets under management. ICCR's members are a cross-section of religious investors, foundations, asset managers, pension funds, and other long-term institutional investors.  Inspired by faith and committed to action, ICCR members have 50 years of experience as pioneers in the shareholder proposal process.  Their long-term engagement on environmental, social, and governance issues has brought about valuable improvements in corporate accountability and transparency.

15.     ICCR's mission is to engage with the companies in its members' portfolios through shareholder proposals, dialogue, and other engagement mechanisms.  ICCR's history includes hundreds of examples where companies improved their policies and practices in response to shareholder proposals.  Many of those changes were later adopted by other companies as well.

16.     Plaintiff James McRitchie is a shareholder advocate and one of the three most active individuals submitting shareholder proposals at U.S. public companies today.  Focusing primarily on corporate governance, Mr. McRitchie has submitted hundreds of proposals on issues such as eliminating supermajority voting provisions that give corporate insiders disproportionate say, requiring unopposed directors to receive a majority of votes cast to be elected, and enabling shareholders to have their own director nominees appear on corporate proxy materials.  Mr. McRitchie's proposals routinely achieve majority shareholder support.  Since 1995, Mr. McRitchie has also published CorpGov.net, a comprehensive blog providing news and commentary on corporate governance issues.

17.     Plaintiff As You Sow, a non-profit corporation, is one of the nation's leading practitioners of corporate engagement and shareholder advocacy.  For over 27 years, As You Sow

has represented shareholders working to improve company practices across a range of issues, from computer take-back programs to climate change, antibiotic resistance, safe and sustainable food systems, gender equity, fair CEO pay, and ocean plastics and recyclability.  In 2021, As You Sow proposals have achieved average support of over 47% through June 3, with votes in favor representing over $1.5 trillion in shareholder equity.  As You Sow has also negotiated resolutions with 34 companies, achieving a range of improved practices and disclosures.

18.     Defendant United States Securities and Exchange Commission is the federal agency that promulgated the rule that is the subject of this action under the Administrative Procedure Act.

## FACTUAL BACKGROUND

### *Shareholder Proposals*

19.     When investors buy shares in a company, they are entitled not only to receive a return on their investment, but also to vote on how the company is run.  Directors and officers manage the corporation as agents of shareholders.  Shareholders therefore elect directors and have the right to hold them accountable.  Shareholders traditionally exercise those rights by voting at annual meetings to elect directors and determine other corporate oversight policies.

20.     Large public companies have thousands or even hundreds of thousands of shareholders.  For that reason, a corporate "town meeting" where shareholders personally cast their votes is impractical.  Instead, shareholders typically vote by proxy.  Proxy holders appear at the meeting and vote on shareholders' behalf.

21.     In addition to electing directors and voting on management proposals, shareholders have the right to submit their own proposals for consideration at the shareholder meeting. Shareholders typically seek to have those proposals included in the proxy materials the company sends to shareholders so that other shareholders are aware of the proposals when casting their

votes.  Although many proposals go to a vote each year, many prompt management to address concerns without a vote being necessary.

22.     Shareholder proposals help foster corporate democracy.  They are an important mechanism for shareholders to monitor corporate management, raise significant issues, and guide corporate policies.  Shareholder proposals help mitigate the collective action problem that results from widely dispersed shareholdings in public companies by providing a cost-effective mechanism for proponents to communicate with fellow shareholders, and for shareholders as a group to communicate with management through votes on proposals.  Although most shareholder proposals are not binding on management, a majority vote almost always leads to adoption, and even a minority vote often prompts meaningful change.  BlackRock, the world's largest asset manager, recently reported that companies adopted 94% of proposals that achieved majority support, and that even where a proposal achieved only 30% to 50% support, the company responded by making changes 67% of the time.

23.     Many shareholder proposals focus on corporate governance reform.  For example, some proposals have sought to eliminate staggered boards of directors in which only certain directors stand for election each year – an arrangement that makes it more difficult for minority shareholders to elect directors and facilitates management entrenchment.  Other proposals have sought to eliminate supermajority voting requirements, establish confidential voting, and create greater roles for outside directors.  A common theme is overcoming the problems that arise when corporate managers seek to advance their own interests rather than the interests of shareholders.

24.     Many of those proposals have achieved majority votes.  Others have led managers to negotiate resolutions rather than face a vote.  In 2014, for example, the New York City Comptroller and the City's pension funds submitted proposals to 75 companies seeking "proxy

access" – the right of shareholders to have their own director nominees appear on the company's proxy materials. Two-thirds of the proposals that went to a vote received majority support. And the vast majority of companies adopted proxy access bylaws within the following year, including Chevron, Hasbro, Occidental Petroleum, Staples, and Priceline.

25.     Plaintiff James McRitchie regularly submits proposals addressing corporate governance issues. Those proposals have seen growing success. In 1999, for example, Mr. McRitchie and his wife submitted 10 proposals. Most were excluded, and none won more than 9% support. By 2019, however, Mr. McRitchie's 46 proposals averaged more than 50% support. Proposals on some topics, such as moving to annual elections of directors, averaged 70% support. So far in 2021, Mr. McRitchie and his wife have submitted about 90 proposals. Already, boards have agreed to implement more than 25 of them without a vote. Shareholders depend on retail investors like Mr. McRitchie to initiate governance reforms at new and especially smaller companies, because those companies receive less scrutiny from institutional investors than established S&P 500 companies.

26.     Other shareholder proposals address the growing risks of environmental and social issues to long-term shareholder value. Those proposals reflect broader trends in the business and investor communities toward greater accountability for environmental, social, and governance ("ESG") stewardship decisions. Investment strategies that incorporate consideration of ESG issues are surging: Bank of America Merrill Lynch has forecasted over $20 trillion in asset growth in ESG funds over the next 20 years. An extensive academic literature confirms the link between ESG policies and corporate performance. Just this past month, shareholders at ExxonMobil – including leading asset managers like BlackRock and Vanguard – elected dissident directors to the

company's board over concerns that management was not doing enough to respond to climate change risks.

27.     Since its founding, plaintiff ICCR has been a pioneer in shareholder proposals on ESG issues.  In March 1971, ICCR founding member Paul Neuhauser drafted a proposal on behalf of the Episcopal Church requesting that General Motors withdraw its business from South Africa until apartheid was abolished.  ICCR remained active in the campaign for disinvestment from South Africa throughout the 1980s.

28.     Climate change in particular has become an increasing focus of shareholder proposals.  Although early proposals received low levels of support, a growing awareness of the potentially catastrophic impact of climate change on long-term shareholder value has led to majority votes on a number of proposals seeking climate-related actions and disclosures.

29.     Plaintiffs and their members have played a key role in those proposals.  ICCR member Mercy Investments, for example, submitted a proposal that convinced U.S. Steel to set quantitative, science-based greenhouse gas emission reduction targets.  ICCR members School Sisters of Notre Dame and Sisters of the Presentation submitted a proposal that persuaded WEC Energy Group and CMS Energy to report on how their business plans align with the Paris Agreement.  Similarly, plaintiff As You Sow submitted proposals that prompted several of the largest U.S. banks to commit to align their financing activities with the goals of the Paris Agreement and to measure and disclose their progress in meeting those goals.  Those proposals will help ensure that banks consider climate change in their funding and investment decisions moving forward, protecting not only the banks but the global economic system from growing climate risk.

30.     Other recent shareholder proposals have focused on corporate political spending. Many American corporations play a major role in the political process through their support of candidates, political action committees, ballot measures, and policymaking organizations. Political spending may often further a company's business strategies.  In some cases, however, management may engage in political activities that the company's shareholders consider to be beyond the corporation's appropriate functions.  Shareholder proposals have accordingly sought to improve disclosure and oversight of political spending.  In 2009, for example, ICCR member Domini Impact Investments submitted a political disclosure resolution at Goldman Sachs that received 27.3% support.  Domini resubmitted the proposal in 2010 and 2011, and then reached a resolution with the company concerning the issues it had raised in 2012.

31.     Political spending disclosures became even more important after the Supreme Court's decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010).  In that case, the Supreme Court held that, under the First Amendment, the government may not prohibit corporations from making independent political expenditures.  The Court reaffirmed, however, that shareholders play a crucial role in ensuring that managers do not spend corporate funds on their own favorite politicians while ignoring the interests of the company or promoting political objectives that shareholders may not condone.  Shareholder proposals on political expenditures thus play an increasingly important role in shareholder oversight.

32.     Shareholder proposals often act as an "early warning system" by bringing outside perspectives to the attention of the board of directors.  As early as 2000, for example, ICCR members submitted proposals on predatory lending in the subprime housing market.  Those proposals included recommendations that financial institutions disclose the risks associated with mortgage securities.  The proposals proved to be prescient, as subprime lending and mortgage

securitization led to the collapse of the housing market in 2007. The proposals benefitted shareholders by raising concerns early and educating shareholders about the growing risks in this area.

33.     Shareholder proposals have indirect benefits too. The threat of receiving a proposal may induce management to maintain more accountable governance structures, especially where high-profile initiatives are underway across the broader investor community. Shareholder proposals thus have impacts well beyond the companies that receive them.

34.     While some shareholders submit their own proposals, many rely on representatives to act for them. Shareholder representatives offer their expertise and experience to help shareholders craft effective proposals, navigate the proposal submission process, effectively engage with management, and negotiate resolutions that address the serious issues raised. Asset managers and service providers often fill this role.

### SEC Rule 14a-8

35.     In 1934, Congress enacted Section 14 of the Securities Exchange Act to curb abuses of the proxy process. That provision grants the Securities and Exchange Commission authority to regulate the form and content of proxy statements.

36.     The Commission has promulgated a number of rules pursuant to that authority. Those rules dictate what details a company must include in shareholder proxy materials. They also prohibit material misstatements or omissions in proxy statements.

37.     One of the Commission's proxy rules is Rule 14a-8, 17 C.F.R. §240.14a-8. Originally promulgated in 1942, this rule requires public companies to include shareholder proposals in the company's proxy statement, subject to various conditions and limitations. Rule 14a-8 requires shareholders to satisfy certain eligibility criteria when submitting a proposal. It sets

submission deadlines and word limits for proposals and their supporting statements.  It also allows management to exclude proposals on a variety of grounds – for example, because a proposal concerns only the company's ordinary business operations.

38.    In 1983, Rule 14a-8 required a shareholder to have held at least $1,000 worth of stock in a company for at least one year to be eligible to submit a proposal.  In 1998, the Commission raised that requirement to $2,000 but declined to impose a higher limit "out of concern that a more significant increase could restrict access to companies' proxy materials by smaller shareholders."

39.    Traditionally, the Commission allowed investors to aggregate their holdings to satisfy those ownership requirements.  Thus, two shareholders who did not individually hold enough stock, but who collectively owned more than $2,000 in stock for more than a year, could pool their resources and submit a joint proposal.

40.    Historically, Rule 14a-8 was silent on the use of representatives.  The rule thus did not disturb state agency law addressing whether or how a shareholder could rely on someone else to act on its behalf in submitting a proposal.  Since 1976, Rule 14a-8 has limited the number of proposals that each ***shareholder*** may submit for any particular shareholder meeting.  But the rule did not prohibit multiple shareholders from choosing to engage the same representative to act on their behalf.

41.    The SEC has also long imposed modest limitations on the resubmission of proposals.  Since 1954, Rule 14a-8 has prohibited shareholders from resubmitting substantially the same proposal (or more recently, a proposal on "substantially the same subject matter") for three years, unless the proposal achieved a specified level of support: 3% if the proposal was voted on once during the past five years, 6% if voted on twice, and 10% if voted on three or more times.

### *The Proposed Rule*

42.    On November 5, 2019, the Commission issued a proposed rule that made several major amendments to the eligibility standards and other requirements for shareholder proposals.

43.    According to the Commission, the proposed amendments were meant to "modernize" and "update" the shareholder proposal rule.  The Commission noted that the ownership and resubmission thresholds had not been amended since 1998 and 1954, respectively. It pointed to "significant changes" over the intervening years, including changes in "the types and use of communications, the types and frequency of shareholder-company engagement and the substantial shift to investing through mutual funds and ETFs, rather than directly by Main Street investors."  The Commission claimed that the amendments would "facilitate and encourage meaningful company-shareholder engagement, and make changes that can help prevent misuse of the [shareholder proposal] process."

44.    The Commission's proposed rule sharply increased the ownership requirements for a shareholder to be eligible to submit a proposal, both in terms of the number of shares the shareholder must own and the length of time for which the shareholder must own them.  It also prohibited shareholders from aggregating holdings to meet those requirements.

45.    The proposed rule also limited shareholders' ability to act through representatives. It prohibited representatives from filing proposals for more than one shareholder for any given meeting.  And it required shareholders to make themselves personally available to engage with management rather than relying on their representatives.

46.    Finally, the proposed rule substantially increased the resubmission thresholds that apply to proposals already submitted at a prior shareholder meeting.

47.     The Commission received thousands of comments on the proposed rule.  The overwhelming majority opposed the rule.  On the new ownership requirements, for example, comments opposing the amendments outnumbered comments in favor by more than 15 to 1.

48.     Commenters urged that the rule would drastically reduce the number of proposals that shareholders would submit.  The Commission, they argued, had not done an adequate analysis to quantify that impact, particularly with respect to the holding periods in the new ownership requirements.  Commenters warned that those new requirements would result in widespread exclusion of many small investors from the shareholder proposal process – even though many significant improvements in corporate policies have come as a result of resolutions brought by small shareholders.

49.     Commenters similarly objected to the new resubmission thresholds.  Emerging issues, they noted, often require a period of education and discussion before they achieve widespread support.  Resubmission permits a shareholder to refine and improve a proposal through dialogue with management and other investors, and many proposals prompt important changes without ever achieving majority support.  The Commission's dramatically increased thresholds would cut that process short.  The impact would be particularly severe at companies with dual-class stock, where corporate insiders with disproportionate voting power can cause a proposal to achieve a low level of reported support even where most outside investors support it.

50.     Commenters urged that shareholder proposals have important benefits for shareholder value that the Commission was not adequately considering.  They pointed to the rich empirical literature documenting how proposals enhance shareholder value.  A 2019 report by the Diligent Institute, for example, found that companies with strong corporate governance policies outperformed those with poor policies by 15% over the most recent two-year period.

51.     Commenters also complained that the Commission was overestimating the cost savings the rule would achieve.  In the proposed rule, they noted, the Commission had cited unreliable anecdotal reports in which companies claimed to have spent $100,000 or $150,000 responding to a proposal.  Commenters submitted contrary information showing that the actual costs were closer to $20,000.  They also faulted the Commission for relying on inflated estimates that included the cost of management's own voluntary efforts to ***exclude and oppose*** a proposal, not merely the cost of ***including*** a proposal in the company's proxy materials.

52.     Commenters highlighted the significant costs the rule would impose on shareholder proponents – particularly the disproportionate impact of the new ownership requirements on Main Street investors.  They observed that shareholders are already under-incentivized to submit proposals, because the proponent alone must shoulder the costs of preparing and submitting a proposal, while the benefits of a successful proposal flow to all shareholders.

53.     Commenters urged that the immense value of shareholder proposals far outstripped the modest cost savings the rule hoped to achieve.  Many proposals identify risks that threaten catastrophic losses to companies and their shareholders.  Studies by Bank of America Merrill Lynch, for example, showed that greater attention to ESG matters could have helped companies predict and potentially avoid as many as 90% of bankruptcies.  The trillions of dollars of shareholder value at stake was orders of magnitude greater than even the Commission's inflated estimate of $70.6 million in cost savings spread across thousands of U.S. companies.

54.     Commenters objected to the rule's arbitrary restrictions on representatives.  The Commission had cited no evidence of any abuses relating to representatives, nor any other reason to interfere with shareholder-representative relationships governed by state agency law.  Moreover, the requirement that shareholders personally interact with management after submitting the

proposal, rather than relying on their representatives to act on their behalf, would discourage many shareholders from submitting proposals in the first place.

55.     Finally, while the Commission had purported to justify the rule as necessary to reduce the costs of shareholder proposals, commenters urged that the Commission's true motive for the rule was corporate management opposition to the substance of many types of shareholder proposals – particularly those addressing environmental and social issues.  Commenters pointed to the Commission's consistent pattern of crediting anecdotal evidence from a handful of corporate interests while ignoring the extensive objections and contradictory information provided by investors.  They cited the extensive empirical literature on the link between superior performance on ESG issues and shareholder value.

56.     The public comment period ended on February 3, 2020.  More than six months later, on August 14, 2020, the Commission added to the file a memorandum from the Chief Economist of its Division of Economic and Risk Analysis, along with a previously undisclosed staff analysis.  That memorandum revealed that, approximately a year earlier in August 2019, the Commission had obtained a voluminous data set from Broadridge Financial Solutions, Inc., the leading service provider that most U.S. broker-dealers rely on to distribute the vast majority of proxy mailings to investors.  That data set showed holding periods and other information for an enormous sample of investor accounts.

57.     The SEC staff analysis appended to the August 14 memorandum explains that the Broadridge data covered 6,820 U.S. companies with shareholder meetings between January 2015 and December 2017, and reflected holdings for a total of 28,476,865 unique retail accounts.  Analyzing that data, including the information on holding periods, the SEC staff concluded that similar increased ownership requirements the Commission had proposed at the time would result

in a **50% to 78% reduction** in the shareholdings that would qualify for submission of a proposal. The staff also examined the impact at the company level and concluded that, for 22% to 55% of all companies, **fewer than 5%** of accounts would remain eligible.

58.     The SEC's Chief Economist nonetheless refused to draw any conclusions from the Broadridge data or the staff analysis performed on that data, asserting several purported shortcomings in the data.  First, he claimed that the SEC's staff was "not able to confirm whether these accounts are limited to retail shareholding accounts," without explaining why that limitation mattered.  Second, he noted that the data did not exclude the possibility that some shareholders might hold the same stock through two different accounts.  Third, he observed that the data showed only annual holdings on the record date before each shareholder meeting, rather than continuous holdings over time.  Finally, he asserted that shareholders likely to submit a proposal might not be representative of the entire universe of accounts reflected in the data.

59.     Despite having that Broadridge data in hand by August 2019, the SEC's proposing release in November 2019 made no meaningful reference to it.  Instead, footnote 245 of the proposing release contained only a brief, cryptic reference to the receipt of "some non-public retail share ownership data from a market participant who requested confidential treatment for the data."

60.     After the SEC belatedly disclosed the Broadridge data and the staff analysis, several commenters objected to the timing of this important disclosure.  They requested that the Commission reopen the comment period so that members of the public could provide input on the Broadridge data and the Commission's questionable decision not to place any weight on it.  The Commission rejected that request.

61.     The SEC's Office of the Investor Advocate was harshly critical of the agency's handling of the staff analysis of the Broadridge data.  The Office explained that it had "repeatedly

requested copies of [the] analysis to no avail, until the Commission quietly submitted the analysis into the public comment file more than nine months later," with "no press release, no official statement, nor so much as a tweet to draw the public's attention to this new information."  It concluded that "this particular rulemaking was adopted in contravention of the Commission's internal policies for full and objective economic analysis" and lamented that "investors should not have to bear the expense of litigation to overturn such a flawed rulemaking."

### *The Final Rule*

62.    On September 23, 2020, the Commission adopted its final rule by a 3-2 vote.  The final rule largely tracks the amendments in the proposing release.

63.    With respect to the ownership requirements for submitting shareholder proposals, the Commission imposed sharp increases to both the amounts and holding periods required. Whereas the prior version of the rule required that a shareholder own only $2,000 of stock for a single year, the new rule requires a shareholder to own as much as ***$25,000 of stock*** depending on the number of years for which the shareholder has held the shares:

| New Ownership Requirements | |
| --- | --- |
| **Holding Period** | **Amount Required** |
| 1 year | $25,000 |
| 2 years | $15,000 |
| 3 years | $2,000 |

64.    The Commission asserted that these more demanding ownership requirements were necessary to ensure that shareholders submitting proposals had a meaningful economic stake in the company.  The $2,000 requirement imposed in 1998, the Commission noted, was now equivalent to about $3,000 when adjusted for inflation, or about $5,000 when adjusted for the

growth of the stock market.  The Commission did not explain how those modest increases justified a more than ***ten-fold*** increase to $25,000.

65.    The Commission also opined that "technological advancements" provided shareholders with other mechanisms to communicate with corporate management – evidently contemplating that shareholders could fire off emails, tweets, or Facebook posts even if they could not submit a shareholder proposal.  The Commission did not explain why those technologies would be an adequate substitute, given that shareholder proposals are not merely a communication mechanism, but a process for engaging institutional and legal arrangements among investors so they can evaluate proposals and vote their shares.

66.    The Commission abolished its longstanding policy allowing multiple shareholders to aggregate holdings to satisfy the ownership requirements.  The Commission's only stated justification was that "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that each shareholder who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company."

67.    The Commission imposed multiple new rules on the use of representatives.  It prescribed a list of information that shareholders must disclose whenever they act through a representative.  And it imposed a new requirement that shareholders personally, and not merely their representatives, participate in a meeting with management to discuss the proposal.

68.    The Commission's justification for that personal-engagement requirement was that "a shareholder-proponent who elects to require a company to include a proposal in its proxy statement, requiring the company and other shareholders to bear the related costs, should be willing and available to discuss the proposal with the company and not simply rely on its representative

to do so." But the Commission never explained why requiring individual shareholders to meet with large corporations' management teams, rather than allowing representatives with expertise and experience in these matters to act for them, would facilitate rather than impede that process. Moreover, the Commission ignored commenters' warnings that requiring personal shareholder engagement with management would discourage many shareholders from submitting proposals.

69.     The Commission also imposed a sharp new limit on the number of shareholders a representative may represent. Since 1976, the Commission has limited the number of proposals each *shareholder* may submit for a shareholder meeting – most recently to one proposal per meeting. In its new rule, the Commission amended that limitation to apply to *representatives* too: It prohibited representatives from submitting proposals on behalf of multiple shareholders, even if each shareholder individually was eligible to submit a proposal. The Commission reasoned that permitting representatives to submit multiple proposals raised "concerns about the expense and obscuring effect of including multiple proposals in the company's proxy materials." But it never explained why multiple proposals submitted through the same representative raised those concerns to any greater degree than multiple proposals submitted through separate representatives or by shareholders themselves.

70.     Finally, the Commission drastically increased the resubmission thresholds for proposals addressing the same topic as earlier proposals previously voted upon:

| Resubmission Thresholds | | |
|---|---|---|
| Prior Votes | Old Threshold | New Threshold |
| One | 3% | 5% |
| Two | 6% | 15% |
| Three or More | 10% | 25% |

71.     The Commission justified those sharp increases on the ground that the current thresholds did not "adequately distinguish between proposals that have a realistic prospect of obtaining broader or majority support in the near term and those that do not."  The Commission acknowledged that some proposals that failed to achieve 5% of the vote nonetheless went on to garner majority support in later years.  It also admitted that many proposals prompt value-enhancing reforms even without achieving majority support.  The Commission asserted that proposals that qualify for resubmission under its new, higher thresholds would be more likely to have such effects too.  But it did not explain why that fact justified excluding proposals that satisfy existing thresholds and may go on to prompt important change.

### *The SEC's Deficient Economic Analysis*

72.     Under Section 3(f) of the Exchange Act, whenever the Commission "is engaged in rulemaking . . . and is required to consider or determine whether an action is necessary or appropriate in the public interest," the Commission must consider "whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  Courts interpret that mandate to require the Commission to perform a proper cost-benefit analysis when promulgating a rule.

73.     The D.C. Circuit has repeatedly set aside SEC rules where the Commission failed to conduct an adequate economic analysis.  The Commission must apprise itself of the economic consequences of the proposed regulation and, as best it can, estimate the costs the rule will impose and the benefits that will flow from it.  The Commission must seek and consider the best available quantitative and qualitative evidence of the rule's costs and benefits.  If the Commission is unable to quantify costs or benefits, it must adequately explain why it is not possible to do so.  When performing that analysis, the Commission must consider alternatives and must respond to problems that commenters raise.

74.     In 2012, the SEC incorporated those principles in its Guidance on Economic Analysis in SEC Rulemakings.  As the 2012 Guidance recognizes, "[h]igh-quality economic analysis is an essential part of SEC rulemaking."  To perform that analysis, the Commission must identify relevant data and consider mechanisms by which to seek that data.  The 2012 Guidance also emphasizes that the Commission must perform its economic analysis "even-handedly and candidly."  "Where the Commission is giving greater weight to some empirical evidence/studies than to others, it should clearly state the reason(s) for doing so."

75.     Consistent with those obligations, the Commission recognized in this case that it was required to "quantify the costs, benefits, and effects on efficiency" of its rule, if possible to do so.  The Commission, however, utterly failed to comply with that duty.

76.     The Commission recognized that "the primary economic effects of the final amendments" would "derive from the reduction in shareholder proposals."  To evaluate that impact, the Commission needed to know how many proposals that were formerly eligible would now be excluded by the more stringent ownership requirements.

77.     The new rule imposed minimum ownership requirements that varied depending on the duration of ownership.  To determine the impact of the rule, the Commission therefore needed information about both the *amounts* that shareholder-proponents typically owned and the *duration* for which they owned those amounts.

78.     To investigate that issue, the SEC examined data from prior-year proxy statements.  That data, however, reflected only the *amounts* that shareholder-proponents owned for at least one year.  They did not include any information about holding periods in excess of one year, because that information was not relevant under the old rule.  The Commission did not conduct a survey

or any similar analysis to obtain that missing data.  Instead, it simply stated in its final rule that "we do not have data on duration of holdings for shareholder-proponents."

79.     Because the Commission purportedly lacked any data on holding periods, it could not meaningfully estimate the impact of the new ownership requirements.  At the "low end of the range," the Commission assumed that *every* shareholder who submitted a proposal under the old rule held the stock for more than three years, so there would be a ***zero percent*** reduction in eligible proposals under the new rule.  At the "high end of the range," the Commission assumed that ***none*** of the shareholders who submitted a proposal under the old rule held their stock for three years, and thus would not have been eligible under the new rule unless they met the more demanding $25,000 minimum – an assumption that yielded a ***56% reduction*** in eligible proposals.  The Commission's final rule thus provides an "estimate of the percentage of excludable proposals" as falling somewhere in the absurdly broad range of ***"0 - 56%."***

80.     In reality, the Commission's claim that "we do not have data on duration of holdings for shareholder-proponents" was simply false.  The Commission had received that data over a year earlier, when Broadridge submitted a trove of anonymized shareholder data for over 28 million retail accounts that included data on holding periods.  Analyzing that data, the SEC's staff had found that similar increased ownership requirements would result in a reduction in shareholder proposals of ***up to 78%***.  The Commission, however, concealed that data from the public and then inserted it into the comment file long after the comment period ended, only a month before issuing its final rule.

81.     Apparently recognizing that its belated revelation of the Broadridge data might raise some eyebrows on judicial review, the Commission's final rule asserts that the agency "satisfied its obligation[s] under the Administrative Procedure Act" in connection with that data.

"Although the Commission was not obligated to do so," it claimed, the Commission "referenced the Broadridge data" in footnote 245 of its proposing release and "invited commenters to submit" additional data. The Commission then reiterated the quibbles that its Chief Economist had invoked to dismiss the data and asserted that the data "cannot be used to reliably determine the number of retail investors who would be affected by the proposed amendments." Nowhere did the Commission explain why using (admittedly imperfect) data to estimate holding periods would be less reliable than the Commission's chosen approach of using ***no data at all***.

82.     The Commission's failure to meaningfully estimate the impact of its new rule was not the only shortcoming in its economic analysis. The Commission performed a woefully inadequate evaluation of costs and benefits.

83.     As the SEC acknowledged, a substantial academic literature establishes that shareholder proposals create value for corporations and their shareholders. Because the Commission's new rule makes it more difficult for shareholders to submit proposals, it predictably reduces the number of proposals, and therefore the benefits that those proposals might have produced. To conduct the required cost-benefit analysis, the Commission had to quantify those lost benefits or show that it was impossible to do so.

84.     The Commission acknowledged that shareholder proposals may bring benefits to corporations and their shareholders. And it did not dispute that, when a proposal addresses a serious or even existential threat to the corporation's future, those benefits may be orders of magnitude greater than the relatively trivial costs of including the proposal in a proxy statement. Nonetheless, the Commission claimed that it was not required to account for those lost benefits in its economic analysis. The Commission asserted that evaluating those benefits "would not be consistent with the intent of Rule 14a-8, which is to set thresholds at which it is appropriate for a

shareholder proposal to be considered . . . without opining on the merits of specific proposals."
The Commission ignored that the more fundamental "intent" of Rule 14a-8 is to facilitate
shareholder proposals that may enhance corporate value – and that the benefits of those proposals
are very much relevant to that "intent."  In any case, the Commission cited no authority that
authorized it to exempt rules from cost-benefit analysis merely by unilaterally declaring that the
rules were not "intended" to opine on the costs they impose.

85.     Under state corporate law, the Commission added, the evaluation of particular
shareholder proposals was a matter properly left to the company's shareholders.  The Commission
did not explain how shareholders could properly perform that function when the Commission's
amendments would prevent many proposals from ever being submitted for their consideration.

86.     The Commission further asserted that measuring the benefits of shareholder
proposals was "inherently speculative."  It acknowledged that there were "studies documenting a
correlation between companies' ESG policies and financial performance."  But it dismissed those
studies on the ground that some of the companies might have adopted those policies "for reasons
other than the submission of shareholder proposals, including shareholder engagement that does
not involve the submission of shareholder proposals."

87.     The Commission thus refused to make ***any effort at all*** to quantify the benefits that
would be lost under the new rule's sharp increases to ownership requirements and resubmission
thresholds.  That refusal made it all but impossible for the Commission to conduct any meaningful
cost-benefit analysis:  Having refused to quantify the substantial and well-documented benefits of
shareholder proposals, the Commission had nothing to weigh against the modest cost savings that
its rule was supposed to achieve.

88.     The Commission's analysis of those cost savings was also deficient on its own terms.  In the proposing release, the Commission cited inflated and unreliable figures to claim that the cost of processing a shareholder proposal was in the range of $100,000 to $150,000. Commenters disputed those figures and submitted comments showing that costs would be in the range of $20,000.

89.     The Commission made no effort whatsoever to scrutinize those competing figures. Instead, observing a "variation" in the estimates submitted, it announced that the cost savings would fall somewhere between a "lower bound" of $20,000 (*i.e.*, the lowest estimate anyone submitted) and an "upper bound" of $150,000 (*i.e.*, the highest estimate anyone submitted).  The Commission thus completely abdicated its responsibility to analyze the reliability of the competing information, and instead simply declared that the actual costs would probably fall somewhere within the broad range of figures submitted.

90.     As commenters noted, there was no shortage of reasons to question the cost estimates at the high end of the range.  The Commission's $150,000 figure derived from a stray reference in a congressional committee report that cited no source whatsoever to support the figure. The Commission acknowledged, moreover, that its estimates included the cost of submitting a no-action request to the SEC seeking permission to exclude a proposal from the company's proxy statement.  But the Commission never explained why those costs were properly included in the cost-benefit analysis.  A company incurs legal fees for a no-action letter only when it ***resists*** submitting a proposal to its shareholders – something that no company is ***required*** to do in response to a proposal and that no company has any legitimate interest in doing absent a reasonable basis for challenging the proposal's validity.

91.     Moreover, the Commission did not separately analyze the costs for ***resubmitted*** proposals.  It is obvious that the cost of processing a proposal will be less if the company has already received and analyzed the same proposal during a previous year.  That principle matters here because the final rule's increased resubmission thresholds affect only ***resubmitted*** proposals, not all proposals.  The costs that matter to the cost-benefit analysis of that change are thus the average costs for ***resubmitted*** proposals, not for all proposals.  Yet the Commission never drew that distinction and made no effort to conduct a separate cost-benefit analysis for this distinct aspect of the rule.

92.     The Commission similarly failed to quantify the costs its new rule imposes on shareholder-proponents.  It acknowledged that the rule will require shareholders to purchase more shares to satisfy the increased ownership requirements, unless they hold the stock for multiple years.  And it admitted that shareholders may have to "sell other assets to raise cash to buy shares or incur borrowing costs to raise cash to buy shares."

93.     The Commission, however, refused to quantify any of those costs.  Instead, it dismissed them as "relatively modest" and "not . . . a significant hurdle."  The Commission also reasoned that only "a negligible number of shareholders [would] incur these costs because . . . most investors do not submit proposals."  The Commission noted that shareholders might even earn "capital gains and/or dividends" while holding their shares for three years under the new rule.  The Commission did not explain why any of those observations excused it from quantifying the costs to shareholder-proponents as part of its cost-benefit analysis.

94.     The overall upshot of the Commission's cost-benefit analysis was an estimated cost savings of somewhere between $1 million and $79 million per year.  That staggeringly broad range reflected the extremely vague inputs the Commission fed into the analysis – both the largely

unknown impact on the number of proposals that resulted from the SEC's refusal to analyze holding period data, and the extremely broad range of cost savings estimates that resulted from the SEC's uncritical acceptance of whatever data any commenter chose to report. Even that broad range, however, understates the true deficiencies in the agency's analysis. The Commission excluded multiple critical components from the cost-benefit analysis entirely by refusing to quantify them – a defect nowhere more apparent than in the Commission's total refusal to quantify any of the benefits that shareholder proposals produce. The result was a meaningless analysis that provides no actual insight into the true economic effects of the rule.

### *The Dissents*

95.     Two of the SEC's five Commissioners dissented from the Commission's adoption of the final rule.

96.     Commissioner Crenshaw urged that the final rule would shut down "a proven, effective pathway" for shareholders to suggest changes to management. She noted that shareholder resolutions have driven positive financial performance, and that the loss of those voices would cost companies much more than any savings from the new rule. She highlighted the rule's disproportionate impact on Main Street investors: "[T]he implication . . . is that the wealthy are more likely to possess ideas worthy of corporate consideration."

97.     Commissioner Lee questioned the majority's motives. Although the Commission adopted the rule "[o]stensibly because of costs associated with shareholder proposals," she noted that "[t]hese changes will be most keenly felt in connection with ESG issues." As she observed, "while the overall number of shareholder proposals has gone down in recent years, support for [ESG-related] shareholder proposals has been on the rise." It was no coincidence that the Commission was moving "to restrain these efforts just as they are gaining real traction."

98.     Commissioner Lee urged that the amendments "put a thumb on the scale for management in the balance of power between companies and their owners."  She faulted the Commission for "not acknowledg[ing] this clear policy choice, purporting instead to be looking after the interests of shareholders by yet again adopting policies they strongly oppose."  As she noted, "an important goal of the 14a-8 process is to provide an avenue of communication for smaller shareholders."  Citing the Broadridge data, she warned that "retail investors will be greatly disenfranchised" under the new rule.

99.     On March 25, 2021, Senator Sherrod Brown introduced a resolution under the Congressional Review Act to rescind the SEC's amendments to Rule 14a-8.  He urged that the amendments "undermine[d] shareholder democracy" by making it "much harder for working families and investors to hold corporate management accountable."  In late May 2021, however, the Congressional Review Act deadline expired without the Senate having voted on the resolution.

### *The Harm to Plaintiffs*

100.    The SEC's new rule harms plaintiffs and their members in various ways.

101.    Plaintiff Interfaith Center on Corporate Responsibility has many members affected by the rule.  One of ICCR's core purposes is to help those members engage with the corporations whose shares they own to improve corporate responsibility.  The SEC's new rule impairs that mission by making it more difficult for members to pursue that goal.

102.    For example, ICCR member Adrian Dominican Sisters ("ADS") is a congregation of over 500 vowed women across 22 states and four foreign countries.  Tracing its roots to St. Dominic in the 13th Century, ADS seeks to continue the Dominican tradition of preaching through prayer, study, common life, and ministry.  ADS has invested its savings in modest stakes in public companies over the years and has submitted shareholder proposals on a variety of topics.

103.    ADS has purchased stakes in multiple companies worth more than $2,000 but less than $15,000.  Those investments, and their market value as of June 2, 2021, include the following:

| Stock | Purchase Date(s) | Number of Shares | Market Value |
|---|---|---|---|
| Dine Brands | Oct. 20, 2020 | 57 | $5,298 |
| GEO Group | Nov. 9, 2017<br>Oct. 20, 2020<br>Oct. 30, 2020 | 111<br>174<br>75 | $2,077 |
| General Motors | Nov. 8, 2019<br>Oct. 20, 2020 | 77<br>29 | $6,323 |

104.    For each of the foregoing companies, ADS is contemplating submitting a shareholder proposal as soon as it is able to do so.  For Dine Brands, ADS is considering a proposal on the social and environmental impacts of food waste.  For GEO Group, ADS is considering a proposal on the human rights risks associated with the company's prisons and detention centers. For General Motors, ADS is contemplating a proposal on the employee and community impacts of the transition from an oil and gas based economy to a renewable one, or on another topic related to climate change.

105.    Under the prior version of Rule 14a-8, ADS's stakes in those companies would have made it eligible to submit a proposal as soon as it had held more than $2,000 in stock for one year.  Under the new rule, however, ADS would either have to substantially increase its holdings to bring them up to the new $25,000 minimum, or else wait for *three* years to be eligible to submit a proposal with a $2,000 stake.  ADS does not currently plan to increase its holdings to $25,000. The SEC's new rule will therefore require ADS to wait two additional years before submitting a proposal.

106.    Those delays will cause significant harm.  They will impair ADS's efforts to carry out its mission of advancing corporate responsibility for at least two more years, harming not only

ADS but also other shareholders who would benefit from the proposals.  They will also tie up ADS's limited funds and prevent ADS from investing in other companies where it could also engage management on important issues.

107.   On some occasions, ADS has combined its holdings with those of other shareholders to meet the rule's ownership requirements.  In 2019, for example, ADS submitted a proposal asking Marathon Petroleum to address climate change risks.  ADS co-filed that proposal with Mercy Investment Services because ADS's holdings alone were not large enough to qualify for submission.  In 2017, ADS co-filed a proposal with American Baptist Home Mission Society at Tyson Foods for the same reason.  But for the Commission's prohibition on aggregation, ADS would continue to rely on aggregation for future submissions, particularly given the SEC's new higher ownership thresholds.

108.   ICCR has a number of members who either act as representatives for other shareholders or who engage representatives to act on their behalf.  ICCR member Trillium Asset Management, for example, is an ESG-focused investment firm with over $4 billion under management that has been pursuing socially responsible investment strategies for nearly 40 years.  Trillium often acts as a representative for shareholders submitting proposals, sometimes for multiple shareholders at the same meeting.  As one example, Trillium submitted proposals on behalf of two different shareholders for Johnson & Johnson's April 22, 2021 shareholder meeting: a proposal for an independent board chair on behalf of shareholder Oneida Trust Minors and a proposal for a civil rights audit on behalf of shareholders Christopher and Anne Ellinger.

109.   Trillium plans to continue acting as a representative in the future.  But for the Commission's new one-proposal-per-representative limitation, Trillium would expect to continue

acting for multiple representatives at some meetings. The new limitation thus interferes with Trillium's ability to carry out its business activities as a representative.

110.    Finally, many ICCR members resubmit proposals that were already submitted in prior years. In some cases, those proposals have achieved levels of support that would qualify for resubmission under the old rule but not under the new rule.

111.    For example, ICCR member American Baptist Home Mission Society ("ABHMS") and several co-filers submitted a proposal to Tyson Foods for its February 11, 2021 shareholder meeting seeking a report on human rights due diligence. The proposal achieved 18.4% support. Proposals on the same topic achieved 5.5% support in 2019 and 14.6% support in 2020. ABHMS would plan to resubmit the proposal next year if able to do so. But while an 18.4% vote would be easily sufficient to qualify for resubmission under the old 10% threshold, it is not sufficient under the SEC's new 25% threshold.

112.    Similarly, ICCR member Zevin Asset Management, LLC submitted a proposal on behalf of a shareholder to T. Rowe Price for its May 11, 2021 shareholder meeting seeking a report on voting policies related to climate change. The proposal achieved 16.8% support. Proposals on the same topic achieved 9.0% support in 2017 and 14.3% support in 2020. Zevin would plan to resubmit the proposal next year if permitted to do so. But while a 16.8% vote would qualify for resubmission under the old 10% threshold, it is not sufficient under the new 25% threshold.

113.    Likewise, ICCR member United Steelworkers submitted a proposal to 3M for its May 11, 2021 shareholder meeting asking the company to take into consideration the pay ranges of other employees when setting CEO compensation. The proposal achieved 11.0% support. Proposals on the same topic achieved 7.9% support in 2018, 10.0% support in 2019, and 11.1% support in 2020. United Steelworkers would plan to resubmit the proposal next year if permitted

to do so.  But while an 11.0% vote would qualify for resubmission under the old 10% threshold, it

is not sufficient under the new 25% threshold.

114.    The SEC's new rule has similarly adverse impacts on plaintiff James McRitchie.

115.    Over the past several months, Mr. McRitchie has purchased shares in a number of

companies that have a market value of more than $2,000 but less than $15,000.  Those investments,

and their market value as of June 2, 2021, include the following:

| Stock | Purchase Date(s) | Number of Shares | Market Value |
|---|---|---|---|
| Editas Medicine | Dec. 21, 2020 – Mar. 4, 2021 | 80 | $2,803 |
| Hubspot | Jan. 25, 2021 | 5 | $2,417 |
| Idexx Labs | Jan. 6, 2021 | 5 | $2,738 |
| Snowflake | Dec. 15, 2020 – Mar. 8, 2021 | 27 | $6,566 |
| Zoom Video Communications | Dec. 31, 2020 – Mar. 8, 2021 | 15 | $4,907 |

The stakes in Editas Medicine, Hubspot, Snowflake, and Zoom are held jointly by Mr. McRitchie

and his wife, while the stake in Idexx is held by Mr. McRitchie individually.

116.    For each of the foregoing companies, Mr. McRitchie plans to submit a shareholder

proposal as soon as possible.  For Editas Medicine, Hubspot, Idexx Labs, and Snowflake, Mr.

McRitchie plans to submit proposals to declassify the board of directors and require annual

elections.  For Zoom, Mr. McRitchie plans to submit a proposal to permit shareholders to place

board nominees on the company's proxy statement.

117.    Under the prior version of Rule 14a-8, Mr. McRitchie's stakes in those companies

would have made him eligible to submit a proposal as soon as he had held $2,000 in stock for one

year.  Under the new rule, however, Mr. McRitchie would either have to substantially increase his

holdings to bring them up to the new $25,000 minimum, or else wait for *three* years to be eligible. Mr. McRitchie does not currently plan to increase his holdings to $25,000, because he wants to maintain a broadly diversified portfolio.  The SEC's new rule will therefore require Mr. McRitchie to wait *two additional years* before submitting a proposal.

118.    Those delays will cause significant harm.  They will put off value-enhancing corporate governance reforms at the companies for at least two more years, to the prejudice of both Mr. McRitchie and other shareholders.  They will also tie up Mr. McRitchie's funds and prevent him from investing in other companies that might present better investment opportunities or other compelling candidates for governance reform.

119.    In some instances, Mr. McRitchie's wife owns stock in the same companies that he does.  For example, while Mr. McRitchie owns 5 shares of Idexx Labs stock, Mr. McRitchie's wife also separately owns an additional 5 shares of Idexx Labs stock.  But for the Commission's prohibition on aggregation, Mr. McRitchie and his wife could combine their holdings for purposes of the ownership requirements.

120.    Mr. McRitchie often submits proposals through a representative (typically John Chevedden).  Sometimes, his representative also represents another shareholder submitting a proposal for the same shareholder meeting, or is submitting a proposal on his own behalf.  Within the past year alone, this occurred for proposals Mr. McRitchie submitted to Citigroup (Oct. 28, 2020), Goldman Sachs (Nov. 18, 2020), Bristol-Myers Squibb (Nov. 23, 2020), JPMorgan Chase (Dec. 6, 2020), and NortonLifeLock (Feb. 15, 2021).

121.    Mr. McRitchie plans to continue to submit proposals through a representative in the future.  Based on the recent history above, however, his representative of choice would likely often already represent someone else or be submitting a proposal on his own behalf.  The

Commission's new one-proposal-per-representative limitation thus harms Mr. McRitchie by preventing him from engaging his representative of choice.

122.    In some instances, Mr. McRitchie relies on his representative to engage with management when necessary over the proposal he is submitting.  That arrangement permits Mr. McRitchie and his representative to focus on tasks where each of them has more expertise.  The Commission's new requirement that shareholders personally engage with management, even when acting through a representative, will thus reduce the effectiveness of both Mr. McRitchie and his representative.

123.    The increased resubmission thresholds will also restrict Mr. McRitchie's ability to submit proposals.   Although Mr. McRitchie's proposals usually far exceed resubmission thresholds – and often obtain majority support – sometimes they do not.  So far this year, for example, Mr. McRitchie (alone or jointly with his wife) has submitted the following proposals on conversion to a public benefit corporation that yielded support between 3% and 5%:

| Company | Vote Date | Prior Submissions | Vote Result |
|---|---|---|---|
| S&P Global | May 5, 2021 | None | 3.8% |
| Tractor Supply | May 6, 2021 | None | 3.4% |

124.    Mr. McRitchie would plan to resubmit both proposals next year if permitted to do so.  But while a 3.8% or 3.4% vote would be sufficient to qualify for resubmission under the old 3% threshold, it is not sufficient under the new 5% threshold.  The SEC's new rule thus prohibits Mr. McRitchie from resubmitting the proposals.

125.    Finally, the SEC's new rule will have a grave impact on plaintiff As You Sow – particularly the restrictions on representatives.

35

126.     One of the services that As You Sow provides to shareholders and asset managers is representing them or their clients in the shareholder engagement process.  As You Sow provides those services to approximately three dozen asset managers interested in improving corporate performance on ESG issues.  The SEC's new rule will directly interfere with As You Sow's ability to provide those representation services.

127.     As You Sow represents a broad range of investors and often represents multiple shareholders who seek to submit proposals for the same shareholder meeting.  This year, for example, As You Sow submitted two different proposals for Caterpillar's June 9, 2021 shareholder meeting on behalf of two different shareholders: a proposal for disclosures related to climate activity on behalf of The Thornhill Company, and a proposal for annual reporting on diversity and inclusion on behalf of PCR Children's Trust.  Last year, As You Sow submitted proposals for Walmart's 2020 shareholder meeting on behalf of two different shareholders: one on the use of antibiotics in animal products and another on consumer packaging waste.  In total, over the past two years, As You Sow has submitted proposals on behalf of multiple shareholders for the same meeting more than a dozen times.

128.     But for the SEC's new restrictions on representatives, As You Sow would continue to represent multiple shareholders seeking to submit different proposals for the same meeting.  The SEC's arbitrary one-proposal-per-representative limit will frustrate As You Sow's ability to provide those services.  The new rule also threatens to undermine As You Sow's goodwill by putting As You Sow in the unenviable position of having to select between multiple important investor proposals at companies with a range of ESG-related issues.

129.     The SEC's new requirement that shareholders must personally engage with management about their proposals, rather than relying on experienced representatives to perform

those functions on their behalf, similarly interferes with As You Sow's corporate purpose. Many shareholders want to use their shares to improve company performance, but are ill-equipped and often unable to shoulder the burdens of engaging directly with large companies. Those shareholders engage representatives to undertake the time-consuming and knowledge-intensive tasks required to submit a proposal – just as they would hire bookkeepers, tax preparers, attorneys, and other professionals to perform tasks more efficiently and expertly than they could themselves. By prohibiting As You Sow from performing certain functions on behalf of shareholders, the SEC's rule arbitrarily limits the services As You Sow can provide.

130. The SEC's personal engagement requirement will discourage shareholders from submitting proposals. Many shareholders feel ill-equipped to bring their concerns to a company and are highly intimidated by the process. Many are already nervous enough about the prospect of having their names made public or receiving intimidating no-action letters sent directly to them. Those anxieties will only increase if shareholders must personally meet with corporate management to discuss their proposals, rather than relying on professional representatives to act for them. The SEC's new rule thus harms As You Sow by reducing the number of investors willing to engage the company's services as representative.

131. Requiring personal involvement of shareholders will not necessarily be helpful to the engagement process that follows submission of a proposal. Some shareholders may not realize the difficulty a company may face in changing course quickly; they may not be sensitive to the need for iterative steps; and they may be unwilling to compromise for anything less than 100% change. Personal shareholder participation thus has the potential to make it harder for As You Sow to facilitate constructive dialogue and achieve the beneficial actions shareholders seek.

## COUNT ONE

### ARBITRARY, CAPRICIOUS, AND NOT IN ACCORDANCE WITH LAW: DEFICIENT ECONOMIC ANALYSIS (5 U.S.C. § 706(2)(A))

132.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 to 131 above.

133.    Under the Administrative Procedure Act, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

134.    Under Section 3(f) of the Exchange Act, the Commission must consider the effect of a rule on "efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  That requirement obligates the Commission to conduct an adequate economic analysis to evaluate the costs and benefits of the rule.  Failure to conduct that analysis renders the rule "not in accordance with law" for purposes of the Administrative Procedure Act.

135.    The Commission failed to conduct the cost-benefit analysis required to justify its amendments to Rule 14a-8.  The Commission did not meaningfully quantify the impact of its new ownership requirements on shareholder proposals despite the availability of data that enabled it to estimate that impact.  The Commission claimed it had no information on investor holding periods and thus could not reliably estimate the impact of the rule's significant increases to the required holding periods.  Instead, the Commission offered only a range of estimates that ran the gamut from **no** shareholders satisfying the longer holding requirements to **all of them** satisfying those requirements.  Relying on that approach, the Commission estimated the reduction in the number of proposals as somewhere between **0%** and **56%** – an absurdly indeterminate range that provided no meaningful economic guidance at all.

136.    The Commission's assertion that it had no data on holding periods defied the administrative record.  Broadridge had submitted precisely that data for *tens of millions* of investor accounts.  While the Commission and its Chief Economist pointed to certain limitations in that data, they never found that the data was worse than *no data at all*.  Nor would the administrative record support such a finding.  In those circumstances, the Commission's refusal to use the Broadridge data to estimate holding periods, or to obtain the necessary data by other means, violated its obligation to quantify the impact of a rule when possible to do so.

137.    The Commission failed to quantify the costs and benefits of its rule in other respects too.  It acknowledged that commenters had cited numerous empirical studies measuring the value that shareholder proposals create.  But it refused to consider those studies because, in its view, the proposed rule was not intended to opine on the merits of shareholder proposals, and the matter was properly left to shareholders under state law.  That holding was plainly erroneous.  Nothing in the APA permits an agency to unilaterally exempt its rules from cost-benefit analysis merely because the agency announces that a rule is not intended to opine on costs.

138.    The Commission's remaining rationales were similarly deficient and did not justify refusing to consider empirical studies when the only alternative was not quantifying the benefits of shareholder proposals at all.  Without that information, the Commission could not conduct a meaningful cost-benefit analysis on the many proposals its more demanding ownership requirements and resubmission thresholds would exclude.  Only by ignoring those benefits entirely could the Commission seek to justify its rule based on the modest cost savings the rule would supposedly achieve.

139.    With respect to those purported cost savings, the Commission abdicated its responsibility to apply any meaningful scrutiny to the information commenters submitted.  After commenters showed that the Commission's initial cost estimates were much too high, the Commission declined to make any findings at all, and instead simply announced that the cost savings would fall somewhere between the lowest and highest numbers submitted – an enormous range that provided no meaningful guidance on the purported benefits of the rule.

140.    As for the costs imposed on shareholder-proponents, the Commission refused to make any quantification at all.  It claimed without any evidence that the costs would be "relatively modest"; it downplayed those costs on the ground that only some shareholders submit proposals; and it suggested that shareholders could ***benefit*** from the new rule by earning dividends and capital gains while waiting three years to be eligible to submit a proposal.  None of those theories was an adequate reason not to quantify costs.

141.    The Commission's cost-benefit analysis was thus lacking in numerous respects. Those deficiencies infected not only the ownership requirements but also the resubmission thresholds and the other mandates designed to reduce the number of proposals.  For all the reasons above, the Commission's rule was arbitrary, capricious, and not in accordance with law.

142.    Plaintiffs and their members are adversely affected by the final rule because it restricts their ability to submit shareholder proposals and increases the costs of doing so.

143.    Plaintiffs are accordingly entitled to a judgment vacating the final rule in its entirety and declaring that the rule is arbitrary, capricious, and not in accordance with law.

## COUNT TWO

### ARBITRARY, CAPRICIOUS, AND NOT IN ACCORDANCE WITH LAW: RESTRICTIONS ON AGGREGATION AND REPRESENTATIVES (5 U.S.C. § 706(2)(A))

144.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 to 143 above.

145.    Even apart from its deficient economic analysis, the Commission violated the Administrative Procedure Act by imposing sharp new restrictions on the aggregation of shareholdings and the engagement of representatives.  The Commission provided no coherent justification for those new restrictions.

146.    The Commission abolished its longstanding policy allowing shareholders to aggregate holdings to meet ownership requirements on the ground that aggregation "undermine[d] the goal of ensuring that *each* shareholder who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company."  That rationale is wholly question-begging because it assumes that what matters is whether "each shareholder" can satisfy the ownership requirement, rather than the group of shareholders collectively.  The Commission identified no reason to expect that a proposal submitted on behalf of a group of shareholders would be any costlier or less likely to benefit shareholders than a proposal submitted on behalf of an individual shareholder who owned the same number of shares.

147.    The Commission acknowledged that groups of shareholders who owned their shares jointly could submit a proposal as a group.  Shareholders could also pool their resources by forming a partnership or other legal entity to hold the shares.  The Commission's rule arbitrarily distinguishes between those forms of joint ownership and the longstanding practice of aggregation that the rule now prohibits.

148.   The Commission imposed similarly arbitrary limits on the use of representatives. It prohibited representatives from acting for more than one shareholder for the same meeting, citing concerns about "the expense and obscuring effect of including multiple proposals in the company's proxy materials."  That rationale is simply an argument that there should be fewer shareholder proposals.  It does not explain why proposals should be singled out for exclusion merely because two shareholders with different proposals happen to use the same representative.

149.   The fact that two shareholders engage the same representative does not make their proposals any more costly to process than if each shareholder had submitted a proposal through a separate representative.  Nor does it reduce the potential benefits of the proposals.  Absent some such rationale, the Commission's one-proposal-per-representative rule is simply an arbitrary means of reducing the number of proposals – a rule that singles out certain proposals for exclusion without any rational reason to treat them less favorably than other proposals.

150.   The Commission similarly failed to justify its new rule that shareholder-proponents must personally engage with corporate management, rather than relying on representatives to act on their behalf.  The Commission reasoned that "a shareholder-proponent who elects to require a company to include a proposal in its proxy statement, requiring the company and other shareholders to bear the related costs, should be willing and available to discuss the proposal with the company and not simply rely on its representative to do so."  That is no justification at all:  The Commission cannot impose additional costs and inconvenience on certain shareholder-proponents merely because it thinks they should be willing to bear those costs.

151.   The Commission did not find that management engagement would be facilitated by forcing shareholders to personally interact with management, rather than relying on expert and experienced professionals to interact on their behalf.   The Commission's rule was a blunt

instrument designed to reduce the number of shareholder proposals by making the process more costly, inconvenient, and intrusive.

152.     Plaintiffs and their members are adversely affected by the foregoing provisions of the rule because the provisions prohibit them from aggregating their holdings to meet ownership requirements, preclude them from acting as representatives on behalf of multiple shareholders, preclude them from engaging a representative who is already acting for another shareholder, and discourage them and their clients from submitting proposals through representatives.

153.     Plaintiffs are accordingly entitled to a judgment vacating the foregoing provisions of the rule and declaring that they are arbitrary, capricious, and not in accordance with law.

## COUNT THREE

### EXCESS OF STATUTORY AUTHORITY
### (5 U.S.C. § 706(2)(C))

154.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 to 153 above.

155.     Under the Administrative Procedure Act, a court must set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

156.     Section 14 of the Exchange Act establishes certain requirements for the proxy solicitation process and empowers the Commission to regulate that process, primarily through disclosure rules.  By contrast, the statute leaves regulation of other aspects of the proxy voting process to state law.

157.     State agency law has historically regulated the authority of representatives to act on behalf of their principals.  State agency law has thus determined whether there is some numerical limit on the number of clients a particular representative may represent, or whether multiple parties

may engage the same representative.  State law has also determined the scope of a representative's authority to engage with a company on behalf of a client without the client's personal involvement.

158.    The Exchange Act does not give the SEC any general authority to rewrite those principles of state agency law.

159.    Nonetheless, the final rule purports to do precisely that by sharply restricting the number of clients a representative may represent and prohibiting representatives from acting on behalf of their clients during management engagement meetings without the client's personal involvement.  Those provisions improperly invade the details of state agency law without any reasonable connection to the SEC's mandate under the federal securities laws.  The provisions thus exceed the SEC's statutory authority.

160.    Plaintiffs and their members are adversely affected by the foregoing provisions of the rule because those provisions preclude them from acting as representatives on behalf of multiple shareholders, preclude them from engaging a representative who is already acting for another shareholder, and discourage them and their clients from submitting proposals through representatives.

161.    Plaintiffs are accordingly entitled to a judgment vacating the foregoing provisions of the final rule and declaring that they exceed the SEC's statutory authority.

## **COUNT FOUR**

### **FAILURE TO OBSERVE PROCEDURES REQUIRED BY LAW (5 U.S.C. § 706(2)(D))**

162.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 to 161 above.

163.    Under the Administrative Procedure Act, a court must set aside agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

164.    In August 2019, months before it promulgated its proposed rule, the SEC received investment data for tens of millions of investor accounts from Broadridge Financial Solutions, Inc. That data included information about the durations for which shareholders held the securities.  The SEC's staff analyzed that data and drew conclusions about the impact of increased ownership requirements on the number of eligible proposals.  The SEC's Chief Economist, however, declined to adopt that analysis based on purported concerns over limitations of the data.  The Commission concealed the data until August 14, 2020 – more than six months after the comment period ended, and a mere month before it issued the final rule.

165.    The Commission acted improperly by adding the Broadridge data and the staff analysis to the comment file only after the comment period had closed.  The agency was obligated to provide an opportunity for meaningful public comment on the data and analysis.  Its failure to timely disclose the data severely restricted the public's ability to comment on the data and to attempt to persuade the SEC to rely on the data despite its alleged imperfections.  The Commission thus failed to observe procedures required by law.

166.    Plaintiffs and their members were adversely affected by the Commission's failure to disclose the Broadridge data and its staff's analysis of that data because they were denied a meaningful opportunity to comment on that data and to persuade the SEC to change course.

167.    Plaintiffs are accordingly entitled to a judgment vacating the final rule in its entirety and remanding the case to the agency for further proceedings.

## COUNT FIVE

### PRETEXTUAL JUSTIFICATION

168.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 to 167 above.

169.    The Administrative Procedure Act requires federal agencies to provide a thorough explanation of the significant regulatory decisions and choices embodied in all final rules.

170.    The Commission purported to justify its rule based on the need to reduce the costs imposed by shareholder proposals.  But the Commission's true reason for promulgating the rule was corporate management opposition to the substance of many types of shareholder proposals, particularly those addressing environmental and social issues.

171.    The public is entitled to know the Commission's actual rationale for the rule. Because the Commission's stated justification for the rule was not its actual one, the Court should vacate the rule and remand the case to the SEC to supplement the administrative record with its actual rationale for adopting the rule.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

a.     enter judgment in plaintiffs' favor;

b.     vacate and set aside the Commission's final rule in its entirety;

c.     declare that the final rule is arbitrary, capricious, and not in accordance with law;

d.     declare that the Commission exceeded its statutory authority;

e.     declare that the Commission failed to comply with required procedures;

f.     issue a permanent injunction prohibiting the Commission from enforcing the final rule; and

g.     grant such other and further relief as the Court may deem appropriate.

Dated:   June 15, 2021             Respectfully submitted,
         Washington, D.C.


Eric A. Posner                     _____
(*pro hac vice forthcoming*)       Robert K. Kry
MOLOLAMKEN LLP                     D.C. Bar #490545
300 North LaSalle Street           Sarah J. Newman
Chicago, IL  60654                 (*admission pending*)
                                   MOLOLAMKEN LLP
                                   The Watergate, Suite 500
                                   600 New Hampshire Avenue, N.W.
                                   Washington, D.C.  20037
                                   Tel.: (202) 556-2011
                                   Fax: (202) 556-2001
                                   rkry@mololamken.com

                    *Attorneys for Plaintiffs*

47