**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERFAITH CENTER ON CORPORATE RESPONSIBILITY, JAMES McRITCHIE, and AS YOU SOW,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Defendant. | No. 1:21-cv-01620-RBW |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, plaintiffs respectfully move for summary judgment on Counts I through IV of the Complaint. This motion is supported by the accompanying memorandum of points and authorities, by the administrative record (relevant excerpts of which will be filed in a joint appendix after the completion of briefing), and by the accompanying declarations of Josh Zinner, James McRitchie, and Danielle Fugere establishing plaintiffs' standing to bring this action.

As explained in the accompanying memorandum, plaintiffs are entitled to summary judgment because the Securities and Exchange Commission's recent amendments to Rule 14a-8 violate the Administrative Procedure Act in multiple respects. The Commission failed to quantify the impact of its new ownership requirements on the number of shareholder proposals that would remain eligible for submission, despite obtaining data from Broadridge Financial Solutions that permitted it to estimate that impact. That failure to conduct a meaningful economic analysis renders the rule arbitrary, capricious, and not in accordance with law. The

Commission also violated the APA's procedural requirements by concealing the existence of the Broadridge data until six months after the comment period ended.

The Commission compounded those failures by refusing to conduct a proper economic analysis of the rule's costs and benefits. It failed entirely to quantify either the benefits of shareholder proposals that would be lost under its new rule or the costs the rule would impose on shareholder proponents. It also conducted an inadequate analysis of the rule's purported cost savings, relying on unreliable financial information without any serious scrutiny.

The Commission's new prohibition on aggregation of ownership is arbitrary and capricious. And its new restrictions on representatives are arbitrary and capricious and exceed its authority by intruding on traditional state agency law.

Plaintiffs accordingly seek a judgment declaring the SEC's final rule unlawful under the Administrative Procedure Act and vacating the rule in its entirety. A proposed order is attached.

Dated:    September 20, 2021             Respectfully submitted,
          Washington, D.C.


                                          /s/ Robert K. Kry
                                         Robert K. Kry
Eric A. Posner                           D.C. Bar #490545
(*pro hac vice*)                         Sarah J. Newman
MOLOLAMKEN LLP                           D.C. Bar #1047210
300 North LaSalle Street                 MOLOLAMKEN LLP
Chicago, IL  60654                       The Watergate, Suite 500
                                         600 New Hampshire Avenue, N.W.
                                         Washington, D.C.  20037
                                         Tel.: (202) 556-2011
                                         Fax: (202) 556-2001
                                         rkry@mololamken.com

                         *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INTERFAITH CENTER ON CORPORATE
RESPONSIBILITY, JAMES McRITCHIE,
and AS YOU SOW,

               Plaintiffs,

    v.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

          Defendant.

No. 1:21-cv-01620-RBW

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Eric A. Posner
(*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654

Robert K. Kry
D.C. Bar #490545
Sarah J. Newman
D.C. Bar #1047210
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2011
Fax: (202) 556-2001
rkry@mololamken.com

*Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

I.     Background ................................................................................................................ 3

     A.     Shareholder Proposals ................................................................................ 3

     B.     SEC Rule 14a-8 .......................................................................................... 5

     C.     Plaintiffs and Their Proposals .................................................................... 6

II.    The SEC's Rulemaking ........................................................................................... 7

     A.     The Proposed Rule ..................................................................................... 7

     B.     Comments on the Proposed Rule ............................................................... 8

     C.     The Broadridge Data .................................................................................. 11

     D.     The Final Rule ............................................................................................ 13

     E.     The Harm to Plaintiffs .............................................................................. 16

ARGUMENT ....................................................................................................................... 18

I.     The Commission Failed To Quantify the Impact of Its Rule on the Number
     of Shareholder Proposals ........................................................................................ 20

     A.     The Commission Arbitrarily Refused To Quantify the Economic Impact of
           Its Rule Despite the Broadridge Data Permitting Such Quantification ............... 20

     B.     The Commission Improperly Concealed the Broadridge Data Until the
           Very End of Its Rulemaking ...................................................................... 26

II.    The Commission Failed To Quantify the Costs and Benefits of Its Rule ........................ 29

     A.     The Commission Refused To Quantify the Benefits of Shareholder
           Proposals .................................................................................................... 29

     B.     The Commission Failed To Scrutinize the Cost Savings Data ............................ 34

     C.     The Commission Failed To Quantify the Costs to Shareholder Proponents ........ 36

III.   The Commission's New Restrictions on Aggregation and Representatives
     Are Unlawful ........................................................................................................... 38

A.  The Commission's Elimination of Its Ownership Aggregation Rule Was Arbitrary and Capricious................................................................. 38

B.  The Commission's Representation Limits and Personal Engagement Requirement Are Arbitrary and Capricious............................................ 40

C.  The Commission's Restrictions on Representatives Exceed Its Statutory Authority ................................................................................ 42

CONCLUSION..................................................................................................... 44

# **TABLE OF AUTHORITIES**

Page(s)

## CASES[1]

*Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010) ...........................................21

*Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27 (D.D.C. 2017) ..............................35

*Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975 (D.C. Cir. 1991) ....................................................27

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) .....................................................39

*Bennett v. Spear*, 520 U.S. 154 (1997) ..........................................................................................19

\* *Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990).............................................................42

\* *Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)..................................................*passim*

\* *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).........................................*passim*

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)....................................................28

*Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329 (D.C. Cir. 2004)............................................38

\* *Conn. Light & Power Co. v. NRC*, 673 F.2d 525 (D.C. Cir. 1982) ......................................26, 27

*Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006) ....................................................19

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ......................................19, 20

*CTS Corp. v. EPA*, 759 F.3d 52 (D.C. Cir. 2014)........................................................................27

*FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986) .............................................................................40

\* *Kennecott Corp. v. EPA*, 684 F.2d 1007 (D.C. Cir. 1982) .............................................26, 27, 28

*Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016) ..........................................................................22

\* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................19, 35, 41

*N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) ....................................................21

*Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359 (D.C. Cir. 2014) ........................................................22

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
    494 F.3d 188 (D.C. Cir. 2007)........................................................................................26

---

[1] Authorities on which we chiefly rely are marked by an asterisk.

*Reo v. U.S. Postal Serv.*, 98 F.3d 73 (3d Cir. 1996) ..................................................................42

*S. Co. Servs., Inc. v. FERC*, 416 F.3d 39 (D.C. Cir. 2005) ........................................................38

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) ................................................................42

*Teicher v. SEC*, 177 F.3d 1016 (D.C. Cir. 1999) ......................................................................42

## STATUTES AND REGULATIONS

5 U.S.C. § 553(b)(3) ....................................................................................................................26

5 U.S.C. § 553(c) .........................................................................................................................26

5 U.S.C. § 706(2)(A) ..............................................................................................................18, 20

5 U.S.C. § 706(2)(C) ...................................................................................................................42

5 U.S.C. § 706(2)(D) ...................................................................................................................26

15 U.S.C. § 78c(f) ...................................................................................................................19, 20

15 U.S.C. § 78n ..............................................................................................................................5

15 U.S.C. § 78n(a) ..........................................................................................................................5

Securities Exchange Act of 1934, ch. 404, § 14, 48 Stat. 881, 895 ...............................................5

17 C.F.R. § 240.14a-4 .....................................................................................................................5

17 C.F.R. § 240.14a-6 .....................................................................................................................5

17 C.F.R. § 240.14a-8 ............................................................................................................*passim*

17 C.F.R. § 240.14a-8(b) .................................................................................................................5

17 C.F.R. § 240.14a-8(d) .................................................................................................................5

17 C.F.R. § 240.14a-8(e) .................................................................................................................5

17 C.F.R. § 240.14a-8(i)(7) .............................................................................................................5

17 C.F.R. § 240.14a-8(i)(12) ...........................................................................................................6

ADMINISTRATIVE MATERIALS

19 Fed. Reg. 246 (Jan. 14, 1954) ....................................................................................6

41 Fed. Reg. 52,994 (Dec. 3, 1976) .............................................................................6, 15

48 Fed. Reg. 38,218 (Aug. 23, 1983) .......................................................................5, 6, 38

62 Fed. Reg. 50,682 (Sept. 26, 1997) ............................................................................3

63 Fed. Reg. 29,106 (May 28, 1998) ............................................................................6

84 Fed. Reg. 66,458 (Dec. 4, 2019) ..................................................................... *passim*

85 Fed. Reg. 70,240 (Nov. 4, 2020) ..................................................................... *passim*

Am. Sec. Ass'n, Comment Letter in File No. 4-725, *Reforms to the U.S. Proxy
System* (June 7, 2019) ...............................................................................................35

Comm'r Caroline A. Crenshaw, *Statement on Procedural Requirements and
Resubmission Thresholds Under Exchange Act Rule 14a-8* (Sept. 23, 2020) ........16

Div. of Risk, Strategy & Fin. Innovation & Off. of Gen. Counsel,
U.S. Sec. & Exch. Comm'n, *Memorandum re: Current Guidance
on Economic Analysis in SEC Rulemakings* (Mar. 16, 2012) ................................22

Comm'r Allison Herren Lee, *Statement on the Amendments to Rule 14a-8*
(Sept. 23, 2020) ...................................................................................................9, 16

Off. of Investor Advocate, U.S. Sec. & Exch. Comm'n, *Report on Activities:
Fiscal Year 2020* (2020) .....................................................................................13, 29

U.S. Sec. & Exch. Comm'n, *Comments on Proposed Rule: Procedural
Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8,*
https://www.sec.gov/comments/s7-23-19/s72319.htm .............................................8

U.S. Sec. & Exch. Comm'n, Exchange Act Release No. 34-3347,
1942 WL 34864 (Dec. 18, 1942) ...............................................................................5

U.S. Sec. & Exch. Comm'n, Exchange Act Release No. 34-62495,
*Concept Release on the U.S. Proxy System* (July 14, 2010) ....................................11

U.S. Sec. & Exch. Comm'n, Press Release No. 2019-232, *SEC Proposes
Amendments To Modernize Shareholder Proposal Rule* (Nov. 5, 2019) ..................8

U.S. Sec. & Exch. Comm'n, Press Release No. 2020-220, *SEC Adopts
Amendments To Modernize Shareholder Proposal Rule* (Sept. 23, 2020) ..............13

U.S. Sec. & Exch. Comm'n, *Sunshine Act Meetings* (Aug. 14, 2020) .........................28

## OTHER AUTHORITIES

Tamas Barko *et al.*, *Shareholder Engagement on Environmental, Social,
and Governance Performance* (2021) .......................................................................33

BlackRock, Inc., *Our 2021 Stewardship Expectations* (2020) .......................................................3

Vicente Cuñat *et al.*, *The Vote Is Cast: The Effect of Corporate Governance
on Shareholder Value*, 67 J. Finance 1943 (2012)............................................31, 33

Matthew R. Denes *et al.*, *Thirty Years of Shareholder Activism:
A Survey of Empirical Research*, 44 J. Corp. Fin. 405 (2017)................................31

Diligent Institute, *The High Cost of Governance Deficits* (2019) ...........................................10, 30

Gunnar Friede *et al.*, *ESG and Corporate Financial Performance* (Dec. 2015)......................4, 31

H.R. Rep. No. 115-904 (2018)....................................................................................35

*Restatement (Third) of Agency* (2006)........................................................................43

*Securit[ies] and Exchange Commission Proxy Rules: Hearings Before
the H. Comm. on Interstate and Foreign Commerce*, 78th Cong.
(June 9-11, 1943) ..................................................................................................43

Plaintiffs Interfaith Center on Corporate Responsibility ("ICCR"), James McRitchie, and As You Sow respectfully submit this memorandum of points and authorities in support of their motion for summary judgment on Counts I through IV of the Complaint.

## **INTRODUCTION**

This is an action under the Administrative Procedure Act challenging the Securities and Exchange Commission's recent amendments to Rule 14a-8.  That rule allows shareholders to submit for inclusion in a company's proxy statement proposals that ask the company to consider additional disclosures, policies, or governance changes.  Shareholders typically submit such proposals in the belief that they will benefit the company and increase or protect shareholder value.  Shareholder proposals are an important engine of corporate democracy, permitting shareholders to raise concerns with corporate management, to manage risk, and to create and protect long-term value.

The SEC's amendments severely impair shareholders' access to the proposal process. They dramatically increase the amount of stock a shareholder must own to submit a proposal, including a more than ***ten-fold increase*** for investments held for only one year.  They make it much more difficult to resubmit a proposal that was submitted in an earlier year.  And they arbitrarily prohibit shareholders from aggregating their holdings or relying on experienced and knowledgeable representatives to draft and submit proposals on their behalf.

The SEC's justifications for the amendments were flawed at every turn.  The Commission recognized that it had a legal obligation to provide an economic analysis of the costs and benefits of the proposed rule.  But it made no meaningful effort to analyze the number of proposals that would be excluded by its new ownership requirements – an essential building block for any cost-benefit analysis.  The Commission claimed it could not do so because it lacked data on how long shareholders hold their shares.  But the Commission did in fact have

that data:   The Commission had secretly requested and obtained a trove of anonymized shareholder data from Broadridge Financial Solutions, Inc., the firm that distributes the vast majority of proxy materials to investors.  That data enabled the SEC to estimate holding periods. The Commission nonetheless concealed that data from the public, belatedly disclosed it only after the comment period ended, and then arbitrarily asserted that the data contained no useful information about holding periods based on minor quibbles that were both unfounded and inadequate to justify the Commission's decision.

The Commission's cost-benefit analysis was also deficient in many other respects. Commenters provided numerous examples of shareholder proposals enhancing shareholder value by promoting greater awareness and responsiveness to risks.  They cited the rich empirical literature analyzing those benefits.  Yet the Commission arbitrarily refused to quantify those benefits.  That failure left the Commission fundamentally unable to weigh those benefits against the meager cost savings its rule would supposedly provide.  The Commission then compounded that problem by invoking unreliable data to determine those cost savings.

Finally, the Commission imposed arbitrary limits on ownership aggregation and the use of representatives.  The Commission justified those amendments largely on the ground that they would reduce the number of proposals.  But the Commission offered no justification for singling out these types of proposals from any others.  As with much of its rule, the Commission seemingly pursued a policy of reducing shareholder proposals by any means necessary.

The Commission's rule was arbitrary, capricious, and not in accordance with law.  The Commission also disregarded basic procedural requirements by concealing the critical Broadridge data until long after the comment period ended, and it exceeded its authority by intruding on state agency law without any statutory mandate to do so.  Plaintiffs accordingly seek

a judgment declaring the SEC's final rule unlawful under the Administrative Procedure Act and vacating the rule in its entirety.[1]

## STATEMENT OF FACTS

### I.  BACKGROUND

#### A.  Shareholder Proposals

When investors buy shares in a company, they are entitled not only to receive a return on their investment, but also to vote on how the company is run.  A113:2.  In addition to electing directors and voting on management proposals, shareholders ordinarily have the right under state law to submit their own proposals for consideration at the annual shareholder meeting.  62 Fed. Reg. 50,682, 50,683 (Sept. 26, 1997).  Shareholders typically seek to have those proposals included in the proxy materials the company sends out to shareholders so that other shareholders are aware of the proposals when casting their votes.  *Id.* at 50,682.

Shareholder proposals are an important mechanism to monitor corporate management, raise significant issues, and guide corporate policies.  A816:13; A1175:2.  Although most shareholder proposals are not binding on management, a majority vote almost always leads to adoption, and even a minority vote often prompts meaningful change.  A816:9-10.  BlackRock, the world's largest asset manager, recently reported that companies adopted 94% of proposals that achieved majority support, and even where a proposal achieved only 30% to 50% support, the company responded by making changes 67% of the time.  *See* BlackRock, Inc., *Our 2021 Stewardship Expectations* 5 (2020).

Many shareholder proposals focus on corporate governance reform.  Some have sought to eliminate staggered boards of directors in which only certain directors stand for election each

---

[1] Documents from the administrative record are cited throughout by index number and page number as "A__:___." The Commission's proposing release and final rule appear as Document Nos. 1 and 1279, respectively.

year – an arrangement that makes it more difficult for minority shareholders to elect directors and facilitates management entrenchment.  A113:25; A933:6.  Others have sought to establish independent board chairs, require majority voting for elections, and claw back unearned compensation.  A113:9, 25; A933:6.  A common theme is overcoming the problems that arise when managers seek to advance their own interests rather than the interests of shareholders.

Other proposals address the growing risks of environmental and social issues to long-term shareholder value.  A113:4.  Investment strategies that incorporate consideration of environmental, social, and governance ("ESG") issues are surging:  Bank of America Merrill Lynch forecasts over $20 trillion in growth in ESG funds over the next two decades.  A816:3 & n.8.  An extensive academic literature confirms the link between ESG policies and corporate performance.  *See, e.g.*, A816:6 & n.17 (citing Gunnar Friede *et al.*, *ESG and Corporate Financial Performance* 7 (Dec. 2015) (performing meta-analysis on studies since 1970)).

Climate change in particular has become an increasing focus of shareholder proposals.  A113:6.  Although early proposals received low levels of support, a growing awareness of the potentially catastrophic impact of climate change on long-term shareholder value has led to majority votes on a number of proposals seeking climate-related actions and disclosures.  A816:12.  Other areas where shareholder proposals have played a major role highlighting risks to long-term shareholder value include political spending, board diversity, antibiotic resistance, and environmental sustainability.  A113:24-25; A816:11; A1175:2.

Shareholder proposals often act as an early warning system by bringing outside perspectives to the attention of the board of directors.  A816:1, 11-13.  The mere threat of a proposal may induce management to adopt more accountable governance structures, especially

4

where high-profile initiatives are underway across the broader investor community.  A816:10 &
n.36.  Shareholder proposals thus have impacts well beyond the companies that receive them.

While some shareholders submit their own proposals, many rely on representatives to act
for them.  Shareholder representatives offer their expertise and experience to help shareholders
craft effective proposals, navigate the proposal submission process, effectively engage with
management, and negotiate resolutions that address the serious issues raised.  A813:2-3, 7-9;
A1037:11; A1175:9-11.

### B.    SEC Rule 14a-8

In 1934, Congress enacted Section 14 of the Securities Exchange Act to curb abuses of
the proxy process.  Securities Exchange Act of 1934, ch. 404, § 14, 48 Stat. 881, 895 (codified as
amended at 15 U.S.C. § 78n).  That provision grants the Securities and Exchange Commission
authority to regulate the form and content of proxy statements.  15 U.S.C. § 78n(a).  The
Commission has promulgated a number of rules pursuant to that authority dictating what details
companies must include.  *See, e.g.*, 17 C.F.R. §§ 240.14a-4, 240.14a-6.

One of the Commission's proxy rules is Rule 14a-8, 17 C.F.R. § 240.14a-8.  Originally
promulgated in 1942, that rule requires public companies to include shareholder proposals in
their proxy statements, subject to various conditions.  U.S. Sec. & Exch. Comm'n, Exchange Act
Release No. 34-3347, 1942 WL 34864 (Dec. 18, 1942) (codified as amended at 17 C.F.R.
§ 240.14a-8).  Rule 14a-8 sets deadlines and word limits for proposals and supporting statements.
17 C.F.R. § 240.14a-8(d)-(e).  It also allows management to exclude proposals on various
grounds – for example, if they concern only ordinary business operations.  *Id.* § 240.14a-8(i)(7).

Rule 14a-8 requires shareholders to satisfy eligibility criteria when submitting a proposal.
17 C.F.R. § 240.14a-8(b).  In 1983, the Commission added a requirement that a shareholder must
have held at least $1,000 worth of stock in a company for at least one year.  48 Fed. Reg. 38,218,

38,219, 38,222 (Aug. 23, 1983).  In 1998, the Commission raised that requirement to $2,000 but declined to impose a higher limit "in light of rule 14a-8's goal of providing an avenue of communication for small investors."   63 Fed. Reg. 29,106, 29,111-12 (May 28, 1998). Traditionally, the Commission allowed investors to aggregate their holdings to satisfy those requirements.  48 Fed. Reg. at 38,219 n.5.  Thus, two shareholders who did not individually hold enough stock, but who collectively owned more than $2,000 in stock for more than a year, could pool their resources and submit a joint proposal.

Historically, Rule 14a-8 was silent on the use of representatives.  The rule thus did not disturb state agency law addressing whether or how shareholders could rely on someone else to act on their behalf in submitting a proposal.  In 1976, the Commission limited the number of proposals each *shareholder* could submit for any particular shareholder meeting.  41 Fed. Reg. 52,994, 52,995-96 (Dec. 3, 1976).  But the rule did not prohibit multiple shareholders from choosing to engage the same representative to act on their behalf.

The SEC has also long imposed modest limitations on the resubmission of proposals. Since 1954, Rule 14a-8 has prohibited shareholders from resubmitting substantially the same proposal (or more recently, a proposal on "substantially the same subject matter") for three years, unless the proposal achieved a specified level of support: 3% if the proposal was voted on once during the past five years, 6% if voted on twice, and 10% if voted on three or more times.  19 Fed. Reg. 246, 246 (Jan. 14, 1954) (codified as amended at 17 C.F.R. § 240.14a-8(i)(12)).

### C.     Plaintiffs and Their Proposals

Plaintiffs are organizations and individuals who play a variety of roles in the shareholder proposal process.

Plaintiff Interfaith Center on Corporate Responsibility is a coalition of more than 300 institutional investors.  A816:1.  ICCR's members are a cross-section of religious investors,

foundations, asset managers, pension funds, and other long-term institutional investors.  *Id.*
They have nearly 50 years of experience as pioneers in the shareholder proposal process, and
their long-term engagement on ESG issues has brought about valuable improvements in
corporate accountability and transparency.  *Id.*  ICCR member Mercy Investments, for example,
submitted a proposal that convinced U.S. Steel to set quantitative, science-based greenhouse gas
emission reduction targets.  A816:10.  ICCR members School Sisters of Notre Dame and Sisters
of the Presentation submitted a proposal that persuaded WEC Energy Group and CMS Energy to
report on how their business plans align with the Paris Agreement.  A816:11.

Plaintiff James McRitchie is a shareholder advocate who frequently submits proposals on
corporate governance issues.  A1035:1.  His proposals are regularly successful.  In 2019, for
example, Mr. McRitchie's proposals averaged more than 50% support.  A2:1.  All of those
proposals sought to make corporations more democratic and accountable.  *Id.*  Shareholders
depend on retail investors like Mr. McRitchie to initiate governance reforms, particularly at new
and smaller companies.  A1035:22.

Plaintiff As You Sow is a non-profit corporation dedicated to promoting environmental
and social corporate responsibility through shareholder advocacy, coalition building, and
innovative legal strategies.  A1175:1.  For over 25 years, it has represented shareholders
submitting proposals on issues affecting corporate value, reputation, and risk.  A1175:1-2.  In
2019, proposals submitted or co-filed by As You Sow that went to a vote achieved 27% support
on average, with votes in favor totaling $1.1 trillion in shareholder equity.  A1175:7.

## II.   THE SEC'S RULEMAKING

### A.      The Proposed Rule

On November 5, 2019, the Commission issued a proposed rule that made several major
changes to the requirements for shareholder proposals.  84 Fed. Reg. 66,458, 66,515 (Dec.

4, 2019) (A1); U.S. Sec. & Exch. Comm'n, Press Release No. 2019-232, *SEC Proposes Amendments To Modernize Shareholder Proposal Rule* (Nov. 5, 2019).   According to the Commission, the amendments were meant to "modernize" and "update" the rule.   Press Release No. 2019-232.   The Commission noted that the ownership requirements and resubmission thresholds had not changed since 1998 and 1954, respectively.   84 Fed. Reg. at 66,459-60 & nn.8, 11.   It pointed to "significant changes" over the intervening years, including changes in "the types and use of communications, the types and frequency of shareholder-company engagement and the substantial shift to investing through mutual funds and ETFs, rather than directly by Main Street investors."   Press Release No. 2019-232.   The Commission claimed that the amendments would "facilitate and encourage meaningful company-shareholder engagement, and make changes that can help prevent misuse of the [shareholder proposal] process."   *Id.*

The Commission's proposed rule sharply increased the ownership requirements for proposals, both in terms of the number of shares the shareholder must own and the length of time for which the shareholder must own them.   84 Fed. Reg. at 66,463.   It prohibited shareholders from aggregating holdings.   *Id.* at 66,464.   It also limited shareholders' ability to act through representatives by prohibiting representatives from submitting proposals for more than one shareholder and by requiring shareholders to make themselves personally available to engage with management rather than relying on their representatives.   *Id.* at 66,467-68.   Finally, the proposed rule substantially increased the resubmission thresholds that applied to proposals already submitted at a prior meeting.   *Id.* at 66,471.

### B.   Comments on the Proposed Rule

The Commission received thousands of comments.   *See* U.S. Sec. & Exch. Comm'n, *Comments on Proposed Rule: Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8*, https://www.sec.gov/comments/s7-23-19/s72319.htm.   Commenters

overwhelmingly opposed the rule.  On the new ownership requirements, for example, comments opposing the amendments outnumbered comments in favor by more than 15 to 1.  Comm'r Allison Herren Lee, *Statement on the Amendments to Rule 14a-8* (Sept. 23, 2020).

Commenters urged that the new ownership requirements would drastically reduce the number of proposals that shareholders would submit.  A816:4.  The Commission, they argued, had not done an adequate analysis to quantify that impact, particularly with respect to the new holding periods.  A1175:5.  Commenters warned that the requirements would result in widespread exclusion of many small investors from the shareholder proposal process, even though many improvements in corporate policies result from resolutions brought by small shareholders.  *Id.*; A816:21.  Multiple for-profit asset managers agreed that proposals from small shareholders benefit their clients by strengthening investor understanding of corporate risks and opportunities.  A811:2; A1160:5-6.  Commenters also urged that the existing ownership requirements were sufficient to ensure a meaningful economic stake and that the Commission had shown no reason to tighten them:  The number of shareholder proposals had been ***decreasing*** in recent years, while approval rates were ***increasing***.  A113:23 & n.31; A933:1-2, 7-8 & n.16.

Commenters similarly objected to the new resubmission thresholds.  Emerging issues, they noted, often require a period of education and discussion before they achieve widespread support.  A816:23; A1175:8-9.  Resubmission permits a shareholder to refine and improve a proposal through dialogue with management and other investors, and many proposals prompt important changes without ever achieving majority support.  A816:10, 23.  The Commission's dramatically increased thresholds would cut short that process.  The impact would be particularly severe at companies with dual-class stock, where corporate insiders with disproportionate voting

power can cause a proposal to achieve a low level of reported support even where most outside investors support it.  A816:24.

Commenters urged that shareholder proposals have important benefits for shareholder value that the Commission was not adequately considering.  A113:2-4; A816:11-16; A933:5-6, 25, 32-33; A1175:6; A1220:3.  They pointed to the rich empirical literature documenting how proposals enhance shareholder value.  A816:6-7; A933:53; A945:5; A1170:4; A1175:6-7.  A 2019 report by the Diligent Institute, for example, found that companies with strong corporate governance policies outperformed those with poor policies by 15% over the most recent two-year period.  A1220:2 (citing Diligent Institute, *The High Cost of Governance Deficits* 4 (2019)).

Commenters also complained that the Commission was overestimating the cost savings the rule would achieve.  In the proposed rule, they noted, the Commission cited unreliable anecdotal reports in which companies claimed to have spent $100,000 or $150,000 responding to a proposal.  A816:17-19; A1175:6 (citing 84 Fed. Reg. at 66,461).  Commenters submitted contrary information showing that the actual costs were closer to $20,000.  A1175:6.  They also faulted the Commission for relying on inflated estimates that included the cost of management's own voluntary efforts to ***exclude and oppose*** a proposal, not merely the cost of ***including*** a proposal in the company's proxy materials.  A816:16-20; A933:26-31, 57.

Commenters highlighted the significant costs the rule would impose on shareholder proponents – particularly the disproportionate impact of the new ownership requirements on Main Street investors.  A2:4; A816:21; A1175:5.  They observed that shareholders are already under-incentivized to submit proposals, because the proponent alone must shoulder the costs of preparing and submitting a proposal, while the benefits of a successful proposal flow to all shareholders.  A816:20.

Commenters urged that the immense value of shareholder proposals far outstripped the modest cost savings the rule hoped to achieve.  Many proposals identify risks that threaten catastrophic losses to companies and their shareholders.  A113:19-20.  A study by Bank of America Merrill Lynch, for example, showed that greater attention to ESG matters could have helped companies predict and potentially avoid as many as 90% of bankruptcies.  A113:20 & n.25.  The trillions of dollars of shareholder value at stake were orders of magnitude greater than even the Commission's inflated estimate of $70.6 million in cost savings spread across thousands of U.S. companies.  A113:20-21.

Finally, commenters objected to the rule's arbitrary restrictions on representatives.  The Commission cited no evidence of any abuses relating to representatives, nor any other reason to interfere with shareholder-representative relationships governed by state agency law.  A816:26-27; A1175:9-11.  The requirement that shareholders personally interact with management after submitting the proposal, rather than relying on their representatives to act on their behalf, would discourage many shareholders from submitting proposals in the first place.  A1175:10.

### C.     The Broadridge Data

The public comment period ended on February 3, 2020.  84 Fed. Reg. at 66,458.  More than six months later, on August 14, 2020, the Commission added to the file a memorandum from the Chief Economist of its Division of Economic and Risk Analysis, along with a previously undisclosed staff analysis.  A1278.  That memorandum revealed that, approximately a year earlier in August 2019, the Commission had obtained a voluminous data set from Broadridge Financial Solutions, Inc., the leading service provider that most U.S. broker-dealers rely on to distribute the vast majority of proxy mailings to investors.  A1278:1 & n.3; *see* U.S. Sec. & Exch. Comm'n, Exchange Act Release No. 34-62495, *Concept Release on the U.S. Proxy System* 56 n.129 (July 14, 2010).

The Broadridge data showed holding periods and other information for an enormous sample of investor accounts.  The SEC staff analysis appended to the August 14 memorandum explained that the Broadridge data covered 6,820 U.S. companies with shareholder meetings between January 2015 and December 2017, and reflected holdings for 28,476,865 unique retail accounts.  A1278:4 n.8.  Analyzing that data, including the information on holding periods, the SEC staff concluded that increased ownership requirements similar to the ones the Commission proposed would result in a **50% to 78% reduction** in qualifying shareholdings.  A1278:8.  The staff also examined the impact at the company level and concluded that, for 22% to 55% of all companies, **fewer than 5%** of accounts would remain eligible.  *Id.*

The SEC's Chief Economist nonetheless refused to draw any conclusions from the Broadridge data or the staff analysis on that data, asserting several purported shortcomings. First, he claimed that the SEC's staff was "not able to confirm whether these accounts are limited to retail shareholding accounts," without explaining why that limitation mattered.  A1278:2. Second, he noted that the data did not exclude the possibility that some shareholders might hold the same stock through two different accounts.  *Id.*  Third, he observed that the data reflected only holdings as of the annual record dates before each shareholder meeting, rather than continuous data over time.  *Id.*  Finally, he asserted that the average holding periods for shareholders who submit proposals might be different from the average holding periods for shareholders generally that were reflected in the data.  A1278:2-3.

Despite having the Broadridge data in hand by August 2019, the SEC's November 2019 proposing release made no meaningful reference to it.  Footnote 245 contained only a brief, cryptic reference to the receipt of "some non-public retail share ownership data from a market participant who requested confidential treatment for the data."  84 Fed. Reg. at 66,498 n.245.

After the SEC belatedly revealed the Broadridge data and the staff analysis, several commenters objected to the timing of this important disclosure. A1224:1. They requested that the Commission reopen the comment period so members of the public could provide input on the Broadridge data and the Commission's questionable treatment of it. *Id.* The Commission rejected that request. 85 Fed. Reg. 70,240, 70,268 (Nov. 4, 2020)

The SEC's Office of the Investor Advocate was harshly critical of the agency's handling of the Broadridge data. It explained that it had "repeatedly requested copies of [the] analysis to no avail, until the Commission quietly submitted the analysis into the public comment file more than nine months later," with "no press release, no official statement, nor so much as a tweet to draw the public's attention to this new information." Off. of Investor Advocate, U.S. Sec. & Exch. Comm'n, *Report on Activities: Fiscal Year 2020*, at 4 (2020). The Office concluded that "this particular rulemaking was adopted in contravention of the Commission's internal policies for full and objective economic analysis" and lamented that "investors should not have to bear the expense of litigation to overturn such a flawed rulemaking." *Id.*

### D. The Final Rule

On September 23, 2020, the Commission adopted its final rule by a 3-2 vote. 85 Fed. Reg. 70,240, 70,295 (Nov. 4, 2020) (A1279); U.S. Sec. & Exch. Comm'n, Press Release No. 2020-220, *SEC Adopts Amendments To Modernize Shareholder Proposal Rule* (Sept. 23, 2020). The final rule largely tracks the amendments in the proposing release.

Ownership Requirements. With respect to the ownership requirements for submitting shareholder proposals, the Commission imposed sharp increases to both the amounts and holding periods required. Whereas the prior version of the rule required that a shareholder own only $2,000 of stock for a single year, the new rule requires a shareholder to own as much as ***$25,000 of stock*** depending on the number of years for which the shareholder has held the shares:

| New Ownership Requirements | |
| --- | --- |
| Holding Period | Amount Required |
| 1 year | $25,000 |
| 2 years | $15,000 |
| 3 years | $2,000 |

85 Fed. Reg. at 70,244.

The Commission asserted that these more demanding ownership requirements were necessary to ensure that shareholders submitting proposals had a meaningful economic stake in the company.  85 Fed. Reg. at 70,244.  The $2,000 requirement imposed in 1998, the Commission noted, was now equivalent to about $3,000 when adjusted for inflation, or about $5,000 when adjusted for the growth of the stock market.  *Id.*  The Commission did not explain how those modest increases justified a more than ***ten-fold*** increase to $25,000.

The Commission abolished its longstanding policy allowing multiple shareholders to aggregate holdings to satisfy the ownership requirements.  85 Fed. Reg. at 70,248.  The Commission's only stated justification was that "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that each shareholder who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company."  *Id.*

Representatives.  The Commission imposed multiple new restrictions on the use of representatives.  It prescribed a list of information that shareholders must disclose whenever they act through a representative. 85 Fed. Reg. at 70,249-50.  And it imposed a new requirement that shareholders personally, and not merely their representatives, participate in a meeting with management to discuss the proposal.  *Id.* at 70,251-54.  The Commission's justification for that personal engagement requirement was that "a shareholder-proponent who elects to require a

14

company to include a proposal in its proxy statement, requiring the company and other shareholders to bear the related costs, should be willing and available to discuss the proposal with the company and not simply rely on its representative to do so." *Id.* at 70,254.

The Commission also imposed a sharp new limit on the number of shareholders a representative may represent. Since 1976, the Commission has limited the number of proposals each ***shareholder*** may submit – most recently to one per meeting. 41 Fed. Reg. at 52,995-96. In its new rule, the Commission amended that limitation to apply to ***representatives*** too: The rule prohibits representatives from submitting proposals on behalf of multiple shareholders, even if each shareholder individually is eligible to submit a proposal. 85 Fed. Reg. at 70,254-56.

<u>Resubmission Thresholds</u>.  Finally, the Commission greatly increased the resubmission thresholds for proposals addressing the same topic as proposals previously voted upon:

| Resubmission Thresholds | | |
|---|---|---|
| **Prior Votes** | **Old Threshold** | **New Threshold** |
| One | 3% | 5% |
| Two | 6% | 15% |
| Three or More | 10% | 25% |

85 Fed. Reg. at 70,258.

The Commission justified those sharp increases on the ground that the current thresholds did not "adequately distinguish between proposals that have a realistic prospect of obtaining broader or majority support in the near term and those that do not." 85 Fed. Reg. at 70,258. The Commission acknowledged that some proposals that fail to achieve 5% of the vote nonetheless go on to garner majority support in later years. *Id.* at 70,259 & n.215. It also admitted that many proposals prompt value-enhancing reforms even without majority support. *Id.* at 70,258. The Commission asserted that proposals that qualify for resubmission under its new thresholds would

be more likely to have such effects too.  *Id.*  But it did not explain why that fact justified excluding proposals that satisfy existing thresholds and may go on to prompt important change.

The Dissents.  Two of the SEC's five Commissioners dissented from the final rule.

Commissioner Crenshaw urged that the rule would shut down "a proven, effective pathway" for shareholders to suggest changes to management.  Comm'r Caroline A. Crenshaw, *Statement on Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8* (Sept. 23, 2020).  She noted that shareholder proposals have driven positive financial performance – benefits that far exceed any cost savings the rule would achieve.  She also highlighted the rule's disproportionate impact on Main Street investors:  "[T]he implication . . . is that the wealthy are more likely to possess ideas worthy of corporate consideration."  *Id.*

Commissioner Lee urged that the amendments "put a thumb on the scale for management in the balance of power between companies and their owners."  Comm'r Allison Herren Lee, *Statement on the Amendments to Rule 14a-8* (Sept. 23, 2020).  She faulted the Commission for "not acknowledg[ing] this clear policy choice, purporting instead to be looking after the interests of shareholders by yet again adopting policies they strongly oppose."  *Id.*  Citing the Broadridge data, she warned that "retail investors will be greatly disenfranchised" under the new rule.  *Id.*

### E.     The Harm to Plaintiffs

The SEC's new rule harms plaintiffs and their members in many different ways.

ICCR.  ICCR has a number of members who are adversely affected by the Commission's new rule.  To take just one example, ICCR member Adrian Dominican Sisters ("ADS") has invested its savings in modest stakes in public companies over the years and has submitted shareholder proposals on a variety of topics.  Zinner Decl. ¶ 4 (citing Compl. ¶¶ 102-106).  Many of its holdings are worth more than $2,000 but less than $15,000.  *Id.*  Under the prior version of Rule 14a-8, ADS's stakes in those companies would have made it eligible to submit a proposal

as soon as it had held more than $2,000 in stock for one year.  Under the new rule, ADS will either have to substantially increase its holdings to as much as $25,000 or else wait ***three*** years to submit a proposal.  And ADS can no longer aggregate its holdings with those of other shareholders to meet the ownership requirements.  *Id.* (citing Compl. ¶ 107).

ICCR member Trillium Asset Management often acts as a representative for shareholders submitting proposals, sometimes for multiple shareholders at the same meeting.  Zinner Decl. ¶ 4 (citing Compl. ¶¶ 108-109).  The Commission's new limitations on representatives will thus interfere with Trillium's ability to carry out those activities.

Finally, many ICCR members resubmit proposals that were already submitted in prior years.  For example, ICCR members American Baptist Home Mission Society, Zevin Asset Management, and United Steelworkers each submitted proposals that achieved levels of support that would qualify for resubmission under the old thresholds but not under the new ones.  Zinner Decl. ¶ 4 (citing Compl. ¶¶ 110-113).

James McRitchie.  Mr. McRitchie regularly purchases stakes in companies with a market value of more than $2,000 but less than $15,000.  McRitchie Decl. ¶ 4 (citing Compl. ¶¶ 115-118).  Under the new rule, Mr. McRitchie will either have to substantially increase his holdings or else wait ***three*** years to be eligible.  The Commission's prohibition on aggregation will also prevent Mr. McRitchie from aggregating his holdings with those of other investors to satisfy the new ownership requirements.  *Id.* (citing Compl. ¶ 119).

Mr. McRitchie often submits proposals through a representative who already represents another shareholder at the same meeting.  McRitchie Decl. ¶ 4 (citing Compl. ¶¶ 120-122).  He relies on his representative to engage with management when necessary.  *Id.*  The Commission's

restrictions on representatives will thus prevent Mr. McRitchie from using his representative of choice and reduce the effectiveness of both Mr. McRitchie and his representative.  *Id.*

Finally, while Mr. McRitchie's proposals usually far exceed resubmission thresholds – and often obtain majority support – sometimes they do not.  McRitchie Decl. ¶4 (citing Compl. ¶¶ 123-124).  Mr. McRitchie has submitted multiple proposals this year that achieved support sufficient to qualify for resubmission under the old thresholds but not under the new ones.  *Id.*

<u>As You Sow</u>.  One of the services As You Sow provides to shareholders and asset managers is representing them or their clients in the shareholder engagement process.  Fugere Decl. ¶4 (citing Compl. ¶¶ 126-128).  As You Sow represents a broad range of investors and often represents multiple shareholders who seek to submit proposals for the same meeting.  *Id.* The new rule thus impairs As You Sow's ability to assist its clients and threatens its goodwill by putting it in the unenviable position of having to select between multiple investor proposals.

In As You Sow's experience, many shareholders want to use their shares to improve company performance, but are ill-equipped and often unable to shoulder the burdens of engaging directly with large companies.  Fugere Decl. ¶4 (citing Compl. ¶¶ 129-131).  Those shareholders engage representatives to undertake the time-consuming and knowledge-intensive tasks required to submit a proposal.  Many shareholders feel ill-equipped to bring their concerns to a company and are highly intimidated by the process.  *Id.*  Those anxieties will only increase if shareholders must personally meet with corporate management to discuss their proposals, rather than relying on professional representatives to act for them.  The SEC's rule will thus reduce the number of investors willing to engage As You Sow's services as representative.

## **<u>ARGUMENT</u>**

Under the Administrative Procedure Act, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  "[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems."  *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006).

The Securities Exchange Act of 1934 imposes additional requirements specifically on the SEC.  Under Section 3, "[w]henever . . . the Commission is engaged in rulemaking . . . and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  That provision imposes on the Commission a "statutory obligation to do what it can to apprise itself – and hence the public and the Congress – of the economic consequences of a proposed regulation."  *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).  The Commission must "adequately . . . assess the economic effects of a new rule."  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

For multiple reasons, the Commission failed to comply with those mandates here.[2]

---

[2] The Commission has not challenged plaintiffs' standing to bring this APA action.  To challenge an agency rule, plaintiffs must show "(1) [they have] suffered an 'injury in fact' that is concrete and particularized, and actual or imminent rather than conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015).  Plaintiffs easily satisfy those requirements because plaintiffs and their members regularly submit shareholder proposals or represent shareholders submitting proposals, and their ability to do so is severely restricted by the SEC's new rule.  Zinner Decl. ¶ 4; McRitchie Decl. ¶ 4; Fugere Decl. ¶ 4.  Plaintiffs' claims also "arguably fall within the zone of interests . . . regulated by the statutory provision."  *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  And ICCR has standing to sue on behalf of its members because "(1) 'its

I.  **THE COMMISSION FAILED TO QUANTIFY THE IMPACT OF ITS RULE ON THE NUMBER OF SHAREHOLDER PROPOSALS**

The Commission recognized that "the primary economic effects of the final amendments" would "derive from the reduction in shareholder proposals."  85 Fed. Reg. at 70,267.  To evaluate that impact, the Commission needed to know ***how many*** formerly eligible proposals would be excluded by its more stringent ownership requirements.  The Commission failed to conduct any reasonable analysis of that key question.

A.  **The Commission Arbitrarily Refused To Quantify the Economic Impact of Its Rule Despite the Broadridge Data Permitting Such Quantification**

When conducting a rulemaking, the Commission has a statutory obligation to "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  Where the Commission fails to comply, its rule is necessarily "arbitrary, capricious, . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The D.C. Circuit has repeatedly interpreted that mandate to require the SEC to quantify the economic impact of a rule whenever possible.

In *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005), for example, the D.C. Circuit vacated an SEC rule that required mutual funds to have an independent chairman and 75% independent directors.  The SEC, it held, "violate[d] the APA by failing adequately to consider the costs mutual funds would incur in order to comply with the conditions."  *Id.* at 136.  The Commission had claimed that it was "difficult to determine the costs associated with electing independent directors."  *Id.* at 143.  But the court rejected that excuse:  "That particular difficulty may mean the Commission can determine only the range within which a fund's cost of compliance will fall," but "it does not excuse the Commission from its statutory obligation to

---

members would otherwise have standing to sue in their own right;' (2) 'the interests it seeks to protect are germane to the organization's purpose;' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Ctr. for Sustainable Econ.*, 779 F.3d at 596; *see* Zinner Decl. ¶¶ 2-4.

***determine as best it can*** the economic implications of the rule it has proposed." *Id.* (emphasis added).  While "uncertainty may limit what the Commission can do, . . . it does not excuse the Commission from its statutory obligation to do what it can to apprise itself – and hence the public and the Congress – of the economic consequences of a proposed regulation." *Id.* at 144.

In *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010), the D.C. Circuit vacated an SEC rule that excluded "fixed indexed annuities" from a statutory exemption.  The SEC's "consideration of the effect of [the rule] on efficiency, competition, and capital formation was arbitrary and capricious." *Id.* at 177.  "The SEC could not accurately assess any potential increase or decrease in competition . . . because it did not assess the baseline level of price transparency and information disclosure under state law." *Id.* at 178.  The SEC's efficiency analysis was inadequate because the SEC "fail[ed] to determine whether . . . sufficient protections existed to enable investors to make informed investment decisions." *Id.* at 179.

Finally, in *Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011), the D.C. Circuit vacated an SEC rule providing proxy access for shareholder board nominees.  The Commission "failed adequately to quantify . . . certain costs or to explain why those costs could not be quantified." *Id.* at 1148-49.  The Commission "did nothing to estimate and quantify the costs it expected companies to incur; nor did it claim estimating those costs was not possible, for empirical evidence about expenditures in traditional proxy contests was readily available." *Id.* at 1150.  "Because the agency failed to 'make tough choices about which of the competing estimates is most plausible, [or] to hazard a guess as to which is correct,' . . . it neglected its statutory obligation to assess the economic consequences of its rule." *Id.* (citation omitted); *see also N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 553 (D.C. Cir. 2020) (recognizing SEC's "statutory obligation to determine as best it can the economic implications of [a proposed] rule").

The D.C. Circuit has excused the SEC from quantifying the economic impact of a rule only where the agency showed convincingly that quantification was impossible or some other factor justified its approach.  In *National Ass'n of Manufacturers v. SEC*, 748 F.3d 359 (D.C. Cir. 2014), for example, the court rejected a challenge to the SEC's "conflict minerals" rule despite the agency's failure to quantify the benefits of reducing foreign military conflicts.  The court held that "[a]n agency is not required 'to measure the immeasurable'" and "f[ound] it difficult to see what the Commission could have done better."  *Id.* at 369.  Moreover, Congress had ***directed*** the SEC to promulgate a conflict minerals rule, so the SEC was entitled to rely on Congress's judgment about the rule's benefits.  *Id.* at 369-70; *see also Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (agency not required to "measure the immeasurable").

The Commission itself embraced those principles in its 2012 *Guidance on Economic Analysis in SEC Rulemakings*.  *See* Div. of Risk, Strategy & Fin. Innovation & Off. of Gen. Counsel, U.S. Sec. & Exch. Comm'n, *Memorandum re: Current Guidance on Economic Analysis in SEC Rulemakings* (Mar. 16, 2012).  That Guidance recognizes that "[h]igh-quality economic analysis is an essential part of SEC rulemaking."  *Id.* at 1.  It emphasizes that the Commission must identify relevant data and consider mechanisms by which to seek such data.  *Id.* at 12, 16.  The SEC must also perform its economic analysis "even-handedly and candidly."  *Id.* at 14.  "Where the Commission is giving greater weight to some empirical evidence/studies than to others, it should clearly state the reason(s) for doing so."  *Id.*

The Commission failed to comply with those requirements here.  To evaluate the economic impact of its new ownership requirements, the Commission needed to know how many formerly eligible proposals would now be excluded.  The new rule imposed minimum ownership requirements that varied depending on the duration of ownership.  85 Fed. Reg. at 70,244.  The

Commission therefore needed information about both the ***dollar-value amounts*** that shareholder-proponents typically owned and the ***duration*** for which they typically owned those amounts.

To investigate those issues, the SEC examined data from prior-year proxy statements. 85 Fed. Reg. at 70,270-71 & n.322; 84 Fed. Reg. at 66,488 tbl.1, 66,497 n.240. That data, however, reflected only the ***amounts*** that shareholder-proponents owned for at least one year. It did not include any information about holding periods in excess of one year, because that information was not relevant under the old rule. The Commission did not conduct a survey or any similar analysis to obtain that missing data. Instead, it simply stated in its final rule that "we do not have data on duration of holdings for shareholder-proponents." 85 Fed. Reg. at 70,270. Because the Commission purportedly lacked data on holding periods, it could not meaningfully estimate the impact of the rule's significant increases to the required holding periods.

Instead, the Commission offered only an absurdly broad range of estimates that ran the gamut from ***no*** shareholders satisfying the longer holding requirements to ***all of them*** satisfying those requirements. At the "low end of the range," the Commission assumed that ***every*** shareholder who submitted a proposal under the old rule held the stock for more than three years, so there would be a ***zero percent*** reduction in eligible proposals under the new rule. 85 Fed. Reg. at 70,271 n.322. At the "high end of the range," the Commission assumed that ***none*** of the shareholders who submitted a proposal under the old rule held their stock for three years, and thus would not have been eligible under the new rule unless they met the more demanding $25,000 minimum – an assumption that yielded a ***56% reduction*** in eligible proposals. *Id.* The Commission's final rule thus provides an "estimate of the percentage of excludable proposals" as falling somewhere between ***0%*** and ***56%*** – an utterly indeterminate range that provides no meaningful economic guidance at all. *Id.* at 70,271 tbl.1.

In reality, the Commission's claim that "we do not have data on duration of holdings for shareholder-proponents" was false and contrary to the administrative record. The Commission had obtained that data over a year earlier, when Broadridge submitted data showing holding periods for over 28 million retail accounts. A1278:1 & n.3, 4 n.8. Analyzing that data, the SEC's staff had found that similar increased ownership requirements would result in a reduction in shareholder proposals of *up to 78%*. A1278:8, 9. The Commission, however, concealed that analysis from the public and then inserted it into the comment file long after the comment period ended, only a month before issuing its final rule. A1278:1.

The Commission asserted that the Broadridge data "cannot be used to reliably determine the number of retail investors who would be affected by the proposed amendments," citing certain imperfections its Chief Economist had mentioned when he refused to endorse the staff analysis. 85 Fed. Reg. at 70,269. But the Commission never found that the Broadridge data was worse than *no data at all*. Nor would the administrative record support such a finding.

The Commission complained, for example, that the Broadridge data measured holding periods based on the annual "record date[s]" used to determine who is eligible to vote at each annual meeting, rather than "the deadline to submit a shareholder proposal" or "the annual meeting date" itself. 85 Fed. Reg. at 70,269. While measuring average holding periods as of those alternative dates might conceivably result in a slightly different average, it hardly makes the data *useless*. Similarly, the Commission pointed out that the Broadridge data measured holding periods "on an account-level basis, not an investor-level basis," even though some investors "may hold securities in the same company through more than one account." *Id.* Again, while that limitation might occasionally result in an investor being classified as ineligible even though he could have satisfied the ownership requirements by combining accounts, that hardly

makes the data worse than no data at all.  The Commission's other theories – that shareholder proponents might have different average holding periods from shareholders generally, or that there may be a difference between retail and non-retail investors (a distinction whose relevance the Commission never explained) – suffer from the same flaw.  *Id.* (citing A1278:2-3).

The fundamental problem running through the SEC's analysis is that the agency treated minor ***imperfections*** in holding period data as reasons not to consider any holding period data at all.  D.C. Circuit precedent does not permit that approach.  The SEC must "determine ***as best it can*** the economic implications of the rule it has proposed."  *Chamber of Commerce*, 412 F.3d at 143 (emphasis added).  While "uncertainty may limit what the Commission can do, . . . it does not excuse the Commission from its statutory obligation to ***do what it can*** to apprise itself – and hence the public and the Congress – of the economic consequences of a proposed regulation."  *Id.* at 144 (emphasis added).  Even where the SEC must "make tough choices about which of the competing estimates is most plausible, [or] hazard a guess as to which is correct," it cannot "neglect[] its statutory obligation to assess the economic consequences of its rule."  *Bus. Roundtable*, 647 F.3d at 1150.

Those principles prohibit the SEC from relying on minor data imperfections as an excuse to consider no data at all.  The Broadridge data was undoubtedly imperfect.  But those imperfections did not mean the SEC could simply throw up its hands and declare that ***all*** investors might satisfy its new holding periods or ***none*** of them might, and that the resulting reduction in proposals would be somewhere between 0% and 56%.  Because the SEC failed to conduct a meaningful economic analysis despite data that permitted it to do so, the SEC disregarded its statutory obligation to provide an adequate cost-benefit analysis.

**B.     The Commission Improperly Concealed the Broadridge Data Until the Very End of Its Rulemaking**

The Commission's treatment of the Broadridge data also violated the APA's procedural requirements.  Under the APA, a court must set aside agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  The Commission failed to comply with required procedures here because it revealed the critical Broadridge data more than six months after the comment period closed, and only a month before it issued its final rule.  A1278.

The APA requires an agency to notify the public of "the terms or substance of the proposed rule or a description of the subjects and issues involved" and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(b)(3), (c).  "[I]ntegral" to those requirements is that the agency "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules."  *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007).  "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."  *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530-31 (D.C. Cir. 1982).  "To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport."  *Id.* at 530.

The D.C. Circuit has vacated rules where an agency disclosed important technical data after the comment period ended.  In *Kennecott Corp. v. EPA*, 684 F.2d 1007 (D.C. Cir. 1982), for example, the court vacated an EPA rule because the agency placed economic forecast data in the record after the comment period ended and only one week before issuing its final rule.  *Id.* at 1019.  Because "the reasonableness and accuracy of the forecast data [was] critical" and "would

clearly have been 'of central relevance,'" the agency's "refusal to convene a new round of public comment proceedings constitute[d] reversible error." *Id.* at 1019-20; *see also Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975, 1010 (D.C. Cir. 1991) (vacating rule where agency relied on data that "came into existence only after the close of the comment period").

The SEC ignored those principles here.  The SEC obtained the Broadridge data in August 2019 – three months before it announced its proposed rule.  A1278:1 & n.3.  The analysis that the SEC's staff and Chief Economist conducted on that data was part of the "technical basis" for the rule that the agency was required to disclose.  *Conn. Light & Power*, 673 F.2d at 530-31.  A critical reason the SEC took the path it did in its cost-benefit analysis was its claim that "we do not have data on duration of holdings for shareholder-proponents."  85 Fed. Reg. at 70,270.  In drawing that conclusion, the agency relied on its Chief Economist's assessment of the Broadridge data and his disagreement with the agency's staff over whether that data did, in fact, provide the necessary information about holding periods.  *Id.* at 70,269-70.  This is not a case where an agency merely declines to consider an unreliable study.  *See, e.g.*, *CTS Corp. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014).  The SEC ***actually relied*** on its Chief Economist's (erroneous) assessment of the Broadridge data in reaching the conclusions it did.

The SEC did not disclose that crucial information "in time to allow for meaningful commentary."  *Conn. Light & Power*, 673 F.2d at 530-31.  The November 2019 proposing release stated cryptically that the agency had "received some non-public retail share ownership data from a market participant who requested confidential treatment for the data."  84 Fed. Reg. at 66,498 n.245.  The comment period ended on February 3, 2020.  84 Fed. Reg. at 66,458.  The Commission did not reveal its staff analysis of the data or its Chief Economist's response until six months later – on August 14, 2020, the same day it scheduled an open meeting to release the

final rule the next month.  A1278; U.S. Sec. & Exch. Comm'n, *Sunshine Act Meetings* (Aug. 14, 2020) (scheduling open meeting for September 16).  That timing clearly did not afford an adequate opportunity for public comment.  *See, e.g.*, *Kennecott*, 684 F.2d at 1019 (no adequate opportunity for comment where agency "placed [data] in the docket only one week before promulgation of its final regulations").

Several commenters objected to the belated disclosure and asked the Commission to reopen the comment period.  A1224:1.  That submission raised preliminary concerns about the agency's refusal to rely on the Broadridge data but made clear that "[t]hese points do not substitute for a meaningful public comment process, as required by the Administrative Procedure Act."  A1224:2.  The Commission rejected the request and plowed ahead with its rule.  85 Fed. Reg. at 70,268, 70,295.

That sequence of events fundamentally compromised the integrity of the rulemaking.  To show prejudice from a procedural violation like this, a plaintiff need not "show[] that the Commission would have reached a different result."  *Chamber of Commerce v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006).  It need only show that it "had something useful to say about this critical data."  *Id.*  That test is clearly met.  A central premise of the Commission's analysis was that "we do not have data on duration of holdings for shareholder-proponents."  85 Fed. Reg. at 70,270.  The public was entitled to dispute that claim and convince the Commission that it ***did*** have holding period data – namely, the Broadridge data – and that the Commission's reasons for dismissing that data amounted to minor quibbles that did not justify disregarding the data entirely.  The staff analysis suggested that, by disregarding that data, the Commission may have underestimated the impact of its rule by ***up to 78%***.  A1278:8.

Those arguments may well have undermined the Commission's push for the final rule. The SEC's Office of Investor Advocate rightly concluded that the SEC adopted this rule in "contravention of [its] internal policies for full and objective economic analysis."  Off. of Investor Advocate, U.S. Sec. & Exch. Comm'n, *Report on Activities: Fiscal Year 2020*, at 4 (2020).  The Court should accordingly set aside the rule.

## II.   THE COMMISSION FAILED TO QUANTIFY THE COSTS AND BENEFITS OF ITS RULE

The Commission's failure to meaningfully estimate the impact of its new rule on the number of shareholder proposals was not the only shortcoming in its economic analysis.  The Commission also performed a woefully inadequate evaluation of costs and benefits.  The Commission recognized that it was required to "quantify the costs, benefits, and effects on efficiency" of its rule if possible to do so – for "companies," "non-proponent shareholders," and "proponents of shareholder proposals" alike.  85 Fed. Reg. at 70,263, 70,266-67.  But the Commission quantified the impact only for the first category – companies – and not the other two.  The result was a nonsensical cost-benefit analysis where the Commission touted the supposed cost savings of its rule for companies but had nothing to weigh those cost savings against.  Even the cost savings evidence, moreover, was wholly unreliable, as the Commission abdicated its responsibility to scrutinize the data commenters submitted.  The Commission failed to quantify costs and benefits or show that it was not possible to do so.  For that reason too, the Court should vacate the rule.

### A.   The Commission Refused To Quantify the Benefits of Shareholder Proposals

The first flaw in the Commission's cost-benefit analysis was its refusal to quantify the benefits of shareholder proposals.  As the Commission acknowledged, a substantial academic literature shows that shareholder proposals create value for corporations and their shareholders. 85 Fed. Reg. at 70,284-85.  Because the Commission's new rule makes it more difficult for

shareholders to submit proposals, the rule predictably reduces the number of proposals and therefore the benefits those proposals would otherwise produce.

To conduct the required cost-benefit analysis, the Commission had to quantify those lost benefits or show that it was impossible to do so.  As explained above, the SEC has a "statutory obligation to ***determine as best it can*** the economic implications of the rule it has proposed." *Chamber of Commerce*, 412 F.3d at 143 (emphasis added).  While "uncertainty may limit what the Commission can do," the Commission still has a "statutory obligation to ***do what it can*** to apprise itself – and hence the public and the Congress – of the economic consequences of a proposed regulation." *Id.* at 144.  The Commission must "***estimate and quantify*** the costs" or show that "estimating those costs [i]s ***not possible***." *Bus. Roundtable*, 647 F.3d at 1150 (emphasis added).  The Commission did none of those things here.

Commenters submitted overwhelming evidence that shareholder proposals create shareholder value.  They cited numerous studies confirming the positive correlation between corporate governance reforms and financial performance.  *See, e.g.*, A816:6-7 & nn.19-24; A945:5; A1170:4; A1175:6-7.  Studies showed, for example, that governance arrangements that insulate boards from shareholder influence tend to decrease shareholder value.  A816:6-7 & nn.19-21.  Classified boards in particular correlate with lower firm value.  A113:3-4 & nn.2-3; A816:7 & nn.22-24.  A 2019 report by the Diligent Institute found that companies with strong corporate governance policies outperformed those with poor policies by 15% over the most recent two-year period.  A1220:2 (citing Diligent Institute, *The High Cost of Governance Deficits* 4 (2019)).  Shareholder proposals on those governance topics are thus highly likely to increase financial performance.

Commenters pointed to similar studies showing a positive correlation between ESG policies and improved performance.  *See, e.g.*, A816:6-8 & nn.17, 25-27; A933:53 n.82.  A meta-analysis of studies from 1970 through 2014 found that 62.6% of studies reported a positive relationship between ESG policies and financial performance.  A816:6 & n.17 (citing Gunnar Friede *et al.*, *ESG and Corporate Financial Performance* 7 (Dec. 2015)); *see also* A113:20 & n.25 (citing Bank of America Merrill Lynch study).  Shareholder proposals on ESG issues are thus similarly likely to have a significant impact on firm value.  A816:8-9.

Commenters urged that empirical studies could be used to estimate the benefits that would be lost by excluding proposals.  Harvard law professor Lucian Ayre Bebchuk pointed to a highly regarded 2012 study published in a leading peer-reviewed financial journal.  A1170:4 (citing Vicente Cuñat *et al.*, *The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. Finance 1943 (2012)).  Examining nearly 4,000 proposals between 1997 and 2007, that study found that proposals that received majority support increased shareholder value by an average of 2.4% over a one-week period.  *See* Cuñat, *supra*, at 1945; *see also* A1144:11 & n.18 (citing Matthew R. Denes *et al.*, *Thirty Years of Shareholder Activism: A Survey of Empirical Research*, 44 J. Corp. Fin. 405 (2017) (reviewing 73 studies of shareholder proposals and finding positive returns in recent periods)).  For a public company with tens of billions of dollars in market capitalization, that added value would amount to hundreds of millions of dollars for a single proposal – dwarfing the Commission's cost savings estimate for *all* proposals at *all* companies affected by its rule.  A816:16 & n.62.

The Commission "recognize[d] that shareholder proposals may bring benefits to companies and their shareholders."  85 Fed. Reg. at 70,264.  But it claimed it was not required to account for those benefits in its economic analysis.  The Commission asserted that evaluating

those benefits "would not be consistent with the intent of Rule 14a-8, which is to set thresholds at which it is appropriate for a shareholder proposal to be considered . . . without opining on the merits of specific proposals." *Id.* at 70,284.  The Commission ignored that the more fundamental "intent" of Rule 14a-8 is to facilitate shareholder proposals that may enhance corporate value – and that the benefits of those proposals are very much relevant to that "intent."  In any case, the Commission cited no authority that authorized it to exempt its rules from cost-benefit analysis merely because the agency declares that a rule is not "intended" to opine on the costs it imposes.

The Commission added that, "under state corporate law," the evaluation of particular proposals was "properly left to the company's owners," who "ultimately determine the value of a proposal to a particular company."  85 Fed. Reg. at 70,264-65.  The Commission did not explain how shareholders could perform that function when the Commission's amendments would prevent many proposals from ever being submitted for their consideration.   Losing the opportunity to vote on proposals that, according to empirical studies, normally increase shareholder value is clearly a cost to shareholders.

The Commission asserted in the alternative that measuring the benefits of shareholder proposals was "inherently speculative."   85 Fed. Reg. at 70,265.   It dismissed "studies documenting a correlation between companies' ESG policies and financial performance" on the ground that some companies might have adopted ESG policies "for reasons other than the submission of shareholder proposals, including shareholder engagement that does not involve the submission of shareholder proposals."  *Id.* at 70,284 & n.427.  That observation is beside the point.  The Commission did not dispute that favorable ESG policies correlate with improved financial performance or that this effect was quantifiable.  Nor did it offer any reason to think that ESG policies adopted due to shareholder proposals would be any more or less beneficial on

average than ESG policies adopted for other reasons. The fact that companies might adopt favorable ESG policies due to shareholder proposals or for some other reason does not make it impossible to quantify those benefits.

The Commission dismissed empirical studies that focused on the corporate value that shareholder proposals generate on the ground that they measured only short-run returns rather than long-run effects. 85 Fed. Reg. at 70,285. It also speculated about potential methodological problems, such as the possibility that other information might have emerged at the same time as a vote on a shareholder proposal. *Id.* But many of the studies addressed and controlled for those problems. In Cuñat's study, for example, the authors used a regression discontinuity design that controls for other confounding impacts and provides evidence that short-term results are likely to persist over the long run too. *See* Cuñat, *supra*, at 1945, 1955-56, 1974. The Commission also ignored other studies that documented the long-term benefits of shareholder engagement. A816:9 & n.31 (citing Tamas Barko *et al.*, *Shareholder Engagement on Environmental, Social, and Governance Performance* 4 (2021) (finding that firms targeted for shareholder engagement on ESG issues outperformed their peers by 7.5% in the following year)).

The Commission ultimately refused to make any effort at all to quantify the benefits lost due to its sharp increases to ownership requirements and resubmission thresholds. That refusal made it all but impossible for the Commission to conduct any meaningful cost-benefit analysis. Having refused to quantify the substantial and well-documented benefits of shareholder proposals, the Commission had nothing to weigh against the modest cost savings its rule was supposed to achieve. Because the Commission "did nothing to estimate and quantify the costs" of its new rule, even though "empirical evidence . . . was readily available," it failed to comply with its statutory obligations. *Bus. Roundtable*, 647 F.3d at 1150.

**B.      The Commission Failed To Scrutinize the Cost Savings Data**

Even the Commission's analysis of the purported cost savings – the sole impact the Commission purported to quantify – was deficient.  The Commission solicited estimates from the public that resulted in an extremely broad range of estimates.  The Commission then made no serious effort to scrutinize those numbers, instead simply declaring that the cost savings would fall somewhere in that enormous range.  That was an abdication of the Commission's responsibility to conduct meaningful analysis of the information it received.

In the proposing release, the Commission claimed that the amendments would produce substantial costs savings, citing inflated and unreliable figures to claim that the cost of processing a shareholder proposal was in the range of $100,000 to $150,000.  84 Fed. Reg. at 66,461, 66,496.  Commenters disputed those figures and urged that the true costs would be much lower, in the range of $20,000.  A1175:6; 85 Fed. Reg. at 70,272 n.332.  The Commission made no effort whatsoever to scrutinize those competing figures.  Instead, observing that there was "variation" in the estimates submitted, the Commission announced that cost savings would fall somewhere between a "lower bound" of $20,000 (the lowest estimate anyone had submitted) and an "upper bound" of $150,000 (the highest).  85 Fed. Reg. at 70,274.  Multiplying those figures by the even broader range in the number of proposals excluded, the Commission predicted total cost savings of somewhere between $1.16 million and $78.53 million per year for all companies combined.  *Id.*  The Commission took no position on whether $1 million, $79 million, or some number in between was the correct figure.

That approach was an abdication of the Commission's responsibility to "make tough choices about which of the competing estimates is most plausible" and to "hazard a guess as to which is correct."  *Bus. Roundtable*, 647 F.3d at 1150.  That standard does not permit the agency to respond to conflicting evidence simply by announcing that ***someone*** must be right, and that

the true figure must therefore fall *somewhere* within the broad range of estimates provided.  The agency must apply at least some scrutiny to competing evidence to determine which figures are most reliable.  *See State Farm*, 463 U.S. at 43 (agency "must examine the relevant data and articulate a satisfactory explanation for its action"); *cf. Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 46-48 (D.D.C. 2017) (rate was arbitrary and capricious where agency "select[ed] a figure that [was] entirely detached from any data or analysis, but merely happen[ed] to fall within a range of figures proposed by commenters").  The Commission's contrary approach resulted in an enormous range of possibilities that provided no meaningful guidance on the purported cost savings the rule would achieve.

As commenters noted, moreover, there was no shortage of reasons to question the cost estimates at the high end of the range.  A816:16-19; A933:27-30; 85 Fed. Reg. at 70,273 & n.333.  The Commission's $150,000 figure, for example, derived from a letter the Commission received from a trade group in another rulemaking, which in turn cited a stray reference in a congressional committee report that cited no source whatsoever as support.  *See* 85 Fed. Reg. at 70,273 & n.334 (citing Am. Sec. Ass'n, Comment Letter in File No. 4-725, *Reforms to the U.S. Proxy System* 4 n.10 (June 7, 2019) (citing H.R. Rep. No. 115-904, at 2 (2018))).

The Commission admitted, moreover, that the cost estimates at the high end of its range included not only the costs of *including* a proposal in the company's proxy materials, but also the costs of trying to *exclude* a proposal – such as legal fees incurred in submitting a request for a no-action letter from the SEC.  85 Fed. Reg. at 70,273-74.  The Commission never explained why those costs were properly included in the cost-benefit analysis.  A company incurs legal fees for a no-action letter only when it *resists* submitting a proposal to its shareholders – something that no company is required to do in response to a proposal.

Finally, the Commission did not separately analyze the costs of **resubmitted** proposals. The Commission acknowledged that "a number of companies noted that their costs for first-time proposals are generally higher than those incurred for resubmitted proposals."  85 Fed. Reg. at 70,272 n.332.  But the Commission failed to grasp the significance of that difference.  The final rule's increased resubmission thresholds affect only resubmitted proposals, not all proposals. The costs that matter to the cost-benefit analysis of that change are thus the average costs for resubmitted proposals, not for all proposals.  Yet the Commission never drew that distinction and made no effort to conduct a separate cost-benefit analysis for this distinct aspect of the rule.

### C.     The Commission Failed To Quantify the Costs to Shareholder Proponents

Finally, the Commission failed to quantify the costs its new rule would impose on shareholders who submit proposals.  The Commission acknowledged that its rule will require shareholders either to purchase more shares to satisfy the increased ownership requirements or to hold the stock for multiple years before submitting a proposal. 85 Fed. Reg. at 70,278.  And it admitted that shareholders may have to "sell other assets to raise cash to buy shares or incur borrowing costs to raise cash to buy shares." *Id.*

The Commission, however, refused to quantify any of those costs.  Instead, without citing any evidence, it dismissed the costs as "relatively modest" and "not . . . a significant hurdle."  85 Fed. Reg. at 70,277.  It downplayed the costs on the ground that only "a negligible number of shareholders [would] incur these costs because . . . most investors do not submit proposals."  *Id.* at 70,278.  And it suggested that shareholders might even **benefit** from the new rule by earning "capital gains and/or dividends" while holding their shares for three years.  *Id.*

None of those theories was an adequate reason not to quantify costs.  The Commission must "determine **as best it can** the economic implications" of its rule, *Chamber of Commerce*, 412 F.3d at 143 (emphasis added), and must "**estimate and quantify** the costs" unless doing so is

"***not possible***," *Bus. Roundtable*, 647 F.3d at 1150 (emphasis added).  The Commission cannot simply assert without any evidence that certain costs are probably small and call it a day.  In that respect too, the Commission failed to comply with binding precedent.

*     *     *

The upshot of the Commission's cost-benefit analysis was an estimated cost savings of somewhere between $1 million and $79 million per year.  That staggeringly broad range reflected the extremely vague inputs the Commission fed into the analysis – both the largely unknown impact on the number of proposals that resulted from the SEC's refusal to analyze holding period data, and the extremely broad range of cost savings estimates that resulted from the SEC's uncritical acceptance of whatever data any commenter chose to report.

Even that broad range, however, understates the deficiencies in the agency's analysis. The Commission excluded multiple critical components from the cost-benefit analysis entirely by refusing to quantify them – a defect nowhere more apparent than in its total refusal to quantify the benefits that shareholder proposals produce.  By refusing to quantify those benefits, the Commission made it impossible to conduct a meaningful cost-benefit analysis:   The Commission had nothing to weigh against the meager cost savings its rule would supposedly achieve.  The Commission's analysis would justify ownership requirements no matter how severe.  A $1 million or even $1 billion ownership requirement would generate additional cost savings for companies, while the unquantified loss to shareholders would remain the same – unquantified.  The Commission's analysis thus provides no basis for choosing one level of ownership requirement over any other.

The Commission produced a meaningless economic analysis that provides no actual insight into the true economic effects of the rule.  Because the Commission failed to conduct the

cost-benefit analysis that cases like *Chamber of Commerce* and *Business Roundtable* require, the Court should vacate the final rule in its entirety.

## III.   THE COMMISSION'S NEW RESTRICTIONS ON AGGREGATION AND REPRESENTATIVES ARE UNLAWFUL

Even apart from its deficient economic analysis, the Commission violated the Administrative Procedure Act by abandoning its longstanding policy allowing aggregation of shareholdings and imposing arbitrary new restrictions on the use of representatives. The Commission provided no coherent justification for any of those changes.

### A.   The Commission's Elimination of Its Ownership Aggregation Rule Was Arbitrary and Capricious

Ever since the Commission first imposed ownership requirements in 1983, it has permitted co-sponsors to aggregate their holdings to satisfy those requirements. 48 Fed. Reg. at 38,219 n.5. That aggregation rule is particularly important for small Main Street investors, who may lack the means to qualify based on their own holdings alone. The Commission's new rule forecloses that approach. Its sole justification for the change was that "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that each shareholder who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company." 85 Fed. Reg. at 70,248. That reasoning is arbitrary and capricious and inadequate to sustain the rule under the APA.

One of the fundamental requirements of the APA is that an agency articulate a coherent rationale. An agency decision "with *no* explanation" is the epitome of "arbitrary and capricious" decisionmaking. *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335-36 (D.C. Cir. 2004); *see also S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 47-48 (D.C. Cir. 2005) (order arbitrary and capricious where agency "offer[ed] no rationale"). An agency fails to comply with that mandate if it relies on circular or question-begging reasoning. "[C]onclusory statements will not do; an

38

'agency's statement must be one of ***reasoning***.'"   *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

The Commission ran afoul of those principles here.  Its sole rationale for this change was that "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that ***each shareholder*** who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company."  85 Fed. Reg. at 70,248 (emphasis added).  That rationale is entirely question-begging because it simply assumes that the relevant unit of analysis is "each shareholder" individually rather than a group of shareholders who collectively own precisely the same economic stake.

The Commission identified no reason why a proposal submitted on behalf of a group of shareholders would be any less likely to enhance the value of the company or any more costly for the company to process than a proposal submitted on behalf of an individual shareholder who owned the same number of shares.  Nor did the Commission explain why the proponents collectively would be any less likely to have interests aligned with those of other shareholders. The Commission simply ***assumed*** that what matters is whether "each shareholder" individually owns a certain amount of stock.

The Commission acknowledged that groups of shareholders who own their shares jointly may submit a proposal as a group.  85 Fed. Reg. at 70,248 & n.88.  Shareholders could also pool their resources by forming a partnership or other legal entity to hold the shares.  The Commission's rule arbitrarily distinguishes between those forms of joint ownership and the longstanding practice of aggregation the rule now prohibits.  Because the Commission offered no coherent explanation for that change, the Court should vacate this aspect of the rule.

### B.     The Commission's Representation Limits and Personal Engagement Requirement Are Arbitrary and Capricious

The Commission also imposed arbitrary new restrictions on the use of representatives.  It prohibited multiple shareholders from engaging the same representative to submit proposals for the same meeting.  85 Fed. Reg. at 70,255-56.  And it prohibited shareholders from relying on their representatives to discuss their proposals with management, instead requiring shareholders to perform that task themselves.  *Id.* at 70,254.  The Commission offered no adequate rationale for either requirement.

The Commission's sole justification for prohibiting multiple shareholders from engaging the same representative was that "permitting representatives to submit multiple proposals for the same shareholders' meeting can give rise to . . . concerns about the expense and obscuring effect of including multiple proposals in the company's proxy materials."  85 Fed. Reg. at 70,255.  That rationale, however, is simply an argument that there should be fewer shareholder proposals.  It does not explain why proposals should be singled out for exclusion merely because two shareholders with different proposals happen to use the same representative.

Even where an agency has a legitimate reason for imposing an overall limit on something, it cannot act arbitrarily in pursuing that goal.  "[A]n agency's unjustifiably disparate treatment of two similarly situated parties works a violation of the arbitrary-and-capricious standard."  *FEC v. Rose*, 806 F.2d 1081, 1089 (D.C. Cir. 1986).  The agency must provide a reasoned justification for ***which*** proposals to exclude.

The fact that two shareholders engage the same representative does not reduce the potential benefits of their proposals.  Nor does it make their proposals any more costly for the company to process.  Absent some such rationale, the Commission's limitation is simply an

arbitrary means of reducing the number of proposals – a rule that singles out certain proposals for exclusion without any rational reason to treat them less favorably than others.

The Commission similarly failed to justify its new rule that shareholders must personally engage with management rather than relying on their representatives to act on their behalf.  The Commission reasoned that "a shareholder-proponent who elects to require a company to include a proposal in its proxy statement, requiring the company and other shareholders to bear the related costs, should be willing and available to discuss the proposal with the company and not simply rely on its representative to do so."  85 Fed. Reg. at 70,254.  That is no justification at all.  The Commission cannot impose additional costs and inconvenience on certain shareholders merely because it thinks they should be willing to bear those costs.

The Commission asserted that requiring personal participation "may encourage greater dialogue" and "may lead to more efficient and less costly resolution."  85 Fed. Reg. at 70,254.  But it never explained why forcing individual shareholders unfamiliar with the process to personally interact with the management of large corporations, rather than relying on professionals with expertise and experience in such matters to act on their behalf, would facilitate rather than impair the engagement process.

Finally, the Commission ignored the severe consequences of its rule.  Commenters warned that requiring personal shareholder engagement with management would discourage many shareholders from submitting proposals in the first place.  A816:30; A1175:10.  The Commission offered no response.  An agency may not "entirely fail[] to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  That is what the Commission did here.

### C.   The Commission's Restrictions on Representatives Exceed Its Statutory Authority

The Commission's new restrictions on representatives are also invalid for another reason. Under the APA, a court must set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  The Commission's rule runs afoul of that prohibition because it effectively seeks to regulate traditional questions of state agency law without any statutory mandate to do so.

The Commission may not rely on expansive interpretations of its statutory authority to intrude on domains Congress reserved to the states.  In *Business Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990), for example, the court vacated a rule that prohibited exchanges from listing dual-class stock.  The SEC invoked its power over the proxy process under Section 14 of the Exchange Act.  *Id.* at 410.  But the court held that "the Exchange Act cannot be understood to include regulation of an issue that is so far beyond matters of disclosure" and instead trenches on "corporate governance traditionally left to the states." *Id.* at 408.  On the SEC's theory, the court noted, the agency could regulate "requirements for independent directors, independent audit committees, shareholder quorums, shareholder approval for certain major corporate transactions, and other major issues traditionally governed by state law." *Id.* at 412; *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden."); *Teicher v. SEC*, 177 F.3d 1016, 1019 (D.C. Cir. 1999) (SEC must exercise its authority with "some concept of the relevant domain").

The Commission invoked that same Section 14 authority here.  85 Fed. Reg. at 70,294.  But agency law, no less than corporate governance, is a "traditional state-law domain." *Reo v.*

*U.S. Postal Serv.*, 98 F.3d 73, 77 (3d Cir. 1996).  State agency law traditionally determines whether multiple parties may engage the same representative or whether there is some numerical limit on how many clients an agent may represent.  *See Restatement (Third) of Agency* §3.14 (2006).  State agency law also determines the scope of a representative's authority to engage with someone on behalf of a client without the client's personal involvement.  *See id.* §2.02.

Nothing in the Exchange Act provides the slightest indication that Congress empowered the SEC to rewrite those traditional state agency principles.  The Commission explained in 1943, a year after promulgating Rule 14a-8, that "the rights that we are endeavoring to assure to the stockholders are those rights that he has ***traditionally had under State law*** to appear at the meeting; to make a proposal; to speak on that proposal at appropriate length; and to have his proposal voted on."  *Securit[ies] and Exchange Commission Proxy Rules: Hearings Before the H. Comm. on Interstate and Foreign Commerce*, 78th Cong. 172 (June 9-11, 1943) (Chairman Ganson Purcell) (emphasis added).  The Commission conceded that principle here, acknowledging when proposing its rule that "[s]tate law . . . governs shareholders' ability to submit a proposal through a representative."  84 Fed. Reg. at 66,474; *see also id.* at 66,465 ("[A] shareholder's ability to submit a proposal for inclusion in a company's proxy materials through a representative . . . has been governed by state agency law.").

Yet the Commission abruptly changed course in its final rule.  The Commission bluntly stated that it did not "agree that state agency law should govern the number of proposals a representative may submit on behalf of proponents."  85 Fed. Reg. at 70,256.  And it did not even mention state agency law when it prohibited representatives from acting on behalf of their clients when engaging with management.  *Id.* at 70,254.

If the Commission can justify those intrusions on traditional state agency law based on its power over the proxy process, nothing would prevent the Commission from imposing CLE requirements on lawyers representing parties in securities lawsuits or regulating the fees that accountants can charge their publicly listed clients for preparing their financial statements. There is not the slightest indication in the Exchange Act that Congress granted the SEC any of those extreme powers.  By intruding into traditional client-representative relationships without any clear authority from Congress, the SEC exceeded its authority.  For that reason too, the Court should vacate these provisions of the final rule.

## CONCLUSION

The Court should grant plaintiffs' motion for summary judgment and vacate the SEC's rule in its entirety.

Dated:    September 20, 2021          Respectfully submitted,
          Washington, D.C.


   _/s/ Robert K. Kry_____

Eric A. Posner                        Robert K. Kry
(*pro hac vice*)                      D.C. Bar #490545
MOLOLAMKEN LLP                        Sarah J. Newman
300 North LaSalle Street              D.C. Bar #1047210
Chicago, IL  60654                    MOLOLAMKEN LLP
                                      The Watergate, Suite 500
                                      600 New Hampshire Avenue, N.W.
                                      Washington, D.C.  20037
                                      Tel.: (202) 556-2011
                                      Fax: (202) 556-2001
                                      rkry@mololamken.com

*Attorneys for Plaintiffs*