No. 1:21-cv-01620-RBW

# In the United States District Court for the District of Columbia

INTERFAITH CENTER ON CORPORATE RESPONSIBILITY,
JAMES McRITCHIE, and AS YOU SOW,
*Plaintiffs*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Defendant*.

## BRIEF OF THE SHAREHOLDER COMMONS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

Thomas A. Burns (*pro hac vice*)
BURNS, P.A.
301 W. Platt St., Ste. 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com

Todd A. Foster (Bar ID FL0048)
BARNETT, KIRKWOOD, LONG,
 KOCHE & FOSTER, P.A.
601 S. Bayshore Blvd., Ste. 700
Tampa, FL 33606
(813) 253-2020
tfoster@barnettbolt.com

*Counsel for amicus curiae*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF *AMICUS CURIAE*'S IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ....................................... 1

SUMMARY OF ARGUMENT ...................................................................... 3

BACKGROUND ....................................................................................... 5

    A.    Main Street investors, diversification, and beta .................................... 5

          1.    Main Street investors ...................................................... 5

          2.    The need for diversification ............................................. 6

          3.    Beta: the all-important value factor ................................. 8

    B.    The amendments .......................................................................... 11

ARGUMENT .......................................................................................... 12

I.    The amendments would prejudice the ability of small investors to diversify and exercise their rights as shareholders ................................. 12

    A.    Rule 14a-8 was designed to protect small shareholders ...................... 12

    B.    The new ownership thresholds require small shareholders to unduly concentrate their holdings in order to submit proposals ............. 13

    C.    Large investors won't necessarily fill the gap if small shareholders stop making proposals focused on Beta concerns ........................... 14

    D.    The limitation on the use of representatives and requirement of participation harm small, diversified investors ................................... 15

    E.    The Commission didn't properly account for the additional burden on small, diversified investors ........................................................ 16

II.    The amendments decrease the likelihood that proposals that protect important economic systems will be submitted or resubmitted ........................ 18

ii

A.    Holders of diversified portfolios are incentivized to introduce shareholder proposals that discourage negative externalities ............. 18

B.    The amendments discourage small shareholders from bringing proposals that address negative externalities ...................................... 21

C.    Large investors won't necessarily fill the gap if small shareholders stop making proposals focused on Beta concerns ........................... 21

D.    Raising the resubmission thresholds burdens small holders .............. 22

E.    The Commission didn't consider the economic effect of the potential for the amendments to reduce Beta-oriented proposals ................ 23

CONCLUSION ........................................................................................... 23

<u>**TABLE OF AUTHORITIES**</u>

**Statutes**                                                                 **Page(s)**

29 U.S.C. § 404 ..................................................................................................... 7

Uniform Prudent Investor Act § 3 ....................................................................... 7


**Regulations**                                                            **Page(s)**

17 C.F.R. § 240.14a-8 ........................................................................................... 2


**Rules**                                                                      **Page(s)**

D.D.C. Local R. 7 ................................................................................................. 1

Fed. R. App. P. 29 ................................................................................................ 1


**Letters**                                                                    **Page(s)**

Letter from Frederick H. Alexander, CEO, The Shareholder Commons, to
    Vanessa Countryman, Acting Secretary, SEC (Jan. 31, 2020),
    https://tinyurl.com/42ya6ps4 (visited Oct. 14, 2021) ............................... 2

Letter from Frederick H. Alexander, CEO, The Shareholder Commons, to
    Gary Gensler, Chairman, SEC, and Renee Jones, Director, Division of
    Corporate Finance, SEC (Aug. 20, 2021),
    https://tinyurl.com/yv3md79u (visited Oct. 14, 2021) .............................. 2


**Websites**                                                                 **Page(s)**

*A Legal Framework for Impact*, FRESHFIELDS BRUCKHAUS DERINGER,
    https://tinyurl.com/m3t93xrp (visited Oct. 14, 2021) ............................ 21

*Building Financial Futures*, FIDELITY INVESTMENTS,
    https://tinyurl.com/59ydvwmj (visited Oct. 14, 2021) .............................. 6

*Funders*, TIPPING POINT FUND ON IMPACT INVESTING,
    https://tinyurl.com/6kvs5ybf (visited Oct. 14, 2021) ............................... 1

*Grants Database*, FORD FOUNDATION,
    https://tinyurl.com/9rev3sev (visited Oct. 14, 2021) ................................. 1

*Reimagining Capitalism*, OMIDYAR NETWORK,
    https://tinyurl.com/9pj8myt4 (visited Oct. 14, 2021) ............................... 1

*What We Do*, TIPPING POINT FUND ON IMPACT INVESTING,
    https://tinyurl.com/5f7scerf (visited Oct. 14, 2021) ................................. 1

## Books                                                                    Page(s)

BURTON G. MALKIEL, A RANDOM WALK DOWN WALL STREET (2015) ........................ 6, 7

DAVID WOOD, WHAT DO WE MEAN BY THE S IN ESG?: SOCIETY AS A STAKE-
    HOLDER IN RESPONSIBLE INVESTMENT, IN THE ROUTLEDGE HANDBOOK OF
    RESPONSIBLE INVESTMENT (2018) ........................................................... 18

JOHN C. BOGLE, THE LITTLE BOOK OF COMMON SENSE INVESTING: THE ONLY
    WAY TO GUARANTEE YOUR FAIR SHARE OF THE STOCK MARKET (2007) ................... 7

JON LUKOMNIK & JAMES P. HAWLEY, MOVING BEYOND MODERN PORTFOLIO
    THEORY: INVESTING THAT MATTERS (2021) ............................................... 9

PRINCIPLES FOR RESPONSIBLE INVESTMENT, UNIVERSAL OWNERSHIP: WHY ENVI-
    RONMENTAL EXTERNALITIES MATTER TO INSTITUTIONAL INVESTORS (2011),
    https://tinyurl.com/9x8n533x (visited Oct. 14, 2021) ............................... 8

STEPHEN DAVIS, JON LUKOMNIK & DAVID PITT-WATSON, WHAT THEY DO WITH
    YOUR MONEY 50 (2016) ..................................................................... 9

WILLIAM BERNSTEIN, THE FOUR PILLARS OF INVESTING: LESSONS FOR BUILDING
    A WINNING PORTFOLIO (2002) .............................................................. 7

## Reports                                                                  Page(s)

PRINCIPLES FOR RESPONSIBLE INVESTMENT, ACTIVE OWNERSHIP 2.0: THE EVO-
    LUTION STEWARDSHIP URGENTLY NEEDS,
    https://tinyurl.com/pdhxt9fa (visited Oct. 14, 2021) ............................... 10

SCHRODERS, FORESIGHT,
    https://tinyurl.com/cffcxc74 (visited Oct. 14, 2021) ............................... 20

SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, WHO OWNS
   STOCKS IN AMERICA? INDIVIDUAL INVESTORS 15 (Oct. 10, 2019),
   https://tinyurl.com/36xu3der (visited Oct. 14, 2021) ............................................. 5

THE SHAREHOLDER COMMONS, THE BETA STEWARD PROXY REVIEW 2021: PRO-
   GRESSING TOWARD AUTHENTIC VALUE CREATION 10, 12 (Aug. 2021),
   https://tinyurl.com/yvthejkz (visited Oct. 14, 2021) ............................................. 3

## Press releases                                                              Page(s)

Press Release No. 2019-232, SEC, SEC Proposes Amendments to Modernize
   Shareholder Proposal Rule (Nov. 5, 2019) ............................................................ 11

Press Release No. 2020-220, SEC, SEC Adopts Amendments to Modernize
   Shareholder Proposal Rule (Sept. 23, 2020) .................................................... 11, 17

## Other agency materials                                                      Page(s)

Allison Herron Lee, Commissioner, SEC, Public Statement, Statement on
   Shareholder Rights, n.14 & accompanying text (Nov. 5, 2019),
   https://tinyurl.com/ysf76tec (visited Oct. 14, 2021) ................................................ 6

COMMENTS ON PROPOSED RULE: PROCEDURAL REQUIREMENTS AND RESUBMIS-
   SION THRESHOLDS UNDER EXCHANGE ACT RULE 14a-8, SEC,
   https://tinyurl.com/542kd786 (visited Oct. 14, 2021) ........................................... 11

Procedural Requirements and Resubmission Thresholds Under Exchange Act
   Rule 14a-8, 84 Fed. Reg. 66,458 (Dec. 4, 2019) (A1) ............................................. 10

Procedural Requirements and Resubmission Thresholds Under Exchange Act
   Rule 14a-8, 85 Fed. Reg. 70,240, 70,295 (Nov. 4, 2020) (A1279) ................... 11, 17

SEC Division of Corporation Finance, Staff Legal Bulletin No. 14A: Share-
   holder Proposals (July 12, 2002),
   https://tinyurl.com/27h9urc4 (visited Oct. 14, 2021) ................................ 12, 13, 15

## Articles                                                                    Page(s)

Frederick H. Alexander,
   *The Benefit Stance: Responsible Ownership in The Twenty-First Century*,
   36 OXFORD REV. OF ECON. POLICY 341 (2020) ....................................................... 19

John C. Coffee, Jr.,
    *The Future of Disclosure: ESG, Common Ownership, and Systematic Risk*
    (Mar. 16, 2021) (manuscript)
    https://tinyurl.com/53fttcjb (visited Oct. 14, 2021) ................................................ 20

Kim Parker & Richard Fry,
    *More than Half of U.S. Households Have Some Investment in the Stock
    Market*,
    PEW RESEARCH CENTER (Mar. 25, 2020),
    https://tinyurl.com/nxfu6np8 (visited Oct. 14, 2021) ............................................... 6

Madison Condon,
    *Externalities and the Common Owner*,
    95 WASH. L. REV. 1 (2020) ...................................................................................... 20

Robert G. Hansen & John R. Lott,
    *Externalities and Corporate Objectives in a World with Diversified Share-
    holder/Consumers*,
    31 J. FIN. & QUANTITATIVE ANALYSIS 1 (1996) ...................................................... 19

Steven Lydenberg,
    *It's Time for Investors to start Reporting on Both Portfolio and Systems-
    level Performance*,
    RESPONSIBLE INVESTOR (Jan. 8. 2016),
    https://tinyurl.com/ajsjazy4 (visited Oct. 14, 2021) ............................................... 10

Warren Buffett & Carol Loomis,
    *Warren Buffett on The Stock Market*,
    FORTUNE (Dec. 10, 2001),
    https://tinyurl.com/7maaxfrm (visited Oct. 14, 2021) .............................................. 8

## STATEMENT OF *AMICUS CURIAE*'S IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

The Shareholder Commons is a nonprofit organization that seeks to shift the investment paradigm away from a narrow and harmful focus on individual company value towards a systems-first approach to investing that better serves investors.[1] In particular, it acts as a voice for long-term, diversified shareholders.[2] Its work includes support for an investor-protection regime that recognizes the fundamental interest of investors in preserving the social and environmental systems in which their investments are embedded.[3]

---

[1] All parties and intervenor have consented to *amicus* filing this brief. *See* D.D.C. Local R. 7(o). No party's counsel authored this brief in whole or in part, and no person or entity other than *amicus*, its members, or its counsel made any monetary contribution to its preparation or submission. *Cf.* Fed. R. App. P. 29(a)(4)(E).

[2] Supporters of The Shareholder Commons include the Ford Foundation, the Omidyar Network, and the Tipping Point Fund on Impact Investing. In turn, the Tipping Point Fund is a donor collaborative whose members include the Blue Haven Initiative, the David and Lucile Packard Foundation, the Ford Foundation, the John D. and Catherine T. MacArthur Foundation, the Meyer Memorial Trust, the Omidyar Network, the Phillips Foundation, the Rockefeller Brothers Fund, the Rockefeller Foundation, the Surdna Foundation, and the Visa Foundation. *See Funders*, TIPPING POINT FUND ON IMPACT INVESTING, https://tinyurl.com/6kvs5ybf (visited Oct. 14, 2021).

[3] The Shareholder Commons received a grant from the Ford Foundation for the 2021 fiscal year to provide "[g]eneral support to advance shareholders movements insisting on responsible business practices through engagement with companies, regulators and the public." *Grants Database*, FORD FOUNDATION, https://tinyurl.com/9rev3sev (visited Oct. 14, 2021). The Omidyar Network "is working to address the structural challenges at the heart of our economic system, and to shape a new, inclusive economy where markets serve the interests of all people and society." *Reimagining Capitalism*, OMIDYAR NETWORK, https://tinyurl.com/9pj8myt4 (visited Oct. 14, 2021). The Tipping Point Fund has a "mission of creating and supporting public goods that are critical to the continued growth and fidelity of the impact investing market." *What We Do*, TIPPING POINT FUND ON IMPACT INVESTING, https://tinyurl.com/5f7scerf (visited Oct. 14, 2021).

The Shareholder Commons has a substantial interest in this case. Originally, Rule 14a-8 had long protected the right of small shareholders to have their proposal included in company proxy material. 17 C.F.R. § 240.14a-8. But the amendments recently adopted by the Securities and Exchange Commission force smaller diversified shareholders to hold unduly concentrated portfolios in order to exercise their rights to communicate through shareholder proposals and otherwise muffle the voice of small and diversified shareholders. This outcome, if allowed to stand, is contrary to The Shareholder Commons' mission because it prohibits smaller, diversified investors from participating in corporate governance. For that reason, The Shareholder Commons joins Plaintiffs' request to vacate and set aside recent amendments.

Because the issue touches upon The Shareholder Commons's core mission, it has remained actively involved throughout the underlying rulemaking proceeding and other rulemaking proceedings in connection with Rule 14a-8. Specifically, during the rulemaking process that preceded the amendments, The Shareholder Commons submitted a comment. Letter from Frederick H. Alexander, CEO, The Shareholder Commons, to Vanessa Countryman, Acting Secretary, SEC (Jan. 31, 2020), https://tinyurl.com/42ya6ps4 (visited Oct. 14, 2021). More recently, The Shareholder Commons submitted a letter to the Commission with respect to other matters under Rule 14a-8 that are not at issue in this proceeding. *See* Letter from Frederick H. Alexander, CEO, The Shareholder Commons, to Gary Gensler, Chairman, SEC, and Renee Jones, Director, Division of Corporate Finance, SEC (Aug. 20, 2021), https://tinyurl.com/yv3md79u (visited Oct. 14, 2021). That letter was co-signed by 27

signatories, including investors with an aggregate $72.7 billion of assets under management, as well as three U.S. state treasurers. *See id.* In the 2021 proxy season, The Shareholder Commons worked with shareholders on 17 proposals that went to a vote, 7 of which (41 percent) cannot be resubmitted in 2022 due to the change in thresholds imposed by the Amendments. THE SHAREHOLDER COMMONS, THE BETA STEWARD PROXY REVIEW 2021: PROGRESSING TOWARD AUTHENTIC VALUE CREATION 10, 12 (Aug. 2021), https://tinyurl.com/yvthejkz (visited Oct. 14, 2021).

## SUMMARY OF ARGUMENT

Plaintiffs are asking this Court to vacate and set aside the Amendments. Plaintiffs argue that the Commission failed to quantify the impact of the Amendments on the number of proposals that will be filed, otherwise failed to quantify the costs and benefits of the Amendments, and made changes to Rule 14a-8 that were otherwise arbitrary and capricious, all in violation of the law that governs the Commission's rulemaking.

The Shareholder Commons joins Plaintiffs in asking this Court to grant summary judgment on the Plaintiffs' motion for summary judgment and vacate the Amendments in their entirety. Plaintiffs' arguments are especially acute with respect to the ability of holders of relatively small, diversified portfolios. The amendments both limit options for those holders and reduce the number of proposals that protect diversified shareholders and the U.S. economy.

In order to earn the higher returns available from riskier securities, investors often include stocks in their portfolios. Stocks are a riskier class of securities than

debt or cash. But in order to reduce the risk of holding individual stocks, investors must broadly diversify their holdings. Alas, many small investors do not have a large enough portfolio to meet the new thresholds established by the Amendments while maintaining adequate diversification. Thus, the Amendments force small shareholders to choose between either exercising their right to participate in corporate governance by making proposals or properly constructing their portfolios. This forced choice is particularly problematic for women and people of color, who have smaller portfolios on average. The Commission did not seriously consider the disparate impact the Amendments would have on the ability of small shareholders to maintain efficient portfolios and fully exercise their governance rights to communicate with companies and other shareholders.

In addition to muffling the voice of small shareholders in general, the Amendments are also likely to reduce one particular category of proposal: those that address corporate conduct based on its impact on the economy and the financial markets generally (in contrast to proposals that only address the impact of a corporation's conduct on its own financial returns). Unlike shareholders who own only a few companies, the financial returns to diversified shareholders depend largely on the return of the market as a whole, rather than on the individual performance of particular companies. For example, while a concentrated shareholder might benefit if the few companies in its portfolio create external costs that weigh on the economy, a diversified investor whose portfolio includes those same companies is likely to find that those externalities weigh down the financial performance of the rest of its portfolio and that this

downside outweighs any benefit it might receive from those few companies adding to their profits by means of those externalities.

Thus, diversified shareholders are financially incentivized to bring proposals that seek to rein in corporate behavior that creates significant costs to the economy. Shareholder engagement on these issues can protect the U.S. economy as a whole, as well as the return of the markets overall. But by forcing small holders to choose between diversifying and making shareholder proposals, the Amendments essentially remove any incentive for small shareholders to participate in such private ordering that preserves a healthy national economy. The Commission failed to account for any change to the types of proposals presented that the Amendments might engender, or the economic impact of any such change.

## BACKGROUND

### A.   Main Street investors, diversification, and beta

To best understand this case, it's helpful to be familiar with the concepts of Main Street investors, diversification, and beta.

#### 1.   Main Street investors

52 percent of American households own stock, either directly or through mutual funds. *See* SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, WHO OWNS STOCKS IN AMERICA? INDIVIDUAL INVESTORS 15 (Oct. 10, 2019), https://ti-nyurl.com/36xu3der (visited Oct. 14, 2021). For these 65 million households, the median value of stock holdings is $40,000; that means there are approximately 32.5 million households in the U.S. that own stock portfolios with a value of $40,000 or less. A subset of these own shares directly in U.S. public companies: retail investors. The

number of accounts with such shares stood at 22.7 million in 2017, with a median portfolio value of less than $28,000. *See* Allison Herron Lee, Commissioner, SEC, Public Statement, Statement on Shareholder Rights, n.14 & accompanying text (Nov. 5, 2019), https://tinyurl.com/ysf76tec (visited Oct. 14, 2021). It is these latter accounts—those with holdings in individual companies—that are eligible to file shareholder proposals under Rule 14a-8.

Additionally, the median differs for different communities. For households identifying as Black, the median holdings of stock, including through mutual funds, was $12,000. Kim Parker & Richard Fry, *More than Half of U.S. Households Have Some Investment in the Stock Market*, PEW RESEARCH CENTER (Mar. 25, 2020), https://tinyurl.com/nxfu6np8 (visited Oct. 14, 2021). For households identifying as Hispanic, the median was $10,800. *Id.* There is also a gender gap in the value of portfolios. The average 401(k) balance for women is 21% less than that of the average male participants. *Building Financial Futures*, FIDELITY INVESTMENTS, https://tinyurl.com/59ydvwmj (visited Oct. 14, 2021).

## 2.    The need for diversification

Sound investing practice requires these Main Street investors to diversify their holdings. *See generally* BURTON G. MALKIEL, A RANDOM WALK DOWN WALL STREET (2015). Diversification allows investors to reap the increased returns available from risky securities, but greatly reduces that risk—this is the critical insight of Modern Portfolio Theory. *Id.* Thus, diversification is incumbent upon most American investors. The wisdom of a diversified investment strategy can be summarized through the

philosophy of the late John Bogle, founder of Vanguard, one of the largest mutual funds companies in the world: "Don't look for the needle in the haystack; instead, buy the haystack." JOHN C. BOGLE, THE LITTLE BOOK OF COMMON SENSE INVESTING: THE ONLY WAY TO GUARANTEE YOUR FAIR SHARE OF THE STOCK MARKET 86 (2007). This core principle is reflected in federal law itself: ERISA, the law governing the fiduciary duties of certain pension trustees, requires plan fiduciaries to act prudently "by diversifying the investments of the plan." 29 U.S.C. § 404(a)(1)(C); *see also* Uniform Prudent Investor Act § 3 ("[a] trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying.").[4]

William Bernstein, a well-known asset management expert, has written that even 15 companies—a number of stocks often deemed sufficient for diversification—is insufficient to protect investors from long-term risk of underperformance. WILLIAM BERNSTEIN, THE FOUR PILLARS OF INVESTING: LESSONS FOR BUILDING A WINNING PORTFOLIO 99–102 (2002) ("In other words, you can buy a 15-stock portfolio that has low volatility, but it may put you in the poorhouse just the same."). Malkiel puts the minimum number of stocks needed for adequate diversification at 50. MALKIEL, *supra*, at 201 ("the golden number for those … fearful of looking beyond our national borders … is at least fifty equal-sized and well-diversified U.S. stocks").

---

[4] The Uniform Prudent Investor Act is a model statute that has been adopted in full by over 40 states. It replaces the 19th century standards for fiduciary duties with more modern ones.

### 3.   Beta: the all-important value factor

Thus, adequate diversification is required by accepted investing theory and federal law itself. Significantly, once a portfolio is diversified, the most important factor determining return will not be how the companies in that portfolio perform relative to other companies ("alpha"), but rather how the market performs as a whole ("beta").

Beta is chiefly influenced by the performance of the economy itself. While the valuations of stocks may vary, they ultimately revert to the mean, reflecting the portion of the global economy that they represent:

> [T]he long-term price of a universally-owning institutional investor's portfolio represents the Universal Owner's part of the appropriately discounted sum of all future GDP proportions of corporations….

> [T]he relationship between GDP and the price of the portfolio of a Universal Owner is linear in the long term.

PRINCIPLES FOR RESPONSIBLE INVESTMENT, UNIVERSAL OWNERSHIP: WHY ENVIRONMENTAL EXTERNALITIES MATTER TO INSTITUTIONAL INVESTORS 59 (2011), https://tinyurl.com/9x8n533x (visited Oct. 14, 2021). While Universal Ownership puts this idea into a mathematical proof, Warren Buffet, the world's most famous investor, uses common sense language to make the same point, explaining that total market capitalization to GDP "is probably the best single measure of where valuations stand at any given moment." Warren Buffett & Carol Loomis, *Warren Buffett on The Stock Market*, FORTUNE (Dec. 10, 2001), https://tinyurl.com/7maaxfrm (visited Oct. 14, 2021).

This reliance on overall economic performance reflects the fact that there are certain common risks faced by all companies and that diversified investors cannot avoid these risks or dilute them through diversification; these are the systematic risks that all investors face. These systematic risks may involve risks to the physical and social environments that the economy is embedded in. One recent work explained that these systematic risks lead to the relative importance of beta in comparison to alpha:

> It is not that alpha does not matter to an investor (although investors only want positive alpha, which is impossible on a total market basis), but that the impact of the market return driven by systematic risk swamps virtually any possible scenario created by skillful analysis or trading or portfolio construction.

JON LUKOMNIK & JAMES P. HAWLEY, MOVING BEYOND MODERN PORTFOLIO THEORY: INVESTING THAT MATTERS 79–116 (2021). Estimates of beta's investment significance vary, but some have calculated the amount to be greater than 90% of a portfolio's variability: "According to widely accepted research, alpha is about one-tenth as important as beta. Beta drives some 91 percent of the average portfolio's return." STEPHEN DAVIS, JON LUKOMNIK & DAVID PITT-WATSON, WHAT THEY DO WITH YOUR MONEY 50 (2016).

In light of this reliance on overall market return, Main Street investors will benefit from activities (including shareholder proposals) that discourage companies from improving their own financial performance with strategies that create systematic risk and threaten overall market return. The Principles for Responsible Investing, a global investor initiative with members having $89 trillion in assets under

9

management, recently explained how the pursuit of profit by an individual company can damage beta and thus negatively affect the return of diversified owners:

- A company strengthening its position by externalising costs onto others. The net result for the [diversified] investor can be negative when the costs across the rest of the portfolio (or market/economy) outweigh the gains to the company;

- A company or sector securing regulation that favours its interests over others. This can impair broader economic returns when such regulation hinders the development of other, more economic companies or sectors;

- A company or sector successfully exploiting common environmental, social or institutional assets. Notwithstanding greater harm to societies, economies, and markets on which investment returns depend, the benefits to the company or sector can be large enough to incentivise and enable them to overpower any defence of common assets by others.

PRINCIPLES FOR RESPONSIBLE INVESTMENT, ACTIVE OWNERSHIP 2.0: THE EVOLUTION STEWARDSHIP URGENTLY NEEDS, https://tinyurl.com/pdhxt9fa (visited Oct. 14, 2021). One commentator succinctly expressed the need for diversified investors to focus on systematic concerns: "Investment decisions that intentionally manage systems as well as portfolios can create a rising tide of investment opportunities and help avoid burning down the house." Steven Lydenberg, *It's Time for Investors to start Reporting on Both Portfolio and Systems-level Performance*, RESPONSIBLE INVESTOR (Jan. 8. 2016), https://tinyurl.com/ajsjazy4 (visited Oct. 14, 2021).

In sum, Main Street investors need the ability to (1) remain diversified and (2) engage with issuers on conduct that threatens the social and economic systems that companies rely on over the long term. It's also the case that those investors have additional interests in preserving those systems, as they must live in a society that depends on the health of the planet and communities in order to thrive.

### B.      The amendments

On November 5, 2019, the Commission issued a proposed set of amendments to Rule 14a-8. *See* Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, 84 Fed. Reg. 66,458 (Dec. 4, 2019) (A1); Press Release No. 2019-232, SEC, SEC Proposes Amendments to Modernize Shareholder Proposal Rule (Nov. 5, 2019). The Commission received thousands of comments, which overwhelmingly opposed the proposed changes. COMMENTS ON PROPOSED RULE: PROCEDURAL REQUIREMENTS AND RESUBMISSION THRESHOLDS UNDER EXCHANGE ACT RULE 14A-8, SEC, https://tinyurl.com/542kd786 (visited Oct. 14, 2021). The Shareholder Commons' comment was among those in opposition and raised concerns that the proposed amendments did not account for the interests of diversified shareholders.

On September 3, 2020, the Commission adopted the Amendments, largely tracking the original proposal. Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, 85 Fed. Reg. 70,240, 70,295 (Nov. 4, 2020) (A1279). The release explaining the Amendments made no mention of the interests of diversified shareholders. Press Release No. 2020-220, SEC, SEC Adopts Amendments to Modernize Shareholder Proposal Rule (Sept. 23, 2020). Nothing in the Commission's analysis recognized that the Amendments had especially negative effects on the interest of diversified investors or that modern investing theory requires that investors diversify in order to optimize their returns or risks.

Portions of the Amendments had marked effects on small shareholders and their ability to maintain diversified portfolios and make beta-oriented proposals:

1.  The value of shares owned necessary to make a proposal after owning shares for a period of one or two years were raised to $25,000 and $15,000, respectively.

2.  Shareholders were prevented from aggregating their shares with other shareholders in order to reach the applicable threshold.

3.  Shareholder representatives were precluded from bringing more than one proposal at any company.

4.  The procedures for appointing representatives were made more complex.

5.  Shareholders (and not just a representative) were required to meet with companies at which they made proposals.

6.  The vote threshold that a proposal must achieve at a meeting in order to qualify for resubmission in subsequent years was raised.

## **ARGUMENT**

### I.  **The amendments would prejudice the ability of small investors to diversify and exercise their rights as shareholders**

In at least five ways (*see infra* Argument I.A–E), the amendments would prejudice small investors' ability to diversify their investment portfolios and participate in corporate governance by exercising their rights as shareholders.

### A.  **Rule 14a-8 was designed to protect small shareholders**

The Commission has explained that the purpose of Rule 14a-8 is to give small investors an opportunity to communicate directly with corporations and other shareholders. That is, Rule 14a-8 "provides an opportunity for a shareholder owning a relatively small amount of a company's securities to have his or her proposal placed alongside management's proposals in that company's proxy materials for presentation to a vote at an annual or special meeting of shareholders." SEC Division of

Corporation Finance, Staff Legal Bulletin No. 14A: Shareholder Proposals (July 12, 2002), https://tinyurl.com/27h9urc4 (visited Oct. 14, 2021).

### B. The new ownership thresholds require small shareholders to unduly concentrate their holdings in order to submit proposals

Modern investing theory has demonstrated that diversification is required to efficiently manage a portfolio of securities. *See supra* Background A.2. Yet a median investor's portfolio is $40,000, and the median portfolio for households that own the shares in individual companies necessary to make proposals is only $28,000. *See supra* Background A.1. This means that even using the low number of 15 as a minimum number of stocks necessary for diversification, half of all retail investment portfolios couldn't qualify under either of the two new thresholds for submitting a proposal if their holdings were roughly equal. The amendments' consequences fall particularly hard on Black and Hispanic households and women as their portfolios are smaller. *See supra* Background A.1.

Requiring that a shareholder own $25,000 or $15,000 of stock would require most Main Street investors to concentrate their holdings in a single company. That approach would unduly risk the assets they're saving for retirement or other needs, contrary to the dictates of respected experts like John Bogle and William Bernstein. These owners would have to wait three years to have a chance at participating in corporate governance via Rule 14a-8. Yet the duration of ownership is not in any way relevant to the legitimate interest of investors in the forward-looking, long-term systemic issues raised by issuer conduct, as evidenced by the illustrative examples given

13

by Principles for Responsible Investment, *supra*, or in any other issue relevant to a corporation's on-going performance.

The forced concentrated ownership contemplated by the amendments extracts the real economic value of diversification as the price for an investor using its rights as a shareholder to give voice to concerns that are proper matters for shareholder action. Ironically, the Commission has promulgated a rule that requires Main Street investors to engage in a concentrated investing style that would be a breach of duty if a fiduciary subject to ERISA were to engage in it.

### C.   Disallowing aggregation will require small investors to unduly concentrate their ownership in order to submit shareholder proposals

The elimination of the ability to aggregate holdings will exacerbate the new ownership thresholds; as detailed above (*see supra* Argument I.B), small, diversified investors will be unable to move enough of their portfolio value into a single holding in order to meet the new threshold without increasing their risk of being unable to fund their retirement or other savings goals. Closing off the possibility of aggregating shares with other small holders magnifies the need to concentrate holdings in order to submit a proposal. Indeed, some small holders who are properly diversified would need to aggregate shareholdings even to meet the minimum threshold as it stood before the Amendments, and as it stands for three-year holdings after the Amendments. With the median value of a stock portfolio for a Black household at $12,000 and a Hispanic household at $10,800, the loss of the right to aggregate essentially bars a

significant portion of these marginalized communities from access to the corporate governance system.

Just as the new ownership thresholds would force small, diversified investors to concentrate their holdings in order to own sufficient shares to make shareholder proposals, the elimination of the ability to aggregate shares could force small shareholders to choose between diversification and making shareholder proposals. That is directly contrary to the SEC's stated purpose to "provide[] an opportunity for a shareholder owning a relatively small amount of a company's securities to have his or her proposal placed alongside management's proposals in that company's proxy materials." Staff Legal Bulletin No. 14A (emphasis added), *supra*, https://tinyurl.com/27h9urc4 (visited Oct. 14, 2021).

### D.   The limitation on the use of representatives and requirement of participation harm small, diversified investors

Non-professional investors with relatively small stakes in multiple companies naturally may prefer to use a representative with greater expertise in dealing with corporate executives. Recognizing this, the Commission has long permitted investors to use representatives to act on their behalf, both in submitting proposals and in communicating with the corporation. The Amendments make the use of representatives more difficult, by limiting the number of proposals a representative can submit to a corporation, by adding to the technical requirements for appointing a representative, and by requiring that the shareholder be personally available to meet with the corporation.

Each of these changes adds to the burden on small, diversified shareholders seeking to submit shareholder proposals but provides no corresponding benefit; they simply raise the bar for participation by the very constituency the Rule is meant to protect.

### E.   The Commission didn't properly account for the additional burden on small, diversified investors

The Release fails to adequately address the peculiar burden that the Amendments place on small, diversified shareholders. Even though the purpose of Rule 14a-8 is to give small holders the opportunity to present proposals and modern investing principles demonstrate that such investors should diversify their holdings, the Commission promulgated amendments to the Rule that force investors to choose between either following investing best practices or exercising their right to communicate through proposals. While acknowledging that commenters had raised this issue, the Commission dismissed such concerns:

> Furthermore, in theory, reallocation of portfolio assets might mean that a shareholder-proponent deviates from what would be an efficient portfolio in the absence of the final amendments. For example, a shareholder who held the minimum amount of shares for the purpose of submitting a shareholder proposal for the minimum amount of time could, instead of holding $2,000 of shares for an additional two years, choose to increase her holdings in a company from $2,000 to $25,000 to retain the ability to submit a shareholder proposal in one year. In theory, such a deviation could result in a portfolio that no longer supplies the shareholder-proponent with the desired levels of risk and return. However, if the shareholder made the minimum investment for purposes of submitting the proposal, such a portfolio-oriented investment strategy would be of secondary consideration. More generally, we do not believe that the additional investment in the company needed to hold the same $2,000 of stock for three years instead of one, or to meet the revised threshold for a one-year holding period (i.e., $25,000 - $2,000 = $23,000), on its own constitutes a cost to shareholder-proponents, as this

amount represents the holding or purchase of assets that will earn an expected rate of return in the form of capital gains and/or dividends.

Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, 85 Fed. Reg. 70,240, 70,278 (Nov. 4, 2020) (to be codified at 17 C.F.R. § 240).

The Commission assumes that there is no cost to concentrating a portfolio because the concentrated ownership position will still pay dividends—ignoring the very benefit that diversification brings, which is decreased risk, not increased return. Thus, the Commission based its analysis on patently wrong assumption. Moreover, the conclusive statement that "if the shareholder made the minimum investment for purposes of submitting the proposal, such a portfolio-oriented investment strategy would be of secondary consideration" blames the victim: without the change in thresholds, the investor would not have had to decide which strategy was secondary—she could have both made the proposal and retained a properly diversified portfolio. The increased threshold forces a choice that that was not previously required, but the Release just states that the small investors will just have to pick their poison:

> While we acknowledge that, in theory, some shareholders may not be able to satisfy the three-year ownership requirement without affecting portfolio diversification decisions to some degree, we believe the appropriate allocation of capital, taking into account various factors, including portfolio diversification and the importance of submitting a proposal for inclusion in a company's proxy statement, is something for the investor to determine.

Press Release No. 2020-220, SEC, SEC Adopts Amendments to Modernize Shareholder Proposal Rule at 31 (Sept. 23, 2020).

This complete failure to account for the interests of the very shareholders to whom the Rule is directed is clearly arbitrary and capricious and should not stand.

17

## II.   The amendments decrease the likelihood that proposals that protect important economic systems will be submitted or resubmitted

On top of all those problems, the amendments also make proposals that protect important economic systems even less likely to be submitted or resubmitted.

### A.   Holders of diversified portfolios are incentivized to introduce shareholder proposals that discourage negative externalities

Sound investing practice mandates that investors adequately diversify their portfolios: this allows investors to reap the increased returns available from risky securities, while greatly reducing that risk—it is this insight that defines Modern Portfolio Theory. *See supra* Background A.2. Moreover, once a portfolio is diversified, the chief threat to successful financial performance is systematic risks to the economy as a whole. *See supra* Background A.3. Long-term, diversified holders, sometimes referred to as "universal owners," are thus incentivized to ensure that companies in their portfolios do not create negative externalities that harm the rest of the portfolio.

This mode of stewardship has been described as follows: "Their portfolio performance depends on the economic growth and social value that their investments, and therefore society, create in aggregate. Costs externalized by one set of investments onto society are likely to weigh down performance in other parts of the portfolio." David Wood, What Do We Mean by the S in ESG?: Society as a Stakeholder in Responsible Investment, in The Routledge Handbook of Responsible Investment 553 (2018).

This distinction between individual company returns and overall market returns is critical because shareholder return at an individual company does not reflect

"externalized" costs, *i.e.*, those costs it generates but does not pay. Externalized costs include harmful emissions, resource depletion, and the instability and lost opportunities caused by eliminating employment opportunity. The collective costs of such externalities are absorbed by diversified shareholders because they degrade and endanger the stable, healthy systems that corporate financial returns depend upon.

Thus, while individual companies can "efficiently" externalize costs from their own narrow perspective (and the perspective of a shareholder of just that company), diversified shareholders pay these costs through a lowered return on their portfolios. Robert G. Hansen & John R. Lott, *Externalities and Corporate Objectives in a World with Diversified Shareholder/Consumers*, 31 J. FIN. & QUANTITATIVE ANALYSIS 1, 43–68 (1996) ("If shareholders own diversified portfolios, and if companies impose externalities on one another, shareholders do not want value maximization to be corporate policy. Instead, shareholders want companies to maximize portfolio values. This occurs when firms internalize between-firm externalities."); Frederick H. Alexander, *The Benefit Stance: Responsible Ownership in The Twenty-First Century*, 36 OXFORD REV. OF ECON. POLICY 341, 349 (2020) ("shareholder return at individual companies does not reflect the costs of externalities such as pollution, resource depletion, or harmful social inequality. Instead, those costs are borne by the economy and population as a whole, and can endanger the stable, healthy systems that a rising stock market depends upon. While individual companies can externalize costs in a race to outperform, UOs internalize many of these costs through a lowered return on their diversified portfolio").

Stewardship of the externalizing companies provides an opportunity to increase return at the portfolio level for diversified investors. *See* Madison Condon, *Externalities and the Common Owner*, 95 WASH. L. REV. 1, 6 (2020) ("A rational owner would use his power to internalize externalities so long as its share of the cost to the externality-causing firms are lower than the benefits that accrue to the entire portfolio from the elimination of the externality."); John C. Coffee, Jr., *The Future of Disclosure: ESG, Common Ownership, and Systematic Risk* (manuscript at 28) (Mar. 16, 2021) (hypothesizing that shareholders would push companies to have tighter emissions standards even if it "would reduce the financial returns for some portfolio companies … if the losses … were outweighed by gains to other firms in the portfolio"), https://tinyurl.com/53fttcjb (visited Oct. 14, 2021).

Externalized social and environmental costs can play an outsized role in the stewardship of beta. A recent study by a major asset manager was able to discern that 55% of the profits attributed to publicly listed companies globally were consumed by external costs absorbed by the rest of the economy: "In total, the earnings listed companies generate for shareholders currently total US$4.1 trillion, which would fall by 55% to US$1.9 trillion if those social and environmental impacts crystallised as financial costs. One third of companies would become loss-making." SCHRODERS, FORESIGHT, https://tinyurl.com/cffcxc74 (visited Oct. 14, 2021). Similarly, a recent report from a major law firm surveying 11 important jurisdictions for investment (including the United States) noted the increasing importance of such beta stewardship:

> In recent years investors have increasingly focused on what must be done to protect the value of their portfolios from system-wide risks

> created by the declining sustainability of various aspects of the natural or social environment. System-wide risks are the sort of risks that cannot be mitigated simply by diversifying the investments in a portfolio. They threaten the functioning of the economic, financial and wider systems on which investment performance relies. If risks of this sort materialised, they would therefore damage the performance of a portfolio as a whole and all portfolios exposed to those systems.

*A Legal Framework for Impact*, FRESHFIELDS BRUCKHAUS DERINGER, https://tinyurl.com/m3t93xrp (visited Oct. 14, 2021).

### B.  The amendments discourage small shareholders from bringing proposals that address negative externalities

As discussed above, small investors should diversify their portfolios (*see supra* Argument I.A), and the Amendments force many small investors to choose between maintaining such diversification and making proposals. When a company engages in activities that threaten the health of the entire market, Main Street investors with diversified portfolios have an economic incentive to make proposals to other shareholders (most of whom are likely equally diversified) that the company curtail such conduct. But if they are forced to concentrate their holdings in order to make proposals, they will lose the incentive to make such proposals in the first place. This Catch-22 will inevitably lead to fewer proposals that address systematic concerns. Thus, even though the Rule is aimed at making the shareholder proposal process more accommodating to small holders, the Amendments limit their ability to act on the most important aspect of return—beta.

### C.  Large investors won't necessarily fill the gap if small shareholders stop making proposals focused on Beta concerns

In the absence of beta-focused proposals from small investors, there will be a gap that may not be filled by large shareholders, even if they are diversified, because

commercial realities may make large shareholders less inclined to lead on beta proposals. Large portfolios are managed by professional asset managers, who compete on the basis of low fees and relative performance. Leading on beta proposals will use professional time, adding to cost, but, by definition, not improve relative performance. Because improved beta creates a rising tide, an asset manager who successfully creates it cannot point to performance superior to its peers to justify any expenditures to its clients. As a result, market realities reduce the incentives for the service providers to help large shareholders pursue beta proposals, even if those proposals would benefit the large shareholders themselves. This means that small, diversified shareholders may have the strongest incentives to lead the way on beta-oriented proposals—the type of proposal that is likely to benefit the entire economy.

## D.     Raising the resubmission thresholds burdens small holders

Even if small shareholders overcome the obstacles to filing proposals created by the Amendments, the increase in the thresholds for resubmitting proposals will create a new burden for them. In general, smaller shareholders are likely to have limited access to sophisticated communication strategies and resources. Thus, where they make beta-oriented proposals, it may be difficult for them to counter management arguments against the proposals.

In contrast, companies have the economic incentive to expend significant efforts opposing proposals that would benefit the economy and the financial markets by preventing them from exploiting negative externalities for profit. This David and Goliath dynamic can increase the time it takes for proposals from small, diversified

shareholders to gain traction among the investor community. Raising the voting threshold for resubmission has made it more difficult for these proposals to succeed. The Shareholder Commons supported seven beta-oriented proposal in the 2021 proxy season that failed under the new thresholds but would have succeeded under the old Rule. *See supra* Statement.

### E.     The Commission didn't consider the economic effect of the potential for the amendments to reduce Beta-oriented proposals

The economic analysis that the Commission undertook failed to consider that the Amendments might not simply reduce the number of proposals but might also be more likely to reduce a particular type of proposal, *i.e.*, those that relate to systemic issues that effect the economy as a whole. This is a significant gap in its analysis and provides added reason for vacating the Amendments.

### CONCLUSION

The Court should grant plaintiffs' motion for summary judgment and vacate the Amendments in their entirety.

Respectfully submitted,

/s/ Todd Foster

|  |  |
|---|---|
| Thomas A. Burns (*pro hac vice*) | Todd A. Foster (Bar ID FL0048) |
| BURNS, P.A. | BARNETT, KIRKWOOD, LONG, |
| 301 W. Platt St., Ste. 137 |   KOCHE & FOSTER, P.A. |
| Tampa, FL 33606 | 601 S. Bayshore Blvd., Ste. 700 |
| (813) 642-6350 | Tampa, FL 33606 |
| tburns@burnslawpa.com | (813) 253-2020 |
|  | tfoster@barnettbolt.com |

*Counsel for amicus curiae*

23

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I served a true and correct copy of the foregoing

brief via CM/ECF on this 15th day of October, 2021, to all counsel of record.

October 15, 2021                                    /s/ Todd Foster
                                                    Todd A. Foster