# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INTERFAITH CENTER ON CORPORATE
RESPONSIBILITY, JAMES McRITCHIE,
and AS YOU SOW,

                    Plaintiffs,

    v.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

             Defendant.

No. 1:21-cv-01620-RBW

<u>ORAL ARGUMENT REQUESTED</u>

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT AND OPPOSITION TO
## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Eric A. Posner
(*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654

Robert K. Kry
D.C. Bar #490545
Sarah J. Newman
D.C. Bar #1047210
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2011
Fax: (202) 556-2001
rkry@mololamken.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.    The Commission Failed To Conduct the Required Cost-Benefit Analysis ...................... 3

    A.    The Commission Must Quantify the Impact of a Rule if Possible ......................... 3

    B.    The Commission Failed To Quantify the Impact of Its Rule on the Number
        of Shareholder Proposals ....................................................................................... 6

    C.    The Commission Failed To Quantify the Benefits of Shareholder
        Proposals ................................................................................................................ 8

    D.    The Commission Failed To Scrutinize the Cost Savings Data ............................. 11

    E.    The Commission Failed To Quantify the Costs to Shareholder-Proponents ........ 12

II.   The Commission Improperly Concealed the Broadridge Data ........................................ 14

    A.    The Commission Relied on Its Analysis of the Broadridge Data ........................ 14

    B.    The Commission Did Not Timely Disclose Its Analysis ..................................... 16

    C.    The Notice and Comment Violation Was Not Harmless ..................................... 19

III.  The Commission's Restrictions on Aggregation and Representatives
    Are Unlawful ................................................................................................................. 21

    A.    The Commission's Elimination of Aggregation Was Arbitrary and
        Capricious ............................................................................................................ 21

    B.    The Commission's Limitation on the Number of Clients a Representative
        May Represent Was Arbitrary and Capricious ..................................................... 22

    C.    The Commission's Personal Engagement Requirement Was Arbitrary
        and Capricious ..................................................................................................... 23

    D.    The Commission's Restrictions on Representatives Exceed Its Authority .......... 24

CONCLUSION .................................................................................................................. 25

## **TABLE OF AUTHORITIES**

Page(s)

### CASES[1]

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*,
No. 17-cv-02000, 2019 WL 450676 (D.D.C. Feb. 4, 2019)....................................................19

*Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975 (D.C. Cir. 1991)................................................16

*Banner Health v. Price*, 867 F.3d 1323 (D.C. Cir. 2017).............................................................8

*California ex rel. Becerra v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153
(N.D. Cal. 2019)......................................................................................................................18

* *Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990)...........................................................24

* *Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)................................................4, 6, 12

*Catholic Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
No. 21-cv-00094, 2021 WL 3609986 (D.D.C. Apr. 4, 2021)................................................17

* *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).........................................3, 4, 6

* *Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006).........................................19, 21

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003)...........................................................25

* *Conn. Light & Power Co. v. NRC*, 673 F.2d 525 (D.C. Cir. 1982)...........................................16

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995)..........................................18

*Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*,
195 F.3d 28 (D.C. Cir. 1999)....................................................................................................6

*Inv. Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013) ...........................................................5, 6

* *Kennecott Corp. v. EPA*, 684 F.2d 1007 (D.C. Cir. 1982) ...................................................15, 16

*Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016) .........................................................................6

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984) .............11, 12

*N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012).............................18

---

[1] Authorities on which we chiefly rely are marked by an asterisk.

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Safety Admin.*, 494 F.3d 188
  (D.C. Cir. 2007) ...................................................................................................15

*Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984) .........................................................17

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).................................17

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011)..................................................6

*Teicher v. SEC*, 177 F.3d 1016 (D.C. Cir. 1999).........................................................24

*Yee v. City of Escondido*, 503 U.S. 519 (1992)............................................................22

## STATUTES

5 U.S.C. § 553 ............................................................................................................15

## ADMINISTRATIVE MATERIALS

84 Fed. Reg. 66,458 (Dec. 4, 2019)....................................................................16, 18, 19

85 Fed. Reg. 70,240 (Nov. 4, 2020)............................................................... *passim*

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ..................................17

Exec. Order No. 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011).......................................17

Div. of Risk, Strategy & Fin. Innovation & Off. of Gen. Counsel,
  U.S. Sec. & Exch. Comm'n, *Memorandum re: Current Guidance
  on Economic Analysis in SEC Rulemakings* (Mar. 16, 2012)..................................20

Off. of Investor Advocate, U.S. Sec. & Exch. Comm'n, *Report on Activities:
  Fiscal Year 2020* (2020) ......................................................................................17

U.S. Sec. & Exch. Comm'n, *Sunshine Act Meetings* (Aug. 14, 2020) .........................18

## OTHER AUTHORITIES

Vicente Cuñat *et al.*, *The Vote Is Cast: The Effect of Corporate Governance
  on Shareholder Value*, 67 J. Finance 1943 (2012)..................................................10

Diligent Institute, *The High Cost of Governance Deficits* (2019) ...................................9

## **INTRODUCTION**

The Commission admits that the Exchange Act requires it to "determine ***as best it can*** the economic implications" of a rule.  SEC Br. 15 (emphasis added).  But the Commission ignores that mandate in this case.  In its view, whenever "the Commission 'd[oes] not have the data necessary to ***quantify precisely***' a particular cost or benefit," a mere "***qualitative*** discussion is sufficient."  *Id.* at 16 (emphasis added).  In other words, if a minor imperfection in the data precludes the Commission from making an ***exact*** determination, the Commission can simply throw up its hands, dispense with the numbers, and retreat to vague generalities.  That hardly amounts to doing the "best it can" to conduct a cost-benefit analysis.  It is tantamount to throwing in the towel at the first sign of imprecision.

The Commission's erroneous view of the law infected its entire economic analysis.  The Commission had data in hand that allowed it to quantify the number of proposals that would be excluded by its new holding period requirements.  But the Commission ignored that data and relied on qualitative generalities instead.  It ***tripled*** the holding period for small investors despite admitting that it had ***no idea*** whether that change would result in a 0% reduction in proposals or a 56% reduction – a range so broad it provides no guidance at all.  Under that approach, the Commission could just as easily have justified a ***thirty-year*** holding period.  Having abandoned any effort to quantify the impact, the Commission could reach whatever result it pleased.

The Commission then did the same thing when analyzing the benefits of shareholder proposals.  Commenters pointed to numerous studies showing that proposals create billions of dollars of shareholder value – orders of magnitude more than the modest cost savings the rule sought to achieve.  After nitpicking certain details, however, the Commission declared itself free to ignore the studies altogether.  Instead, it offered a qualitative list of pros and cons that would justify whatever approach the Commission preferred – even one that sacrificed billions of dollars

in shareholder value to save management some modest administrative costs that the Commission admitted could be as little as $1.16 million per year for all companies combined.

That is not what the D.C. Circuit envisioned when it required the Commission to determine "as best it can" the economic effects of a rule.  Cost-benefit analysis is supposed to be a meaningful constraint on the Commission's actions – not a bump in the road to its preferred outcome.  The Commission's refusal to quantify costs and benefits threatens billions of dollars of shareholder value by insulating corporate management from important oversight.  The rule's unquantified costs also fall disproportionately on Main Street investors who may have limited means but who propose some of the most valuable and widely supported reforms.

The Commission urges that shareholder proposals present a "risk of abuse" because proponents represent only a "tiny fraction of all shareholders."  SEC Br. 5.  But the number of proposals has been *decreasing* in recent years while approval rates have been *increasing*, and many proposals now achieve substantial and even majority support.  A2:1; A113:23 & n.31; A816:12; A933:1-2, 7-8 & n.16; *see also* Council of Institutional Investors Amicus Br. 7-18 (showing approval trends for various governance reforms and other proposals).  That a small group of shareholders may submit many of the proposals is beside the point when their proposals so often achieve widespread approval.  Far from "abusing" the process, those shareholders have successfully persuaded their fellow shareholders of the merits of their initiatives.[1]

The Commission imposed drastic new limits on shareholder proposals without conducting the economic analysis that D.C. Circuit precedent requires.  The Commission also violated procedural requirements by concealing the key Broadridge data until the eleventh hour,

---

[1] The Chamber of Commerce's amicus brief is even more detached from reality when it describes the proposal process as a "free-for-all that a small minority of special interests use to advance their idiosyncratic social and policy agendas at the expense of Main Street investors."  Chamber of Commerce Amicus Br. 2.  If there were any truth to that description, proposals would not routinely command such widespread support.

and it imposed arbitrary and unauthorized limits on ownership aggregation and the use of representatives. The Court should vacate the rule in its entirety.

## ARGUMENT

### I.  THE COMMISSION FAILED TO CONDUCT THE REQUIRED COST-BENEFIT ANALYSIS

The Commission starts from the premise that, if it cannot quantify costs exactly, it does not have to quantify costs at all. That is not the law.

#### A.  The Commission Must Quantify the Impact of a Rule if Possible

The Commission repeatedly downplays its obligation to quantify costs and benefits despite clear precedent requiring it to do so. At some points, the Commission claims it need not quantify costs and benefits where imperfections in the data prevent it from making a ***precise*** quantification. *See, e.g.*, SEC Br. 16 ("[W]hen the Commission 'd[oes] not have the data necessary to quantify precisely' a particular cost or benefit, a qualitative discussion is sufficient . . . ."); *id.* at 21 (similar). At other points, the Commission suggests it has no obligation to quantify costs and benefits ***at all***. *See, e.g.*, *id.* at 15 ("Nothing in the Exchange Act or the APA requires the Commission to undertake a formal, quantified cost-benefit analysis."). Neither of those arguments is correct. D.C. Circuit precedent clearly requires the Commission to do its best to quantify costs and benefits when possible to do so.

In *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005), for example, the court vacated an SEC rule that imposed two new requirements on mutual funds: first, to have 75% independent directors, and second, to have an independent chairman. On the first requirement, the Commission claimed that it was "difficult to determine the costs associated with electing independent directors" because it lacked a "reliable basis for determining how funds would choose" among different methods of complying. *Id.* at 143. The court rejected that excuse: "That particular difficulty may mean the Commission can determine only the ***range*** within

which a fund's cost of compliance will fall," but "it does not excuse the Commission from its statutory obligation to ***determine as best it can*** the economic implications of the rule it has proposed." *Id.* (emphasis added). The Commission had to "exercise its expertise to make tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, ***even if*** . . . the estimate will be imprecise." *Id.* (emphasis added).

As for the independent chairman requirement, the court accepted that data limitations made it difficult to estimate the "aggregate cost to the mutual fund industry." 412 F.3d at 144. But it held that the Commission "readily could have estimated the cost to an individual fund, which estimate would be pertinent to its assessment of the effect the condition would have." *Id.* Again, while "uncertainty may limit what the Commission can do, . . . it does not excuse the Commission from its statutory obligation to ***do what it can*** to apprise itself . . . of the economic consequences of a proposed regulation." *Id.* (emphasis added).

The court reiterated those principles in *Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011). There, the court vacated an SEC rule granting proxy access to shareholder board nominees. The Commission, it held, "failed adequately to quantify . . . certain costs or to explain why those costs could not be quantified." *Id.* at 1149. It "did nothing to estimate and quantify the costs it expected companies to incur; nor did it claim estimating those costs was not possible, for empirical evidence about expenditures in traditional proxy contests was readily available." *Id.* at 1150. "Because the agency failed to 'make tough choices about which of the competing estimates is most plausible, [or] to hazard a guess as to which is correct,' . . . it neglected its statutory obligation to assess the economic consequences of its rule." *Id.* (citation omitted).

Those precedents squarely foreclose the Commission's assertion that it need not perform a "quantified cost-benefit analysis." SEC Br. 15. The court of appeals set aside SEC rules

***precisely because*** the Commission had not quantified costs and benefits.  Those precedents also foreclose the Commission's more nuanced position that it need not quantify costs and benefits if it cannot do so "precisely."  *Id.* at 16.  The Commission must quantify costs and benefits ***even if*** imperfections in the data mean it can determine only a "range" or "estimate" of a rule's impact.  The Commission's duty to determine a rule's impact "as best it can" necessarily means doing what it can to quantify that impact despite imprecision in the data – not giving up at the first sign the agency cannot fix an exact number.  An "estimate," almost by definition, is not precise.  But the Commission must do its best to estimate regardless.

Those principles follow not just from precedent but from common sense.  The purpose of cost-benefit analysis is to guide the agency's exercise of authority and discretion.  If the agency need only assemble a qualitative list of pros and cons for a rule, the exercise imposes no constraint on the agency's actions at all.  The same list of qualitative generalities could justify a three-year holding period, a ten-year period, or a fifty-year period.  It could justify eliminating shareholder proposals whether the lost governance reforms would cost shareholders millions of dollars, billions of dollars, or even more.  Without ***quantifying*** the costs and benefits of a rule – so the Commission can actually estimate the impact of the rule and ***weigh*** those costs and benefits against each other – the exercise serves no real purpose and is a mere fig leaf that allows the agency to reach whatever result it wishes.

Neither of the Commission's cases supports its view.  In *Investment Company Institute v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013), the plaintiffs challenged a CFTC data collection rule on the ground that the agency had not quantified the benefits of "preventing future financial crises."  *Id.* at 379.  The court rejected that argument because those benefits were truly "unquantifiable."  *Id.*  "[T]he law," it held, "does not require agencies to measure the immeasurable."  *Id.*

Similarly, in *Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016), the court held that the benefits of preempting certain state laws were "immeasurable" and "unquantifiable." *Id.* at 658. The court reaffirmed that the Commission must "determine ***as best it can*** the economic implications of the rule." *Id.* at 657 (quoting *Chamber of Commerce*, 412 F.3d at 143) (emphasis added).

*Investment Company* and *Lindeen* thus addressed situations where quantification was ***impossible***, not just imprecise. Read in that context, those cases are fully compatible with the D.C. Circuit's earlier holdings in *Chamber of Commerce* and *Business Roundtable* that the Commission must quantify costs and benefits when possible. To the extent there is any tension, the earlier cases prevail. *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("[W]hen a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail."); *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) (similar). The Commission must quantify costs and benefits if it is possible to do so.

### B. The Commission Failed To Quantify the Impact of Its Rule on the Number of Shareholder Proposals

The Commission imposed sharp new ownership requirements that ***tripled*** the holding period for shareholders with $2,000 of stock. Yet the Commission admits that it utterly failed to "quantify the marginal impact on proponents of the proposed two- and three-year thresholds." SEC Br. 16. "Instead, the Commission derived upper bound (56%) and lower bound (0%) estimates of the percentage of currently eligible proposals that would be excludable by assuming that ***all*** or ***none*** of currently eligible proponents satisfied the duration requirements." *Id.* at 16-17 (emphasis added). It is hard to imagine a more blatant failure to quantify the key variable driving the impact of a rule.

The Commission admits that "it had *some* duration data" – namely, the Broadridge data showing holding periods for millions of investor accounts.  SEC Br. 17 n.2.  But in its view, it could ignore that data entirely by deeming it not "reliable."  *Id.* at 18.  The shortcomings the Commission identifies, however, show only that the data was *imprecise* – not that it provided no useful information at all.  The fact that some shareholders might hold stock through multiple accounts, or that the dates in the Broadridge data might differ slightly from the ones that determine eligibility, or that the data might not clearly distinguish between retail and institutional accounts, are at worst sources of error – they do not render the data useless.  Opening Br. 24-25.  To determine the impact of a rule "as best it can," the Commission must do its best to estimate the rule's impact despite such imperfections – it cannot rely on the imperfections as an excuse to do no quantitative analysis at all.

The Commission now focuses on its objection that the Broadridge data covers *all* shareholders, not just shareholders "likely" to submit proposals.  SEC Br. 17-18 & n.2.  That myopic focus distorts the impact of the rule.  *All* shareholders have a *right* to submit proposals, provided they satisfy applicable eligibility criteria.  The SEC's new restrictions thus dramatically impact the *rights* of all shareholders, regardless of which ones are "likely" to submit proposals in any given year.  It is a basic principle of economics and corporate law that a right can be valuable even if not exercised.  A1224:3-4.  The impact on that right is precisely what the Broadridge data would have permitted the Commission to analyze.

Even if the Commission were correct to focus only on shareholders "likely" to submit proposals, it identified no reason to think that holding periods for those investors would be any higher or lower on average than holding periods for investors generally.  Mere imprecision is not a sufficient basis for refusing to quantify a rule's impact, so the mere *possibility* that a source of

imprecision might exist – a possibility the Commission has never attempted to substantiate – cannot suffice either.

The Commission claims that it did not ***fail*** to quantify the rule's impact; it "merely relied on ***different*** data" that was "specific to shareholder-proponents."  SEC Br. 18-19.  In fact, with respect to the key rule change at issue – the massive increase in required holding periods from one year to three years – the agency's "different" data provided no information whatsoever.  The Commission admits that its historical proxy data contained ***"no duration information" at all*** beyond one year – precisely the information the Commission needed to assess the impact of its three-fold increase in holding periods.  *Id.* at 19.  On that critical issue, the Commission did not rely on "different" data.  It relied on ***no*** data.  *Contrast Banner Health v. Price*, 867 F.3d 1323, 1356 (D.C. Cir. 2017) (deferring to agency's choice of predictive model because it "correlated reasonably well" with costs the agency sought to measure).

Besides, the question is not whether the Broadridge data or the historical proxy data was superior.  If the Commission thought the historical proxy data was informative too, it should have analyzed ***both*** data sets.  That approach would make particular sense if the Commission thought that each data set had different shortcomings.  Instead, the Commission arbitrarily ignored one of the two data sets entirely – the only one with holding period data.

### C.     The Commission Failed To Quantify the Benefits of Shareholder Proposals

The Commission repeated the same error when it refused to quantify the benefits of shareholder proposals that would be lost due to its increased ownership requirements, stricter resubmission thresholds, and other new requirements.  The Commission claims it satisfied its obligation merely by ***observing*** that "shareholder proposals may bring benefits to companies and their shareholders" and that the loss of those benefits "would be a cost of the rule."  SEC Br. 22. Without ***estimating*** those benefits, however, the Commission had no way to know whether the

meager cost savings its rule sought to achieve would be worth it. The Commission's qualitative approach epitomizes why cost-benefit analysis requires the agency to do more than simply list out pluses and minuses of a proposed rule.

Perhaps the Commission could justify its approach if the benefits of shareholder proposals were truly "immeasurable" or "unquantifiable." But they are not. Commenters pointed to a wealth of empirical studies showing that shareholder proposals – and the governance reforms and ESG policies they promote – correlate with improved financial performance and shareholder value. Opening Br. 30-31. The Commission's attempts to nitpick those studies may show that it "lack[ed] data to quantify . . . [the] benefit *with precision*." SEC Br. 21 (emphasis added). But that is not the test. The Commission must do the "best it can" to estimate the amount of shareholder value its rule would destroy.

With respect to the many long-term studies showing that governance reforms and ESG policies correlate with improved financial performance, the Commission speculates that some policies may have been adopted "for reasons other than the submission of shareholder proposals." SEC Br. 23. But the Commission offers no reason whatsoever to think that a governance reform or ESG policy is any less likely to benefit shareholders depending on whether the company adopted it in response to a shareholder proposal or for some other reason. Once again, the Commission is merely speculating about a *potential* source of imprecision. That is not a good enough reason to dispense with quantitative analysis altogether.[2]

---

[2] Nor can the Commission avoid quantifying benefits by claiming that the long-term studies do not "provide evidence of a causal relation" – a critique that can be lodged against most statistical regression analyses. SEC Br. 23. The Commission offers no reason to think that positive financial performance *causes* corporate governance reforms rather than the other way around, and in fact one key study showed that companies that *already had* strong governance policies outperformed their peers. *See* Diligent Institute, *The High Cost of Governance Deficits* 4 (2019) (cited at A1220:2). Regardless, causation issues do not make it *impossible* to quantify benefits; at most, they inform what conclusions to draw from the numbers derived.

With respect to the many short-term studies showing that approval of shareholder proposals correlates with positive stock price returns, the Commission speculates that "short-term market reactions may reflect other contemporaneous events or market expectations." SEC Br. 23. Again, that is speculation: The Commission never identifies what "contemporaneous events" the studies failed to exclude. At most, the critique goes to the studies' precision, not to whether the Commission could dispense with quantitative analysis altogether. Moreover, the Commission admits that at least one rigorous study *did* control for confounding events. *Id.* at 24 (discussing Vicente Cuñat *et al.*, *The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. Finance 1943 (2012)). The Commission's only response is that that study addressed governance reforms and not other types of proposals. *Id.* That is no reason to ignore the study with respect to *that* category of proposals – indeed, governance reforms are the traditional heartland of shareholder proposals. Opening Br. 3-4.

All studies are imperfect in one respect or another. While those imperfections may justify the Commission in selecting *among* studies when fashioning a rule, they are not an excuse to ignore *all* the studies and forgo quantification entirely. The Commission had an obligation to determine *as best it could* the costs of its increased ownership requirements, stricter resubmission thresholds, and other limitations. Its refusal to consider *any* empirical data on those pivotal issues made it impossible to conduct a meaningful cost-benefit analysis.

The Commission's complaints about imprecision ring particularly hollow in this case. As commenters observed, the billions of dollars in long-term shareholder value imperiled by the Commission's rule is *orders of magnitude greater* than the paltry administrative cost savings the Commission sought to achieve. Opening Br. 11. By the Commission's own admission, those cost savings could be as little as $1.16 million per year for all companies combined. 85 Fed.

Reg. 70,240, 70,274 (Nov. 4, 2020).  The empirical studies would have to be far more than just "imprecise" to swing the balance the other way.  Nitpicking the details of the studies might be productive if this were a close question, but it is not.  The only way the Commission could justify the route it took was by dispensing with quantitative analysis entirely.

The Commission finally points to factors that might "mitigat[e]" the impact of its rule, including "changes in proponent behavior in response to the amendments (such as holdings adjustments)" or the prospect that "proposals that would have been submitted by shareholders that no longer meet the new thresholds may be taken up by other shareholders that do."  SEC Br. 24.  That is no response at all.  If shareholders find ways to submit proposals despite the rule, that may reduce the benefits lost, but it will also reduce whatever cost savings the rule aimed to achieve, for precisely the same number of proposals.  The Commission cannot have it both ways.

### D.     The Commission Failed To Scrutinize the Cost Savings Data

The Commission's analysis of the purported cost savings – the only impact the Commission purported to quantify – was similarly deficient.  The Commission's solicitation of cost information from commenters resulted in an extremely broad range of estimates.  The Commission then simply declared that the cost savings would fall somewhere within that enormous range, without any scrutiny of the estimates submitted.

The Commission claims it was entitled to accept whatever figures commenters submitted. SEC Br. 29.  But the case it cites says no such thing.  In *National Ass'n of Regulatory Utility Commissioners v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984), the court upheld certain FCC orders after finding that "[t]his is ***not*** a case in which party submissions were accepted uncritically by the Commission."  *Id.* at 1125 (emphasis added).  The FCC had "very carefully threaded its way through the opposing claims," "reject[ing] a number of petitions as 'unsupported speculation' and criticiz[ing] other more substantially grounded estimates."  *Id.*  The agency "evaluat[ed] the

sufficiency of those comments, and responsively adjust[ed] its access orders to achieve what it determined in its expert discretion to be the optimum balance among its statutory goals."  *Id.*

Here, the Commission did the opposite.  It uncritically accepted whatever figures commenters submitted and then embraced them all as marking out the full gamut of possibilities. That is not the work of an agency doing the "best it can" to estimate costs.  The Commission cannot outsource its work to the commenting public.

The Commission acknowledges, moreover, that the estimates at the high end of the range were inflated by legal fees and other expenses management incurred trying to ***exclude*** proposals. SEC Br. 27.  The Commission has never offered any rational justification for including those costs in its analysis.  The problem is not just that the costs are avoidable.  *Cf. id.* at 30.  They are ***self-inflicted***.   The Commission provides no coherent rationale for including costs that management willingly incurs in an effort to keep proposals off the ballot.

The Commission claims that the "implication" of *Business Roundtable* supports its position.  SEC Br. 30.  That case does no such thing.  The court held there that the Commission should have considered the costs companies incurred opposing shareholder nominees because directors would typically be "compelled by [their] fiduciary duty to make an appropriate effort to oppose the nominee."  647 F.3d at 1150.  The costs were not "discretionary" at all.  Here, by contrast, the Commission never claimed that companies were ***required*** to seek no-action relief from shareholder proposals, as opposed to simply submitting the proposals to shareholders and letting shareholders make up their own minds.

### E.      The Commission Failed To Quantify the Costs to Shareholder-Proponents

Finally, the Commission failed to analyze the costs of its rule for shareholder-proponents. While the Commission urges that it "identified" and "discussed" certain costs, SEC Br. 25, it did

nothing to *quantify* them.  Instead, it simply asserted – without any evidence – that the costs would be "relatively modest."  *Id.*  That is no substitute for economic analysis.

The Commission protests that it had no "data on proponents' portfolio holdings, investment preferences and resources."  SEC Br. 25.  On the contrary, there was plenty of data.  The median individual stock portfolio in the United States was worth about $27,700 in 2017.  A978:2.  Average holding times were between four and eight months.  A2:3; A1175:5.  The Commission's new rule thus forces many investors either to devote practically their entire savings to the one company where they want to submit a proposal, or else to hold securities for about *six times* as long as they otherwise would.  Far from imposing "relatively modest" burdens, the rule creates a significant obstacle to Main Street investor participation in the shareholder proposal process.

The Commission points out that "proponents would earn a return on their holdings" while waiting around multiple years to become eligible.  SEC Br. 25.  But prudent investors seek a *diversified* portfolio; they do not bet the farm on a single stock.  A978:2; *see also* Shareholder Commons Amicus Br. 5-10, 13-14 (explaining that "[t]he forced concentrated ownership contemplated by the amendments extracts the real economic value of diversification as the price for an investor using its rights as a shareholder to give voice to concerns").  To maintain a reasonably diversified portfolio with no more than 5% in any one stock, an investor would need *hundreds of thousands of dollars* to invest $25,000 in a single company.  A933:10.  That requirement may pose no obstacle to the Warren Buffetts of the world, but the shareholder proposal process was designed for Main Street investors too.  The Commission's cavalier treatment of those burdens is reason enough to vacate the rule.

## II.     THE COMMISSION IMPROPERLY CONCEALED THE BROADRIDGE DATA

The Commission also violated basic procedural requirements.  The Commission admits it had "a duty 'to identify and make available technical studies and data that [the agency] has employed in reaching the decisions to propose particular rules' in time to permit 'meaningful commentary.'"  SEC Br. 32.  Yet the Commission concealed its Chief Economist's and staff's analysis of the critical Broadridge data until *six months* after the comment period ended, barely a month before issuing its final rule.

### A.     The Commission Relied on Its Analysis of the Broadridge Data

The Commission first argues that it had no duty to disclose the Broadridge data or its staff analysis *at all* because it "did not rely" on those materials in formulating its rule.  SEC Br. 32.  The Commission, however, clearly relied on its *Chief Economist's* analysis in determining whether the Broadridge data contained meaningful information about holding periods.  The Commission analyzed and agreed with its Chief Economist's assessment and, on that basis, proceeded with its drastic three-fold increase to holding periods even though it had no idea how many proposals the increase would exclude.

That reliance is unmistakable.  In its final rule, the Commission discussed the Broadridge data, the staff analysis, and its Chief Economist's analysis at length.  85 Fed. Reg. at 70,263, 70,268-69.  It concluded:  "*We concur* with the conclusions of the Commission's Chief Economist set forth in the August 14, 2020 memorandum accompanying the Preliminary Staff Analysis."  *Id.* at 70,263 (emphasis added).  Even now, while the Commission disputes whether it relied on the "preliminary staff analysis" or "the Broadridge data," it never actually denies that it relied on the Chief Economist's analysis.  SEC Br. 32.  To the contrary, it admits that that analysis "influenced the Commission's decision."  *Id.* at 33.  Requiring the Commission to disclose that analysis would not "eviscerate longstanding limits on Section 553's scope."  *Id.*  It

14

would simply require the Commission to follow the law when it curtails longstanding and important shareholder rights.

The Commission claims that, even if it relied on the Chief Economist's analysis, it was not required to disclose that analysis because the analysis "was not 'central' – or even relevant – to the Commission's 'decision to adopt the [amendments].'" SEC Br. 33. But nothing in 5 U.S.C. § 553 limits the Commission's disclosure obligations to "central" issues. Rather, the agency must "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007). Nowhere does that standard turn on the Commission's assessment of the "centrality" of an issue.[3]

In any case, the Broadridge analysis *was* "central" (and certainly at least "relevant"). One of the most significant changes the Commission made was tripling the required holding period for small investors with only $2,000 in stock from one year to three years – a change that has a particularly severe impact on less affluent Main Street investors who may have valuable governance reforms to propose but who lack the means to purchase large blocks of stock while maintaining reasonable diversification. The Commission was required to quantify that impact if it was possible to do so, and the Chief Economist's analysis of the Broadridge data was critical to the Commission's determination that it was *not* possible to do so – *i.e.*, that the Commission had no meaningful holding period data from which to perform the analysis. The Chief Economist's analysis thus fundamentally drove the path the Commission took on this critical issue.

---

[3] Neither of the Commission's cases says otherwise. In *Owner-Operator*, the petitioner repeatedly accused the agency of omitting "central" information, but the court never suggested that that was the legal standard. 494 F.3d at 198-99, 201. In *Kennecott Corp. v. EPA*, 684 F.2d 1007 (D.C. Cir. 1982), the court addressed the "central" nature of certain information only because it was relevant for other purposes under the unique statutory review scheme at issue. *See id.* at 1017 & n.28 (noting that court could set aside agency action, *even absent* timely objection, if issue was of "central relevance to the outcome"); *id.* at 1019 & n.32 (agency must convene a proceeding for reconsideration of a rule for issues of "central relevance"). Neither case suggests that Section 553's disclosure obligation applies only to information that is "central."

The Commission finally argues that it was not required to disclose its analysis of the Broadridge data because the supposed lack of relevant holding period information in that data was "an objective fact, not a disputable 'claim.'" SEC Br. 33. In fact, the claim was very much disputable. As explained above, even though the Broadridge data contains holding period data for all shareholders and not just shareholders "likely" to submit proposals, the data is still highly relevant because (1) *all* shareholders have the *right* to submit proposals; and (2) there is no evidence that "likely" proponents have substantially different holding periods from "unlikely" ones. Commenters had a right to make those points to the Commission and persuade it to change its mind. The Commission could not avoid that debate simply by declaring its own view of the record "objectively" correct.

## B.       The Commission Did Not Timely Disclose Its Analysis

Nor did the Commission disclose its analysis of the Broadridge data "in time to allow for meaningful commentary." *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530-31 (D.C. Cir. 1982). The comment period ended on February 3, 2020. 84 Fed. Reg. 66,458, 66,458 (Dec. 4, 2019). The Commission revealed its analysis more than *six months later*, on August 14, 2020. A1278. It then promulgated its rule scarcely a month after that, on September 23, 2020. 85 Fed. Reg. at 70,295. That timing clearly did not afford an adequate opportunity for public comment.

The D.C. Circuit routinely vacates rules where an agency discloses important information at the eleventh hour, after the comment period has already ended. *See, e.g.*, *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019 (D.C. Cir. 1982) (vacating rule where agency placed economic forecast data in the record after the comment period ended and only one week before issuing final rule); *cf. Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975, 1010 (D.C. Cir. 1991) (vacating rule where agency relied on data that "came into existence only after the close of the comment period"). That principle requires vacatur of the Commission's rule here.

16

The Commission urges that "a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." SEC Br. 33. But the fact that a 30-day comment period may be sufficient in some circumstances does not mean it sufficed here. The D.C. Circuit has described 30 days as "cut[ting] the comment period to the bone," *Petry v. Block*, 737 F.2d 1193, 1202 (D.C. Cir. 1984), and other cases have found similar periods inadequate, *see Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011) (holding 28 days instead of "usual 90 days" insufficient); *Catholic Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, No. 21-cv-00094, 2021 WL 3609986, at *2-3 (D.D.C. Apr. 4, 2021) (30 days likely insufficient). The Executive Branch agrees: "[T]wo Executive Orders state that agencies should 'generally' or 'in most cases' provide at least 60 days for comments." *Catholic Legal Immigr. Network*, 2021 WL 3609986, at *3 (citing Exec. Order No. 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011); Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)).

One month was not sufficient here. The agency's analysis of the Broadridge data implicated complex technical issues that plainly would have taken commenters significant time to investigate and digest. The analysis also concerned a critical issue in the rulemaking that went to the heart of the rule's impact on Main Street investors – a fact that should have led the agency to be especially solicitous of public input.

The Commission, moreover, did not actually invite any comments when it disclosed the Broadridge data. A1278. Instead, it "quietly submitted the analysis into the public comment file" with "no press release, no official statement, nor so much as a tweet to draw the public's attention to this new information." Off. of Investor Advocate, U.S. Sec. & Exch. Comm'n, *Report on Activities: Fiscal Year 2020*, at 4 (2020). On the very same day the Commission

submitted the information, it scheduled the open meeting to release the final rule a month later. *See* U.S. Sec. & Exch. Comm'n, *Sunshine Act Meetings* (Aug. 14, 2020).  Those actions hardly bespeak an earnest effort to encourage public input.  Rather, they suggest that the Commission had already made up its mind and was charging ahead to the finish line.

The best evidence that the Commission's late submission did not invite meaningful public comment was that hardly anyone interpreted it that way.  The Commission received **almost 1200** comment letters during the actual comment period.  A2-A1181.  By contrast, the Commission received only **two** comments on its Broadridge analysis.  A1223; A1224.  Even those comments were abbreviated, raising only preliminary concerns and emphasizing that they were not intended as a "substitute for a meaningful public comment process."  A1224:2.  Those facts confirm that the Commission did not provide adequate time to respond.  *See N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (comparing 11,000 comments received over 60-day comment period to 800 comments received over 10-day period and finding 10-day period insufficient); *California ex rel. Becerra v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1177-78 (N.D. Cal. 2019) (similar).

Finally, the Commission cannot redeem its late disclosure by pointing to Footnote 245 of its original proposing release.  That footnote stated cryptically that the agency had "received some non-public retail share ownership data from a market participant who requested confidential treatment for the data," briefly mentioned some concerns, and invited commenters to submit more data.  84 Fed. Reg. at 66,498 n.245.  It did not meaningfully explain **what the data was**, let alone the purported deficiencies.  That one inscrutable footnote did not come close to satisfying the agency's notice and comment obligations.  *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1396, 1402 (9th Cir. 1995) (agency violated notice and comment

requirements where proposing release "mention[ed]" study but "neither discuss[ed] the results of the study nor provide[d] a citation for it").[4]

Even more far-fetched is the Commission's reliance on the boilerplate statement in the preamble to its proposing release that "[w]e or the staff may add studies, memoranda, or other substantive items to the comment file during this rulemaking."  84 Fed. Reg. at 66,458.  An agency cannot satisfy notice and comment by informing the public that it may add unspecified "studies" or "memoranda" to the comment file at some future date.  The agency actually has to say what the studies and memoranda are.  *Cf. 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, No. 17-cv-02000, 2019 WL 450676, at *11 (D.D.C. Feb. 4, 2019) (explaining that "boilerplate notices clearly fail to satisfy the 'specific nature' standard" of the requirement that agencies give notice of the subject matter of meetings).

### C.     The Notice and Comment Violation Was Not Harmless

The Commission claims that any notice and comment violation was harmless.  SEC Br. 34-35.  To show prejudice from such a violation, however, plaintiffs need not "show[] that the Commission would have reached a different result."  *Chamber of Commerce v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006).  They need only show they "had something useful to say."  *Id.* Plaintiffs have already made that showing in their opening brief.  Opening Br. 20-29.

The Commission responds that "the arguments plaintiffs have identified are the very same ones they and others raised before the Commission."  SEC Br. 34 (citing a comment letter signed by one of the three plaintiffs).  The Commission's only support for that claim is the observation that the comment letter argued that the Broadridge data was imperfect but not

---

[4] Contrary to the Commission's claim, the proposing release did ***not*** say the Commission had "not relied" on the Broadridge data.  SEC Br. 34.  It merely said the data had shortcomings and invited ***better*** data.  84 Fed. Reg. at 66,498 n.245.  Commenters could not reasonably have inferred from that footnote that the Commission planned to ignore its imperfect holding period data and proceed on the basis of no data at all.

irrelevant, and plaintiffs make the same point here. *Id.* Of course, defined at that high level of generality, it is not surprising that the submissions overlap. But even a cursory comparison shows that the abbreviated comment letter merely scratched the surface of what plaintiffs could have argued on these issues. *Compare* A1224 *with* Opening Br. 20-29.

There is much more plaintiffs could have argued too. For example, plaintiffs could have urged the Commission to seek clarification or supplementary information from Broadridge addressing the supposed shortcomings in its data, or additional information from other sources filling in the perceived gaps. The Commission protests that agencies have no obligation to "conduct or commission their own empirical or statistical studies." SEC Br. 17 n.2. But the Commission clearly has ***authority*** to obtain more information when appropriate; the SEC's own economic guidance recognizes as much. *See* Div. of Risk, Strategy & Fin. Innovation & Off. of Gen. Counsel, U.S. Sec. & Exch. Comm'n, *Memorandum re: Current Guidance on Economic Analysis in SEC Rulemakings* 12 (Mar. 16, 2012) (explaining that "staff should identify any specific data that would be necessary for or that would assist in quantification, and should consider various mechanisms by which to seek such data"). Whether or not the Commission was ***required*** to obtain supplementary data, it was required to give plaintiffs the opportunity to persuade it that it ***should*** do so.

Even apart from plaintiffs' own submissions, the rulemaking would have unfolded very differently if the Commission had timely disclosed its analysis. It is a safe bet that more than two of the 1200 comment letters would have addressed this key issue; the sheer volume and diversity of views may have convinced the Commission to change course. Moreover, the Commission would have had a more meaningful opportunity to consider the issue at an earlier stage. The comment letter at issue was filed a mere two weeks before the Commission issued its

final rule.  A1224.  While the Commission evidently had enough time to add a short response, it blinks reality to suggest that the Commission was still meaningfully deciding how to proceed at that very late stage in the process.

Finally, the Commission asserts in a footnote that any error was harmless because the staff analysis based on the Broadridge data estimated a 50% to 78% reduction in proposals, while the Commission's own analysis estimated a 0% to 56% reduction, and the small overlap in those ranges somehow proves the Commission might have reached the same result regardless.  SEC Br. 35 n.9.  That argument is absurd.  Regardless of any overlap, there is an obvious difference between a rule that will eliminate 50% to 78% of proposals and a rule that will eliminate only 0% to 56%.  In any event, plaintiffs are not required to "show[ ] that the Commission would have reached a different result" – only that they "had something useful to say."  *Chamber of Commerce*, 443 F.3d at 905.  Plaintiffs clearly meet that standard here.

## III. THE COMMISSION'S RESTRICTIONS ON AGGREGATION AND REPRESENTATIVES ARE UNLAWFUL

The Commission also violated the Administrative Procedure Act by abandoning its longstanding policy allowing aggregation of shareholdings and by imposing arbitrary new restrictions on the use of representatives.  The Commission provides no coherent justification for those changes.

### A. The Commission's Elimination of Aggregation Was Arbitrary and Capricious

The Commission's rationale for eliminating its ownership aggregation rule was circular. Its sole justification was that "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that ***each shareholder*** who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company."  85 Fed. Reg. at 70,248.  That rationale begs the question because it

simply assumes that the relevant unit of analysis is "each shareholder" rather than each group of like-minded shareholders.

The Commission offers no coherent response.  It points out that "the relevant unit of analysis depends on the 'objectives' of the requirement at issue" and that it would not make sense to "let two children . . . aggregate their heights to meet an amusement park ride restriction."  SEC Br. 36.  True enough, but it is hard to see why amusement park safety regulation is the pertinent analogy here.  The Commission failed to explain why *one* shareholder's ownership of $25,000 in stock would be any more likely to produce proposals that align with corporate interests than *two* shareholders' ownership of the same amount.  In the first scenario, the shareholder might have a greater individual holding (and therefore supposedly a greater alignment of interest), but in the second scenario, the fact that *multiple* shareholders support a proposal provides its own evidence of alignment by eliminating the possibility that a proposal reflects only one shareholder's idiosyncratic views.  The Commission never explained why focusing on each shareholder rather than each group was more likely to produce proposals that align with corporate interests.[5]

**B.    The Commission's Limitation on the Number of Clients a Representative May Represent Was Arbitrary and Capricious**

The Commission similarly failed to justify its new rule prohibiting multiple shareholders from engaging the same representative to submit proposals on their behalf.  The Commission's primary rationale was that the rule would reduce the number of proposals.  85 Fed. Reg. at 70,255.  The Commission does not even attempt to defend that justification here.

---

[5] The Commission's elimination of the aggregation rule also creates an arbitrary distinction between groups of shareholders and joint owners of an account.  Opening Br. 39.  The Commission complains that this specific argument was not raised before the agency.  SEC Br. 37.  But the Commission itself mentioned the issue of joint accounts in its rule.  85 Fed. Reg. at 70,248 & n.88.  Besides, the argument is not a new claim; it is merely additional support for the existing claim that the elimination of aggregation was arbitrary and capricious.  *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

Instead, the Commission claims that the limitation responds to "the risk of abuse" that could supposedly occur "[w]hen a representative appears to be the driving force behind a proposal," "with only an acquiescent interest by the shareholder."  SEC Br. 37-38.  But the Commission points to no evidence that such abuses are actually occurring.  The Commission claims it may "make precautionary or prophylactic responses to **_perceived_** risks."  SEC Br. 38 (emphasis added).  But the agency's "perceptions" must still be grounded in reality, not speculation.  Because the Commission identified no actual evidence that these supposed abuses were either occurring or even likely to occur, its rule was arbitrary and capricious.

### C.  The Commission's Personal Engagement Requirement Was Arbitrary and Capricious

The Commission similarly failed to justify its new rule requiring shareholders to personally engage with corporate management rather than relying on experienced and knowledgeable representatives to act on their behalf.  As plaintiffs explained, many Main Street investors have valuable ideas for corporate reform but feel intimidated by the prospect of interacting directly with the management of large corporations and would be discouraged from submitting proposals if required to do so.  Opening Br. 18, 41; A816:30; A1175:10.  The Commission failed to consider that important aspect of the problem in promulgating its rule.

The Commission points to its statement that "a shareholder-proponent who elects to require a company to include a proposal in its proxy statement . . . should be willing and available to discuss the proposal."  SEC Br. 39.  In its view, "[t]he willingness to participate in a discussion with the company . . . is an indication that the proponent has a genuine and meaningful interest in the proposal."  *Id.*  That is no response at all.  The fact that many small investors are intimidated by the prospect of meeting with corporate management does not make

their proposals any less "genuine or meaningful."  The Commission's rationale thus fails to address the concern that commenters raised.[6]

### D.   The Commission's Restrictions on Representatives Exceed Its Authority

Finally, the new limitations on representatives exceed the Commission's statutory authority.  The D.C. Circuit made clear in *Business Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990), that "the Exchange Act cannot be understood to include regulation of an issue that is so far beyond matters of disclosure" and which trenches on matters "traditionally left to the states." *Id.* at 408.  The Commission must exercise its authority with "some concept of the relevant domain."  *Teicher v. SEC*, 177 F.3d 1016, 1019 (D.C. Cir. 1999).  The Commission flouted those principles here.  State agency law has traditionally determined how many clients an agent may represent and what actions the agent may take without the client's personal involvement.  The Commission's new restrictions on representatives seek to leverage its authority over proxy statements into a far-removed power to rewrite those traditional state-law principles.

The Commission tries to distinguish *Business Roundtable* on the ground that the intrusion into state law here is "narrow."  SEC Br. 41-42.  But that case's holding did not turn on whether the intrusion was broad or narrow.  Rather, the court held that the Commission could not leverage its authority over proxy disclosures to venture into unrelated state-law domains.  905 F.2d at 408.  The Commission's power over proxy disclosures does not imply a power to limit how many clients a representative may represent, any more than the Commission's power over annual securities filings implies a power to regulate how many clients a securities lawyer may represent.  The problem is not that federal and state law "overlap."  SEC Br. 42.  It is that

---

[6] The Commission also asserts that it "reasonably concluded that such engagement 'may be more likely to occur where the company knows the shareholder-proponent's availability in advance.'"  SEC Br. 40.  The quoted portion of the rule, however, has nothing to do with **personal** shareholder engagement with management – it addresses the more general requirement to specify availability for a meeting in advance.  85 Fed. Reg. at 70,253-54.  The Commission addressed personal shareholder engagement separately in the following paragraph.  *Id.* at 70,254.

Congress's grant of authority over proxy disclosures cannot reasonably be read to encompass a power to regulate these fundamentally unrelated topics.[7]

## **CONCLUSION**

The Court should grant plaintiffs' motion for summary judgment, vacate the SEC's rule in its entirety, and deny the Commission's cross-motion for summary judgment.


Dated:    December 17, 2021                    Respectfully submitted,
          Washington, D.C.


                                                 /s/ Robert K. Kry
Eric A. Posner                                 Robert K. Kry
(*pro hac vice*)                               D.C. Bar #490545
MOLOLAMKEN LLP                                 Sarah J. Newman
300 North LaSalle Street                       D.C. Bar #1047210
Chicago, IL  60654                             MOLOLAMKEN LLP
                                               The Watergate, Suite 500
                                               600 New Hampshire Avenue, N.W.
                                               Washington, D.C.  20037
                                               Tel.: (202) 556-2011
                                               Fax: (202) 556-2001
                                               rkry@mololamken.com


*Attorneys for Plaintiffs*

---

[7] Plaintiffs do not seek summary judgment on Count V of the Complaint, but they have not abandoned the claim either.  *Cf.* SEC Br. 43 n.12.  By contrast, while the SEC nominally moves for summary judgment on Count V, it offers no argument or explanation as to why it is entitled to that relief.  The Commission has therefore forfeited the argument.  *See City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003) (argument forfeited where it was raised "only summarily, without explanation or reasoning").  There is no proper basis for granting summary judgment to either party on that claim.