UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                 )
INTERFAITH CENTER ON CORPORATE RESPONSIBILITY,   )
JAMES McRITCHIE and AS YOU SOW,                  )
                                  Plaintiffs,    )
                                                 )
            v.                                   )   No.  1:21-cv-1620-RBW
                                                 )
UNITED STATES SECURITIES                         )
AND EXCHANGE COMMISSION,                          )
                                  Defendant.     )
_____)


**BRIEF OF COUNCIL OF INSTITUTIONAL INVESTORS
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Cornish F. Hitchcock                    Jeffrey P. Mahoney (Of counsel)
(D.C. Bar No. 238824)                   (D.C. Bar No. 420965)
Hitchcock Law Firm PLLC                 General Counsel
5614 Connecticut Avenue, NW, No. 304    COUNCIL OF INSTITUTIONAL
Washington, DC   20015                  INVESTORS
 (202) 489-4813 • conh@hitchlaw.com     1717 Pennsylvania Ave. NW, Suite 350
                                        Washington, D.C.   20006
                                        (202) 261-7081 • jeff@cii.org

*Counsel for Amicus Curiae the Council of Institutional Investors*

September 2021

# TABLE OF CONTENTS

Page

BRIEF OF *AMICUS CURIAE* .................................................................. 1

INTEREST OF *AMICUS CURIAE* ........................................................... 1

ARGUMENT ........................................................................................... 2

      Introduction ..................................................................................... 2

  I. SHAREHOLDER PROPOSALS HAVE MADE SIGNIFICANT
     IMPROVEMENTS IN CORPORATE GOVERNANCE EVEN
     WITHOUT MAJORITY SUPPORT. ................................................ 7

  II. THE SEC FAILED ADEQUATELY TO ADDRESS KEY POINTS. .................... 18

CONCLUSION......................................................................................21

# TABLE OF AUTHORITIES

Cases:

*Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc.*,
  54 F.3d 69 (2d Cir. 1995) ...............................................................3

*Business Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) .....................................................13

*J.I. Case Co. v. Borak*,
  377 U.S. 426, 431 (1964) ..............................................................3

*Morgan v. Virginia*,
  328 U.S. 373 (1946) ....................................................................10

*New York City Employees' Retirement System v. American Brands, Inc.*,
  634 F. Supp. 1382 (S.D.N.Y. 1986) ...............................................4

*Peck v. Greyhound Corp.*,
  97 F. Supp. 679 (S.D.N.Y. 1951) ..................................................10

*Roosevelt v. E.I. Du Pont de Nemours & Co.*,
  958 F.2d 416 (D.C. Cir. 1992) .......................................................8

Statutes:

15 U.S.C. § 78n(a) ...........................................................................3
15 U.S.C. § 78n-1 ..........................................................................15
26 U.S.C. § 527(e)(1), (2) ..............................................................16

_____

\* Authorities principally relied upon are indicated by an asterisk.

Delaware Code § 211(a) ............................................................2
Delaware Code § 211(b) ............................................................2

Legislative materials:
H.R. Rep. No. 1383, 73d Cong., 2d Sess. (1934) ..............................3
S. Rep. No. 792, 73d Cong., 2d Sess. (1934) ...................................3

Regulations and regulatory materials:
SEC Rule 14A, 17 C.F.R. § 240.14a-1 *et seq.* ...................................4
SEC Rule 14a-8, 17 C.F.R. § 240.14-8....................................*passim*
SEC Rule 14a-9, 17 C.F.R. § 240.14-9........................................4

*Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to*
   *Proposals by Security Holders*,
   48 Fed. Reg. 38218 (23 August 1983) .....................................5

*Amendments to Rules on Shareholder Proposals*,
   62 FED. REG. 50682 (26 September 1997) ...............................5

*Concept Release on the U.S. Proxy System*,
   75 FED. REG. 42982 (22 July 2010) ......................................19

*Facilitating Shareholder Director Nominations*,
   75 FED. REG. 56668 (16 September 2010) ..............................13

*Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a–8*,
   85 FED. REG. 70240 (4 November 2020) ...........................1-2, 5-6

Other authorities:
Bebchuk, *The Case for Increasing Shareholder Power,* 118 HARV. L. REV. 833 (2005) ....11

Bebchuk, Coates and Subramanian, *The Powerful Antitakeover Force of*
   *Staggered Boards: Theory, Evidence, and Policy*,
   54 STANFORD L. REV. 887 (2002) ........................................11

Bebchuk and Kastiel, *The Untenable Case for Perpetual Dual-Class Stock*,
   103 VA. L. REV. 585 (2017) ..............................................20

A. Berle and G. Means, THE MODERN CORPORATION AND PRIVATE PROPERTY (1932) .......8

Center for Political Accountability, *2020 CPA-Zicklin Index of Corporate Political*
   *Disclosure and Accountability* 23 (2020),
   available at https://politicalaccountability.net/hifi/files/2020-CPA-Zicklin-Index.pdf.......16-17

Facebook, *2021 Proxy Statement*, available at
   https://www.sec.gov/Archives/edgar/data/1326801/000132680121000022/facebook20
   21definitiveprox.htm ...................................................20

Fairfax, *Social Activism through Shareholder Activism*,
76 WASH. & LEE L. REV. 1129, 1133-1135 (2019) ...........................................10

Ford Motor Co*., 2021 Proxy Statement*, available at
https://www.sec.gov/Archives/edgar/data/37996/000104746921000813/a2243092zdef
14a.htm..........................................................................................................20

Global Reporting Initiative, *Sustainability reporting is growing, with GRI the global
common language* (1 December 2020), available at
https://www.globalreporting.org/about-gri/news-center/2020-12-01-sustainability-
reporting-is-growing-with-gri-the-global-common-
language/#:~:text=The%202020%20KPMG%20Survey%20of,countries%20%E2%80
%93%2080%25%20do%20so. .....................................................................17

Governance and Accountability Institute, 9*0% of S&P 500 Index Companies Publish
Sustainability Reports in 2019, G&A Announces in its Latest Annual 2020 Flash
Report* (16 July 2020), available at
https://www.globenewswire.com/news-release/2020/07/16/2063434/0/en/90-of-S-P-
500-Index-Companies-Publish-Sustainability-Reports-in-2019-G-A-Announces-in-
its-Latest-Annual-2020-Flash-Report.html.......................................................17

Gregory, *Proxy Access: A Five Year Review*, HARVARD LAW SCHOOL FORUM ON
CORPORATE GOVERNANCE (4 February 2020), available at
https://corpgov.law.harvard.edu/2020/02/04/proxy-access-a-five-year-review/ ................13

Haan, *Shareholder Proposal Settlements and the Private Ordering of Public Elections*,
126 YALE L.J. 262 (2016) ............................................................................10

Investor Advisory Committee, *Recommendation of the SEC Investor
Advisory Committee (IAC) Proxy Plumbing* (5 September 2019), available at
https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-
recommendation-proxy-plumbing.pdf...............................................................19

Investor Advisory Committee, *Recommendation of the SEC Investor
Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy
Advisors and Shareholder Proposals* at 1 (24 January 2020), available at
https://www.sec.gov/spotlight/investor-advisory-committee-2012/sec-guidance-and-
rule-proposals-on-proxy-advisors-and-shareholder-proposals.pdf.....................................19

Jensen & Meckling, *Theory of the Firm: Managerial Behavior, Agency
Costs and Ownership Structure*, 3 J. FIN. ECON. 305 (1976) ...............................8

Kanzer, *Putting Human Rights on the Agenda: The Use of Shareholder Proposals to
Address Corporate Human Rights Performance* (2009), available at
https://www.domini.com/uploads/legacy/Finance_for_a_Better_World_Kanzer.pdf ........10

* Papadopoulos, *The Long View: The Role of Shareholder Proposals in*

*Shaping U.S. Corporate Governance (2000-2018),* HARVARD LAW SCHOOL FORUM ON
CORPORATE GOVERNANCE (6 February 2019), available at
https://corpgov.law.harvard.edu/2019/02/06/the-long-view-the-role-of-shareholder-
proposals-in-shaping-u-s-corporate-governance-2000-2018/.............................................9, 14-15

* Tonello, *Corporate Board Practices in the Russell 3000 and S&P 500* (18 October 2020),
HARVARD LAW SCHOOL FORUM ON CORPORATE  GOVERNANCE, available at
https://corpgov.law.harvard.edu/2020/10/18/corporate-board-practices-in-the-russell-
3000-and-sp-500/.................................................................................................... 12

T. Rowe Price, *T. Rowe Price To Compensate Clients For Dell Voting Error* (2016),
https://www.troweprice.com/corporate/us/en/press/t--rowe-price-to-compensate-
clients-for-dell-voting-error.html ........................................................................ 18-19

Wikipedia, *Criticism of Facebook*, available at
https://en.wikipedia.org/wiki/Criticism_of_Facebook................................................. 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
INTERFAITH CENTER ON CORPORATE RESPONSIBILITY,  )
JAMES McRITCHIE and AS YOU SOW,                 )
                                     Plaintiffs,          )
                                                              )
             v.                                           )   No.  1:21-cv-1620-RBW
                                                              )
UNITED STATES SECURITIES                          )
AND EXCHANGE COMMISSION,                       )
                                     Defendant.          )
_____)

**BRIEF OF COUNCIL OF INSTITUTIONAL INVESTORS
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTEREST OF *AMICUS CURIAE***

The Council of Institutional Investors ("CII") is a nonprofit association of U.S. public,

corporate and union employee benefit funds, other employee benefit plans, state and local

entities charged with investing public assets, and foundations and endowments with combined

assets under management of approximately $4 trillion.  CII's fund members include major long-

term shareowners with a duty to protect the retirement savings of millions of workers and their

families, including public pension funds with more than 15 million participants.  Associate

members include non-U.S. asset owners with about $4 trillion in assets, as well as other asset

managers with over $35 trillion in assets under management.

CII fund members are long-term investors with a fiduciary obligation to safeguard and

grow their investments.  To that end, they seek to invest in companies that operate with

transparency, have a board and management that are accountable to shareholders, and

appropriately manage risk to promote the business's long-term health.  Because sound corporate

governance is critical to long-term returns  — and because poor governance can have a negative

result on returns — CII members have a strong interest in seeing that shareholders can submit and vote on shareholder proposals that raise important corporate governance issues.

The final rule in this case places significant limits on such proposals. Because CII members have had considerable experience with shareholder proposals over the years, CII's participation as *amicus curiae* would help the Court by providing context for and a unique perspective on how the final rule is harmful not only to CII members, but to the millions of participants and beneficiaries who have invested their savings in those plans.[1]

## ARGUMENT

At issue here is the validity of the 2020 amendments to the Securities and Exchange Commission's rule governing shareholder proposals, known as Rule 14a-8 (17 C.F.R. § 240.14-8). *Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a–8*, 85 FED. REG. 70240 (4 November 2020). This brief will not repeat the plaintiffs' arguments, but will try to place those arguments in context by focusing on how shareholder proposals have been valuable in promoting good corporate governance and long-term shareholder value, goals that will be diminished if these recent amendments are allowed to stand.

Introduction.

Publicly traded companies are generally required by the law of their state of incorporation to conduct an annual meeting of shareholders, and a shareholder who attends such a meeting may present a proposal for a vote by all shareholders on any topic that is a proper subject for shareholder action under state law. *E.g.*, 8 Del. Code §§ 211(a), (b).

As a practical matter, however, many companies are widely held, and travel to annual

---

[1] No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than CII, its members, or its counsel contributed money intended to fund preparing or submitting the brief.

meetings may be costly or inconvenient for many shareholders. As a result, companies generally provide their stockholders with written (and, these days, electronic) notice of a meeting, along with a "proxy statement" that lists and explains the items to be voted at the meeting, and a "proxy card" that the stockholder fills out and returns, thus providing instructions as to how his or her shares are be voted at the meeting.

Poor in-person attendance at annual meetings is not a new phenomenon. In fact, the 73rd Congress was aware of this situation when it enacted the Securities Exchange Act of 1934 (the "Act"), section 14 of which makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C § 78n(a). As the Supreme Court has explained, Congress deemed this provision necessary to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964), citing legislative report language stating that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange," H.R. Rep. No. 1383, 73d Cong., 2d Sess. 13 (1934), that section 14 was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders," *id*. at 14, and that "[t]oo often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S. Rep. No. 792, 73d Cong., 2d Sess. 12 (1934). See also *Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc*., 54 F.3d 69, 72 (2d Cir. 1995) ("In order to exercise the right of corporate suffrage, shareholders must be informed of important issues confronting the corporation," and section 14(a) of the Act "provides the framework").

A series of SEC rules govern the content of proxy materials and the procedures for soliciting proxies.  17 C.F.R. § 240.14a-1 *et seq*.  Two of those rules are important in addressing the problems about lack of notice to shareholders that lay behind the adoption of section 14.

Rule 14a-9 (17 C.F.R. § 240.14a-9) requires that proxy materials not be materially false or misleading.  Thus, if a company knows in advance that a shareholder intends to present a proposal at the annual meeting, yet fails to disclose that item in its proxy materials, the proxy materials may violate this rule.  See *New York City Employees' Retirement System v. American Brands, Inc.*, 634 F. Supp. 1382, 1386 (S.D.N.Y. 1986).

Rule 14a-8, the rule at issue here, sets out the conditions that a shareholder must meet in order to assure that a proposal is included in a company's proxy materials.  In a nutshell–

• the proponent must have held a specified amount of stock for a specified period of time, Rule 14a-8(b);

• the proponent may submit only one proposal of no more than 500 words (including a supporting statement), by a deadline disclosed by the company, Rule 14a-8(c), (d), (e);

• the proposal must not fall within one of 13 content-based exemptions, Rule 14a-8(i)),[2] one of which was amended here to increase the percentage of "yes" votes the proposal must have received in order to be resubmitted in later years, Rule 14a-8(i)(12).

The 2020 amendments sharply limited the eligibility of shareholders to submit proposals. Notably, Rule 14a-8(b) replaced a requirement that a proponent must have held $2000 worth of stock for one year with a tiered schedule of $25,000 for one year, $15,000 for two years, $2000

---

[2] For example, the exemptions thus allow companies to omit a proposal that is improper under state law or would cause the company to violate the law; that advances a personal grievance; that asks the company to do something it lacks the power to do; that relates to "ordinary business" decisions best left to management; that conflicts with a management proposal or proposes a policy that has been "substantially implemented"; that duplicates another shareholder proposal that the company intends to include; that relates to a specific amount of cash or stock dividends.  Rule 14a-8(i)(1), (2), (4), (6), (7), (9), (10), (11), (13).

4

for three years, along with a prohibition of shareholders aggregating their shares to meet that

threshold.  In addition, Rule 14a-8(i)(12) was amended so that a proposal may be resubmitted if

it had been voted within the past five years and received a "yes" vote of 5% if voted once (up

from 3%); 15% if voted twice (up from 6%) and 25% if voted three times (up from 10%).[3]

The effect of these amendments – plus others cited in plaintiffs' complaint – is to limit

the number of shareholders eligible to submit proposals, thus limiting the ability of shareholders

to communicate with each other on issues of importance to their investment, not to mention

limiting the ability of a company's shareholders *as a whole* to advise the board of directors as to

owners' views on a topic.

The rationale for the SEC's decision was clear and simple: Too many shareholder

proposals are being filed each year by shareholders who lack a sufficient "economic stake" to

warrant all those proposals being submitted, and companies should be freed from the obligation

to print and distribute such proposals because few of these proposals are unlikely ever to "earn

majority support" in a shareholder vote.[4]  The Commission estimated that the 2020 amendments

could eliminate up to 56% of all proposals in a given year.  85 FED. REG. at 70271, Table 1.  But

if anything, this estimate could sweep far more broadly.

Plaintiffs' complaint notes that the proposed rule failed to disclose a staff economic

cost/benefit analysis, based on data from 6,820 U.S. companies with shareholder meetings over a

three-year period reflecting holdings for a total of 28,476,865 unique retail accounts.  That

---

[3] Rule 14a-8 did not contain minimum holding requirements prior to 1983, when the Commission adopted a "$1000 for one year" limit.  *Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders*, 48 FED. REG. 38218 (23 August 1983).  The minimum holding requirement was raised to $2000 in 1997.  *Amendments to Rules on Shareholder Proposals*, 62 FED. REG. 50682 (26 September 1997).  The "3%-6%-10%" resubmission thresholds have been in effect since the early days of the rule.

[4] The Commission's statement accompanying these rule changes refers to the concept of "economic stake" over 20 times and to the concept of "majority support" over 40 times.

analysis – disclosed only after the comment period had closed – indicated that the rule changes could limit shareholder proposals far more drastically, in that (a) more stringent holding requirements close to the ones adopted in the final rule would result in a 50% to 78% reduction in the shareholdings that would qualify for submission of a proposal and (b) for 22% to 55% of all companies, fewer than 5% of accounts would remain eligible.  Complaint ¶¶ 56-61, 80-81.

With respect to the higher resubmission thresholds, the Commission found that higher limits were necessary to weed out proposals that appeared to have no hope of attaining majority shareholder support in the near future.  85 FED. REG. at 70258.  This myopic focus on majority support obscured the fact that many proposals can lead to governance changes even if they never come close to attaining a "yes" vote of 50.1%.[5]

In the first section below, we explain why this approach gave too much significance to the supposed "cost" of shareholder proposals and underestimated the benefits. As a result, by raising the ownership thresholds needed to resubmit proposals, the Commission underestimated the fact that many governance reforms that have received widespread acceptance in the marketplace were offered by shareholders (often individuals) with small holdings. The size of an individual's holdings has no correlation with the significance of a given issue for the long term health of a company.

We then discuss how, in its haste to adopt these rule changes, the Commission put the cart before the horse by raising the percentage of votes needed to resubmit proposals even after the Commission has acknowledged serious flaws in the ways votes are counted in the current "proxy plumbing" system, *i.e.*, the procedures by which intermediaries process the millions if not

---

[5] Shareholder proposals tend to be precatory in nature, and even if they are adopted by the shareholders, they do not bind the board of directors to take the requested action.  See note accompanying Rule 14a-8(i)(1).  The lack of significance of a majority "yes" vote is a further indication of why the Commission erred in focusing on whether a given proposal was ever likely to reach that threshold.

billions of shares that may be voted at individual companies.  A related concern to which the Commission paid short shrift is the effect of higher resubmission thresholds on shareholder votes at companies that have multiple classes of stock, *e.g.*, one class of "common stock" that sold to the public and a smaller number of "Class B" shares that are held by company founders, founders' families and other insiders.  Such Class B shares may be entitled to two or 10 or 20 or another number of votes per share, and because those shares are usually voted against shareholder proposals, the higher resubmission requirements in the 2020 amendments have a disproportionate impact on proposals submitted at such dual class companies.

I.  SHAREHOLDER PROPOSALS HAVE MADE SIGNIFICANT IMPROVEMENTS IN CORPORATE GOVERNANCE EVEN WITHOUT MAJORITY SUPPORT.

Shareholder proposals are important to CII and its members, because such proposals allow shareholders to raise questions about – and change – a company's corporate governance. Good corporate governance is an important guarantor of long-term shareholder value, a goal that is important to CII fund members, who have fiduciary obligations to the participants and beneficiaries in the pension and benefit plans these funds operate.  A 35 year-old employee today will want to receive his or her promised retirement benefits 30 years in the future, and CII fund members are responsible for meeting that need.

Viewed from that perspective, good corporate governance is important to CII fund members and to shareholders generally because of the potential "agency costs" arising from the separation of ownership and control of many corporations, particularly when ownership is widely dispersed among many shareholders (the principals), and control is held by management and the board (the agents), who may have their own agenda in addition to that of the principals. These divergent interests can result in agency costs.

"Agency costs" may also arise because of asymmetric information between shareholders

and managers  or because of a conflict of interest between shareholders and managers.  Such risks place a premium on sound corporate governance, namely, having a board of directors that not only appoints management, but is also independent of management and works to assure that management is operating in the best interest of shareholders.   See generally Jensen & Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976);  A. Berle and G. Means, The Modern Corporation and Private Property (1932).

Shareholder proposals – from investors with either large or small holdings – can raise important governance issues on which shareholders may wish to communicate with management, as well as each other.  Rule 14a-8 thus plays a critical role in shareholder-director communications, as the Rule gives shareholders "[a]ccess to management proxy solicitations to sound out management views and to communicate with other shareholders on matters of major import...."  *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 421 (D.C. Cir. 1992) (R.B. Ginsburg, J.).

The Commission's single-minded focus on the failure of shareholder proposals to achieve a majority vote was short-sighted, as there is a rich history of shareholder proposals improving corporate governance, often over the strenuous opposition of managements and directors, even if the proposals failed to receive majority support.  In the next section of the brief, we summarize some key areas where shareholder proposals have led to significant governance changes.

Before discussing specific examples, however, a general observation is warranted.  Shareholder proposals that come to a vote often fail to obtain majority support.  The point is illustrated by a 2019 report by ISS Analytics, the research arm of Institutional Shareholder Services ("ISS"), a proxy advisory firm that analyzes company proxy statements and advises

clients on voting their shares.  The following chart shows over the past two decades, support for shareholder proposals peaked at a 37% level of support after the Enron, WorldCom scandals and the resulting Sarbanes-Oxley reforms.



Papadopoulos, *The Long View: The Role of Shareholder Proposals in Shaping U.S. Corporate Governance (2000-2018),* HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (6 February 2019) https://corpgov.law.harvard.edu/2019/02/06/the-long-view-the-role-of-shareholder-proposals-in-shaping-u-s-corporate-governance-2000-2018/ (hereinafter "*ISS Long Review Report*").

But if all that is true, if shareholder proposals tend not to achieve 51% of the vote, what then would be the justification for *not* amending Rule 14a-8 to weed out proposals that have little chance of winning majority support?  There are several answers.

First, the Commission failed to acknowledge that shareholder proposals can raise important issues that management is unlikely to raise, much less add to the agenda for a

shareholder vote.  Indeed, sometimes shareholder proposals may raise an issue that management would prefer not be raised at all.  Even if such proposals do not garner a large vote, they may prompt management – and other shareholders – to think about issues that might otherwise be ignored.[6]

Second, and as the ensuing discussion will indicate, companies may – and often do – implement the policy recommended in a shareholder proposal, either in whole or in part. Enlightened managements may realize that if a significant segment of shareholders want the company to do X, it may be in the company's best interest to do so.

Third, the Commission's focus on whether proposals can attain majority support overlooks the fact that many shareholder proposals are withdrawn if, after a dialogue with the proponent, the company agrees to implement some or all of the policy recommended in the proposal.  Such negotiated resolutions covered many topics over the years.  Haan, *Shareholder Proposal Settlements and the Private Ordering of Public Elections*, 126 YALE L.J. 262 (2016).

Finally, once some companies start adopting a specific governance reform, other companies may see that the reform does not have the dire consequences that opponents initially predicted, and thus more companies may be willing to take the plunge, with the result that

---

[6] In 1950, after the Supreme Court declared that segregated seating on commercial interstate buses was unconstitutional, *Morgan v. Virginia,* 328 U.S. 373, 386 (1946), a civil rights activist named James Peck submitted a shareholder proposal to Greyhound recommending abolition of the company's segregated seating system in the south.  Greyhound refused to print the proposal, claiming that it was "not a proper subject" for shareholder action." Peck sued to get his proposal onto Greyhound's proxy statement, but the court denied him a preliminary injunction on the ground that he would not be irreparably injured by the denial.  Fairfax, *Social Activism through Shareholder Activism*, 76 WASH. & LEE L. REV. 1129, 1133-1135 (2019), citing *Peck v. Greyhound Corp.,* 97 F. Supp. 679, 680 (S.D.N.Y. 1951).

Twenty years later two shareholder proposals filed as part of a 1971 shareholder campaign at General Motors received under 3% of the vote, yet the campaign resulted in GM deciding to add Rev. Leon Sullivan to the GM board.  Rev. Sullivan later developed the "Sullivan Principles," which became the subject of many shareholder proposals that ended up persuading companies that did business in South Africa during the apartheid era to adopt certain human rights principles in their operations there.  Kanzer, *Putting Human Rights on the Agenda: The Use of Shareholder Proposals to Address Corporate Human Rights Performance* (2009), available at https://www.domini.com/uploads/legacy/Finance_for_a_Better_World_Kanzer.pdf.

today's "fringe issue" becomes tomorrow's "best practice."

We set out below some of the most important governance reforms over the past 20 years that fit this pattern:  They all grew out of shareholder proposals that often did not achieve majority support, and all of them, at least in the early years, were strenuously opposed by corporate managements and boards.

Classified boards.  A long-standing governance practice was for companies to have a "classified" or "staggered" board of directors, a structure in which only a set percentage of directors is elected each year to multi-year terms, *e.g.,* one-third of the board is elected each year to three-year terms.  Classified boards are defended as a way of promoting continuity, but the practice can lead to boards (and managements) that are entrenched and that may not operate in the best interest of shareholders.

Classified boards can present significant "agency costs" issues, particularly if there is a takeover bid by a third party who believes that the company is undervalued and that a new board and new managers could do a better a job and enhance shareholder value.  A classified board structure board can discourage such bids from even being made, thus (at a minimum) depriving shareholders of the opportunity to consider and vote on whether they think the incumbents or a new team should be managing the company. Bebchuk, *The Case for Increasing Shareholder Power,* 118 HARV. L. REV. 833, 852-54 (2005).[7]

Shareholder proposals urging board declassification have been filed at many companies over the years, and despite a lack of majority support in early years, the effort was highly successful.  As of late 2020, 89% of companies in the S&P 500 index and 59% of companies in

---

[7] It is estimated that an effective staggered board can double the odds of a target remaining independent in the face of a hostile tender or exchange offer.  Bebchuk, Coates and Subramanian, *The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy,* 54 STANFORD L. REV. 887 (2002).

the Russell 3000 index had declassified boards.  Tonello, *Corporate Board Practices in the Russell 3000 and S&P 500* (18 October 2020), Harvard Law School Forum on Corporate Governance, available at

https://corpgov.law.harvard.edu/2020/10/18/corporate-board-practices-in-the-russell-3000-and-sp-500/.

Proxy access.  Shareholders generally have the right to nominate candidates for a company's board of directors, yet few ever exercise that right because the only way to do so is by mounting a proxy contest, *i.e.*, printing and circulating one's own proxy materials and urging shareholders to vote for their candidates using a separate proxy card.  The expense of a proxy campaign makes the risk unfeasible unless one is seeking to replace all or most directors and take control of the company.  As a result, most director elections consist of voting for a slate of candidates nominated by the incumbent board of directors.

Starting from the premise that board performance could be improved without a hostile takeover, but with the addition of one or two directors with a fresh perspective, shareholder advocates proposed that if long-term shareholders holding a significant percentage of company stock nominated one or two board director candidates, those shareholders should have access to the company proxy materials, and the company should include those candidates' names and qualifications in the company's proxy statement and allow shareholders to vote those candidates as well as the management candidates on the company's proxy card.

Over 500 "proxy access" proposals were filed from 2000 to 2018, and they garnered, on average, 49% of the vote.  *ISS Long View Report, supra*.  There was a lull after the SEC in 2010 adopted a rule requiring companies to adopt proxy access procedures, but two business groups

sued before the rule took effect, and the rule was vacated in 2011.[8]  Thereafter, the New York City pension funds resumed a shareholder proposal campaign at dozens of companies, and within a few years that campaign prompted more than 600 companies adopting proxy access bylaws by the end of 2019.  Gregory, *Proxy Access: A Five Year Review*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (4 February 2020), available at

https://corpgov.law.harvard.edu/2020/02/04/proxy-access-a-five-year-review/.

Majority vote for directors.  For many years, corporate boards were elected using a "plurality vote" system in which the company would present a slate of candidates, and a shareholder could only vote "for" a candidate, "withhold" giving one's proxy to vote or a candidate (which meant that the vote did not count) or "abstain" from voting.  The effect of this regime was that the management slate was always elected.  Indeed, a board candidate could be elected simply by voting for himself or herself, assuming no opposition candidates.

The following chart, reprinted from the *ISS Long View Report* discussed above, charts the progress of majority vote shareholder proposals.  Within only a few years, a majority of companies in the S&P 500 had adopted majority vote bylaws, and majority vote is currently the practice at 91% of S&P 500 companies.

---

[8] *Facilitating Shareholder Director Nominations*, 75 FED. REG. 56668 (16 September 2010), *vacated sub nom. Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011).



Independent board chairman.  Many companies combine the positions of chief executive officer ("CEO") and chairman of the board of directors.  Shareholder proposals have urged companies to adopt a policy of splitting the two positions, on the theory that the board should provide independent oversight of management, and that such oversight may be difficult if the person in charge of the oversight is also the CEO.

In terms of support levels, this campaign has been less successful than the three cited above.  The ISS Long View Report showed that between 2000 and 2018 over 700 shareholder proposals on the topic were voted, with only 4% of them receiving majority support with the median level of support at 30%.  Even so, this effort moved the needle.  In 2005 only 8% of S&P 500 companies split the two roles; by 2018, figure was up to 28%.  The chart below lays out the statistics.





Independent chair proposals continue to appear on ballots in high numbers
shareholder proposals seeking to establish independent chair at S&P 500 companies
and percentage of S&P 500 with independent chair

*Source: ISS Analytics*

Say on pay.  In response to outrage about exorbitant pay packages for senior executives, a number of shareholder proposals asked companies to adopt a policy of giving shareholders a "say on pay," *i.e.,* a non-binding vote on the compensation of senior executives.  Hundreds of such proposals were filed, and although 80% of them did not attain majority support, the median level of support was 43%.

Despite the lack of majority support from shareholders, the logic of a shareholder vote on executive pay was clear to Congress, which in 2010 adopted the Dodd-Frank Wall Street Reform and Consumer Protection Act, section 951 of which (15 U.S.C. § 78n-1) requires a non-binding say-on-pay vote at publicly traded companies no less than once every three years.

Pensions for outside directors.  Although the practice is largely ended these days, it was common in years gone by for companies to pay pensions to outside directors.  In the mid-1990s several individual investors pioneered in filing such shareholder proposals that opposed this practice, and the support hovered in the 27%-33% range.  Once the issue had been raised, however, a dialogue took place, and views shifted, based on a perception that while outside

directors certainly should be compensated for their service, pensions can affect (or be seen as affecting) an outside director's impartiality and willingness to question management (CII Comments on Proposed Rule, Docket No. 933, pp. 19-20 & n.44).

Corporate political spending.  Over the past ten years a number of shareholder proposals have sought to persuade companies to make greater and improved disclosures of corporate expenditures on lobbying and political activities.  According to the most recent data, between 2015 through 2020 there were a total of 158 proposals asking companies to disclose political contributions at Russell 3000 companies. On average, these received 34.0% of votes cast, with only nine receiving a majority of votes cast.[9]

Despite the seemingly low shareholder vote, companies have responded.  The Center for Political Accountability, an advocate of improved disclosure, reports that as of 2020, over 200 S&P 500 companies disclose full or partial information about  (a) corporate contributions to candidates, parties and political committees (assuming there was not a company policy against such contributions),  (b) corporate contributions to so-called "section 527" political organizations,[10] or prohibited such contributions, (c) a company's independent expenditures to support or oppose a political campaign, or prohibited such spending, and (d) the company's contributions to support or oppose ballot initiatives or prohibited such contributions.  Center for Public Accountability, *2020 CPA-Zicklin Index of Corporate Political Disclosure and*

---

[9] The data cited in the text come from a database compiled by Institutional Shareholder Services, which advises institutional shareholders on items in a company's proxy statement.  That database (https://link.issgovernance.com/index/main/), which is available on a subscription basis, serves as a resource for reports and comments on shareholder voting such as the *ISS Long View Report* and other commentary and analysis of the sort posted on the Harvard Law School Forum on Corporate Governance cited above.

[10] Section 527 covers "political organizations" such as a party, committee or other organization that is "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures" that seek to influence the selection, nomination, election, appointment or defeat of candidates for elective office.  26 U.S.C. § 527(e)(1), (2).

*Accountability* 23 (2020), available at https://politicalaccountability.net/hifi/files/2020-CPA-Zicklin-Index.pdf.[11]

Sustainability.  A major effort over the past 20 years has been to persuade companies to issue "sustainability reports," which detail a company's activities on environmental, human rights and other issues that may not be reflected in the financial or performance metrics that must be disclosed in SEC-mandated reports.  According to ISS data (see note 9, *supra*), from 2015 through 2020 a total of 49 proposals asking companies to prepare reports on sustainability were voted on at Russell 3000 companies. On average, these received 32.9% of votes cast, with only six receiving a majority.  Despite this lack of majority support, there is nonetheless a significant demand for this information.  One report indicates that 90% of S&P 500 companies issue sustainability reports, as do 96% of the world's largest 250 companies.[12]

\*        \*        \*

As these examples demonstrate, the lack of majority support for a shareholder proposal is not always a reliable indicator of whether the policy expressed in a given proposal warrants adoption.  Indeed, companies may decide that if a significant minority of their shareholders want the company to engage in a certain practice, it is worth adopting that practice.  Also, as views about what is good corporate governance are debated and evolve, a certain practice (*e.g.,* majority vote for directors) may come to be seen as a "best practice," such that companies decide

---

[11] The Kanzer article, *supra* p. 10, notes (at p. 13 n.20) that Verizon in 2006 decided to increase its disclosures after the shareholder support of such a proposal rose to 33%.

[12] Governance and Accountability Institute, 9*0% of S&P 500 Index Companies Publish Sustainability Reports in 2019, G&A Announces in its Latest Annual 2020 Flash Report* (16 July 2020), available at https://www.globenewswire.com/news-release/2020/07/16/2063434/0/en/90-of-S-P-500-Index-Companies-Publish-Sustainability-Reports-in-2019-G-A-Announces-in-its-Latest-Annual-2020-Flash-Report.html; Global Reporting Initiative, *Sustainability reporting is growing, with GRI the global common language* (1 December 2020), available at https://www.globalreporting.org/about-gri/news-center/2020-12-01-sustainability-reporting-is-growing-with-gri-the-global-common-language/#:~:text=The%202020%20KPMG%20Survey%20of,countries%20%E2%80%93%2080%25%20do%20so

the practice is worth adopting.

This underscores a point about the shareholder proposal process to which the 2020 amendments give short shrift: the ability of shareholders and companies to communicate with each other and for management to explain to shareholders – the owners of the company – why the company is or is not pursuing a particular policy. The costs of such a dialogue are not high, and because the SEC used the wrong benchmark (the likelihood of achieving majority support), the 2020 amendments gave inadequate consideration to the benefits of the current rule.

## II.  THE SEC FAILED ADEQUATELY TO ADDRESS KEY POINTS.

A major shortcoming in the rule under consideration here is the Commission's failure to address two structural problems with the existing regime, both of which were identified by CII (Docket No. 933, pp. 2-5, 11, 18, 33, 48-49), but were brushed aside by the Commission.

Proxy plumbing.  A particular problem with raising the resubmission thresholds for a proposal is the risk of errors in what is known as the "proxy plumbing," *i.e.*, the methods by which third-party intermediaries follow and tabulate shareholders' voting instructions on millions and sometimes billions of shares at a single company. The potential effects of any errors can be substantial. In 2013 Dell announced a "going private" buyout in 2013, and T. Rowe Price believed that the offer was undervalued and sought to vote its clients shares against the buyout. A "no vote" would have allowed T. Rowe Price to pursue an appraisal action against Dell to recover a higher price than Dell had offered. However, T. Rowe Price's shares were erroneously voted "yes" in favor of the transaction, and T. Rowe Price ended up paying $194 million to its clients to compensate them for the difference in valuation, plus statutory interest, that resulted from the loss of their appraisal rights. *T. Rowe Price To Compensate Clients For Dell Voting Error* (June 2016), https://www.troweprice.com/corporate/us/en/press/t--

rowe-price-to-compensate-clients-for-dell-voting-error.html.

The problems with proxy plumbing are not new.  Indeed, the Commission published a lengthy "concept release" that sought public comment on the issue over ten years ago, *Concept Release on the U.S. Proxy System*, 75 FED. REG. 42982 (22 July 2010).  The Commission has, however, taken no remedial action, even though the problems endure.  CII is not alone in calling for reform of the current vote counting system before other changes are made.  In a 2019 report, the SEC's Investor Advisory Council urged reform in a report that cited other significant errors in vote counting and criticized the current system for failing to allow shareholders to confirm that their votes have been properly cast.  *Recommendation of the SEC Investor Advisory Committee (IAC) Proxy Plumbing* at 2-4 (5 September 2019), available at

https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-plumbing.pdf.

In January 2020, after the proposed rule in this case had been published, the SEC's Investor Advisory Committee criticized the Commission's proposed rule and a separate rule on proxy advisors, stating that those proposals "simply do not address the most serious issues in the current proxy system – such as counting votes correctly."  *Recommendation of the SEC Investor Advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals* at 1 (24 January 2020), available at

https://www.sec.gov/spotlight/investor-advisory-committee-2012/sec-guidance-and-rule-proposals-on-proxy-advisors-and-shareholder-proposals.pdf.  The final rule at issue here did not mention proxy plumbing.

Multi-class stock companies.  Another vote counting issue that the Commission did not consider adequately is the ability of shareholders to resubmit proposals at companies that have

more than one class of stock.  As noted (at pp. 6-7), some companies have multiple classes of stock with unequal voting power.  A classic example is Ford Motor Co., which has 3.9 billion publicly traded shares of "common stock" and a separate "Class B" stock of only 70 million shares held by members of a Ford family trust.  However, each Class B share has 36.888 votes on a given issue, which means that roughly 40% of the voting power is exercised by holders of under 20% of the outstanding shares.  Ford Motor Co*., 2021 Proxy Statement* at 102, available at https://www.sec.gov/Archives/edgar/data/37996/000104746921000813/a2243092zdef14a.htm.

The wisdom of multi-class stock companies has been a subject of debate in recent years,[13] and such a stock structure is particularly evident at technology companies, as founders seek to have the best of both worlds – access to public capital markets without the level of accountability to shareholders that normally inheres in being a public company.

A prime example is Facebook, which has been the target of criticism on many fronts, yet has largely been able to resist demands for change, given that founder Mark Zuckerberg's Class B shares give him ten votes per share, which gives him 57% of the voting power though he owns only 15% of the outstanding shares.  Facebook, *2021 Proxy Statement* at 61, available at https://www.sec.gov/Archives/edgar/data/1326801/000132680121000022/facebook2021definitiveprox.htm.[14]

The history recounted above suggests that a company such as Facebook – with a classified board, no independent board chairman and other governance shortcomings – would be a target for governance reform proposals that would ordinarily have a reasonable chance of being adopted.  And

---

[13] See Bebchuk and Kastiel, *The Untenable Case for Perpetual Dual-Class Stock*, 103 VA. L. REV. 585 (2017).

[14] Criticism of Facebook's practices is now so large and so varied that "Criticism of Facebook" is a stand-alone Wikipedia site that lists over 20 controversies.  Wikipedia, *Criticism of Facebook*, available at https://en.wikipedia.org/wiki/Criticism_of_Facebook.

although proposals have been voted on in recent years, the votes have been predictably low.  The threat from the new resubmission thresholds is that such proposals will now disappear entirely.

As CII's comments on the proposed rule indicated (Docket No. 933, p. 49), for a proposal to be resubmitted after a third vote under the former rule, the proposal must have received the support of approximately 25% of shares not controlled by Mr. Zuckerberg.  Under the higher threshold adopted in the 2020 amendments, more than 60% of non-Zuckerberg shares would have to support a proposal merely for it to be eligible for resubmission after the third year.

And it is at this point that the SEC's rationale for a rule change collides with reality.  According to the SEC, resubmission thresholds should be raised if a proposal is unlikely to achieve majority support.  But if one person controls 57% of the vote, a shareholder proposal at a multi-class stock company will never receive a majority of the shareholder vote.  Yet paradoxically, it is at such a company that "agency costs" may be at their highest and that accountability to shareholders is most needed.  The higher resubmission thresholds make it likely that shareholder proposals at such companies will, at most, have a three-year life span and then disappear from sight, leaving deep-seated governance issues entrenched and unlikely even to be challenged.

How did the SEC respond to these comments?  The Commission acknowledged the point, but declined to address the issue, citing the "complexity" of any change to rules for counting votes at multi-class stock companies.  85 FED. REG. at 70288.  That argument is difficult to credit, since the rule as adopted introduces new levels of complexity, such as the requirements for shareholders to engage with companies and transitional requirements regarding share ownership.  85 FED. REG. 70251-70254, 70263.

## CONCLUSION

For these reasons, as well as those stated by plaintiffs in their filings, the 2020 amendments to SEC Rule 14a-8 should be vacated and judgment entered in plaintiffs' favor.

Respectfully submitted,


Of counsel:                                    /s/ Cornish F. Hitchcock
Jeffrey P. Mahoney                             Cornish F. Hitchcock (D.C. Bar No. 238824)
(D.C. Bar No. 420965)                          Hitchcock Law Firm PLLC
General Counsel                                5614 Connecticut Avenue, NW, No. 304
COUNCIL OF INSTITUTIONAL  INVESTORS            Washington, DC   20015
1717 Pennsylvania Avenue, NW, Suite 350         (202) 489-4813 • conh@hitchlaw.com
Washington, DC   20006
(202) 261-7081 • jeff@cii.org

         *Counsel for Amicus Curiae Council of Institutional Investors*

23 September 2021