**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| INTERFAITH CENTER ON CORPORATE RESPONSIBILITY, <u>et al.</u>, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 21-1620 (RBW) |
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Defendant. | ) ) | |

---

<u>**MEMORANDUM OPINION**</u>

Interfaith Center on Corporate Responsibility, James McRitchie, and As You Sow—

collectively, the "plaintiffs"—bring this civil action pursuant to the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 701–06, alleging that the defendant, the United States Securities and

Exchange Commission ("Commission"), promulgated amendments to Commission Rule 14a-8 in

violation of the APA. <u>See generally</u> Complaint ("Compl."), ECF No. 1. Currently pending

before the Court are (1) the plaintiffs' motion for summary judgment, <u>see</u> Plaintiffs' Motion for

Summary Judgment at 1 ("Pls.' Mot."), ECF No. 16; and (2) the defendant's cross-motion for

summary judgment, <u>see</u> Cross-Motion for Summary Judgment at 1 ("Def.'s Mot."), ECF No. 22.

Upon careful consideration of the parties' submissions,[1] the Court concludes that it must grant

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pls.' Mem."), ECF No. 16; (2) the Combined Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Mem."), ECF No. 22-1; (3) the Plaintiffs' Reply in Support of Motion for Summary Judgment and Opposition to Defendant's Cross-Motion for Summary Judgment ("Pls.' Reply"), ECF No. 27; (4) the Joint Appendix ("Joint App'x"), ECF No. 29; (5) the Brief of Council of Institutional Investors as <u>Amicus Curiae</u> in Support of Plaintiffs' Motion for Summary Judgment ("Institutional Investors Br."), ECF No. 31; (6) the Brief of the Shareholder Commons as <u>Amicus Curiae</u> in Support of Plaintiffs ("Shareholder Commons Br."), ECF No. 23; (7) the Brief of <u>Amicus Curiae</u> The Chamber of

(continued . . .)

the defendant's cross-motion for summary judgment and deny the plaintiffs' motion for

summary judgment.

## I.    BACKGROUND

This case concerns a rule addressing the corporate proxy statement process promulgated

by the Commission under Section 14 of the Securities Exchange Act ("Exchange Act" or "Act").

The proxy statement process "allows a [corporate] shareholder to vote without being physically

present at the annual meeting[ of a corporation]."  Jill E. Fisch, From Legitimacy to Logic:

Reconstructing Proxy Regulation, 46 Vand. L. Rev. 1129–35 (Oct. 1993).  In the early years of

corporate proxies, "it was necessary for shareholders to attend the annual meeting personally in

order to exercise their voting rights."  Id. at 1134.  However, "[t]he development of large, widely

held corporations rendered th[e in-person] requirement problematic[, which] led to the

development of the [now federally recognized] proxy voting process."  Id.  "Although state law

originally restricted the use of proxies, their use grew necessary as corporations became unable

to secure sufficient shareholder presence to meet the quorum requirements."  Id. at 1135.

"Eventually, state statutes addressed proxy voting and expressly protected the right of

shareholders to vote by proxy."  Id.

## A.    Statutory and Legal Background

The wide acceptance of corporate proxy process procedures did not come without

challenges.  Thus, in 1934, when Congress enacted Section 14 of the Securities Exchange Act,

see Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. § 78a–77pp), partially to

---

(. . . continued)
Commerce of the United States of America in Support of Defendant's Cross-Motion for Summary Judgment and in
Opposition to Plaintiffs' Motion for Summary Judgment ("Chamber of Com. Br."), ECF No. 33; (8) the Plaintiffs'
Supplemental Memorandum on Count V of the Complaint ("Pls.' Suppl. Mem."), ECF No. 37; and (9) the
Defendant's Supplemental Memorandum ("Def.'s Suppl. Mem."), ECF No. 38.

curb growing abuses of the proxy statement process, the Commission was authorized to "prescribe as necessary or appropriate" any "rules and regulations[,]" to address this concern. 15 U.S.C. § 78n(a)(1). As the Commission has stated, the "[r]egulation of the proxy solicitation process is one of the original responsibilities that Congress assigned [it.]" Concept Release on the U.S. Proxy System, Release No. 29,340, Investment Company Act Release No. IC-29,340, 98 S.E.C. Docket 3027, *3 (July 14, 2010). Initially promulgated in 1942, Rule 14a-8 "general[ly governs the proxy process by] regulat[ing] the inclusion of shareholder proposals in proxy materials[ or statements]." United Church Bd. for World Ministries v. Sec. & Exch. Comm'n, 617 F. Supp. 837, 837 (D.D.C. 1985) (citing 17 C.F.R. § 240.14a-8); see Exchange Act Release No. 34,3347, 1942 WL 34864 (Dec. 18, 1942) (codified as amended at 17 C.F.R. § 240.14a-8). Rule 14a-8 is "structured in a question-and-answer format so that it is easier to understand[,]" 17 C.F.R. § 240.14a-8, and to clearly address "when a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders[,]" id.

Over the years, the Commission has updated Rule 14a-8 to better address continued concerns over abuses of the proxy process that lead to increased costs for both companies and shareholders alike. In 1948, the Commission began adopting different bases for excluding shareholder proposals "[i]n order to relieve [corporate] management[s] of harassment in cases where such proposals are submitted for the purpose of achieving personal ends rather than for the common good of the issuer[s] and [their] security holders[.]" Notice of Proposal to Amend Proxy Rules, Release No. 34-4114 (July 6, 1948). For instance, in 1953, the Commission amended the shareholder-proposal rule to allow companies to omit the names and addresses of shareholder proponents to "discourage the use of th[e] rule by persons who are motivated by a

desire for publicity rather than the interests of the company and its security holders."  Notice of Proposed Amendments to Proxy Rules, Release No. 34-4950 (Oct. 9, 1953).  In 1954, in response to concerns over the resubmission of proposals that received little support, the Commission amended Rule 14a-8 to permit

> that a proposal [ ] be omitted for a period of three years from the last previous submission if it was submitted within the previous five years and received less than [three percent] in the case of a single submission, less than [six percent] upon a second submission or less than [ten percent] upon a third or subsequent submission during such five year period.

Adoption of Amendments to Proxy Rules, Release No. 34-4979 (Jan. 6, 1954).

For decades, Rule 14a-8 did not place restrictions on the use of representatives and allowed multiple shareholders to use the same representative—which proved to be another avenue for potential abuse.  See Adoption of Amendments Relating to Proposals by Security Holders, 41 Fed. Reg. 52,994, 52,995–96 (Dec. 3, 1976) ("The Commission . . . has noted that in recent years[,] several [shareholder] proponents have exceeded the bounds of reasonableness either by submitting excessive numbers of proposals to [be voted on] or by submitting proposals that are extreme in their length.").  Thus, beginning in 1976, the Commission began restricting the number of proposals each shareholder could submit per meeting.  See id.

In 1982, the Commission noted "an increase in the number of proposals used to harass issuers into giving the proponent some particular benefit or to accomplish objectives particular to the proponent[,]" Proposed Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, 47 Fed. Reg. 47,420, 47,427 (Oct. 26, 1982), when it began allowing the exclusion of shareholder proposals that were based on personal grievances, see id. at 47,421.  And, in 1983, in amending resubmission thresholds, the Commission noted that commenters in support of the amendment

felt that it was an appropriate response to counter the abuse of the security holder proposal process by certain proponents who make minor changes in proposals each year so that they can keep raising the same issue despite the fact that other shareholders have indicated by their votes that they are not interested in that issue.

Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, 48 Fed. Reg. 38,218, 38,221 (Aug. 16, 1983). However, around this time, the Commission acknowledged that it allowed "[shareholder-]proponents [to] [ ] aggregate[ their holdings] in determining the includability of a proposal[ in proxy statements]." Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, 48 Fed. Reg. 38,218, 38,219 n.5 (Aug. 23, 1983).

And finally, to ensure that proposals were only being presented by shareholders with a significant stake in the corporation, a prior version of Rule 14a-8 required that,

> [i]n order to be eligible to submit a proposal, [a shareholder] must have continuously held at least [two thousand dollars] in market value, or [one percent], of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date [the shareholder] submit[s] the proposal.

Amendments to Rules on Shareholder Proposals, 63 Fed. Reg. 29,106, 29,119 (May 28, 1998).

## 1. New Rule 14a-8 Amendments

In November 2019, the Commission published a notice of proposed rulemaking that recommended amendments to modernize its shareholder proposal rule. See generally Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, 84 Fed. Reg. 66,458 (Dec. 4, 2019) ("Proposing Release"). The proposed amendments were developed as a result of a roundtable discussion that included various experts on the proxy process, as well as from comments from the public at large—both in support of and against modernizing the shareholder proposal rules. See id. at 66,460. The notice consisted of several proposed amendments to the proxy rules that affect shareholder ownership thresholds, shareholder proposal submission requirements, and shareholder resubmission thresholds. See id. at 66,459–

60.  First, the proposed amendment specific to Rule 14a-8(b) "establishes the eligibility requirements a shareholder-proponent must satisfy to have a proposal included in a company's proxy statement."  Id. at 66,459.  To be eligible to submit a proposal under this proposed amendment, a shareholder must continuously own at least

> [(1) two thousand] of the company's securities entitled to vote on the proposal for at least three years; [(2) fifteen thousand] of the company's securities entitled to vote on the proposal for at least two years; or [(3) twenty-five thousand] of the company's securities entitled to vote on the proposal for at least one year.

Id. at 66,463.  The Commission noted that these new thresholds were necessary because the prior threshold currently "does not strike the appropriate balance[.]"  Id.  "[The Commission] believe[d] that holding [only two thousand dollars] worth of stock for a single year [as previously permitted] does not demonstrate enough of a meaningful economic stake or investment interest in a company to warrant the inclusion of a shareholder's proposal in the company's proxy statement."  Id.

Second, the Commission also proposed an amendment which "require[s] shareholders that use a representative to submit a proposal for inclusion in a company's proxy statement to provide documentation attesting that the shareholder supports the proposal and authorizes the representative to submit the proposal on the shareholder's behalf."  Id. at 66,466.  If a shareholder uses a representative, the shareholder would be required to submit documentation that identifies or includes: (1) "the company to which the proposal is directed[,]" (2) "the annual or special meeting for which the proposal is submitted[,]" (3) "the shareholder-proponent and the designated representative[,]" (4) "the shareholder's statement authorizing the designated representative to submit the proposal and/or otherwise act on the shareholder's behalf[,]" (5) "the specific proposal to be submitted[,]" (6) "the shareholder's statement supporting the proposal[,]" and (7) "[a] sign[ature] and date[] by the shareholder."  Id.  The Commission

> believe[d] that these proposed amendments would help safeguard the integrity of the shareholder-proposal process and the eligibility restrictions by making clear that representatives are authorized to so act, and by providing a meaningful degree of assurance as to the shareholder-proponent's identity, role, and interest in a proposal that is submitted for inclusion in a company's proxy statement.

Id.  The Commission noted that this requirement would be "minimal" and is often already included by shareholders-proponents in their proposals.  Id.

Third, the Commission proposed amending Rule 14a-8 to "require a statement from each shareholder-proponent that he or she is able to meet with the company in person or via teleconference no less than [ten] calendar days, nor more than [thirty] calendar days, after submission of the shareholder proposal."  Id. at 66,467.  The Commission

> believe[d] that this proposed eligibility requirement would encourage shareholders to engage with companies, and could facilitate useful dialogue between the parties by enabling the company to reach out directly to a shareholder-proponent to understand his or her concerns, potentially leading to a more mutually satisfactory and less burdensome resolution of the matter.

Id.

Fourth, the Commission proposed an amendment specific to Rule 14a-8(c) that would "apply the one-proposal rule to 'each person' rather than 'each shareholder'" so that "a representative would not be permitted to submit more than one proposal to be considered at the same meeting, even if the representative would be submitting each proposal on [his or her own behalf, or on] behalf of different shareholders."  Id. at 66,468.  The Commission believed that

> a shareholder submitting one proposal personally and additional proposals as a representative for consideration at the same meeting, or submitting multiple proposals as a representative at the same meeting, would constitute an unreasonable exercise of the right to submit proposals at the expense of other shareholders and also may tend to obscure other material matters in the proxy statement.

Id.  In proposing this fourth amendment, the Commission noted that it was "not intended to prevent shareholders from seeking assistance and advice from lawyers, investment advisers, or

others to help them draft shareholder proposals and navigate the shareholder-proposal process."

Id.  Nonetheless, "to the extent that the provider of such services submits a proposal, either as a proponent or as a representative, it would be subject to the one-proposal limit and would not be permitted to submit more than one proposal in total."  Id.

> Fifth, the Commission proposed amending Rule 14a-8(i)(12) to
>
> replace the current [shareholder-proponent] resubmission thresholds of [three], [six], and [ten] percent with new thresholds of [five], [fifteen], and [twenty-five] percent, respectively, and add an additional provision to the rule that would allow companies to exclude proposals that have been submitted three or more times in the preceding five years if they received more than [twenty-five] percent, but less than [fifty] percent, of the vote and support declined by more than [ten percent] the last time substantially the same subject matter was voted on compared to the immediately preceding vote.

Id. at 66,471.  The Commission noted that the above resubmission threshold increase and momentum requirements "reflect[ed] [its] experience with shareholder proposals and are intended to reduce the number of proposals eligible for resubmission that have little or no chance of gaining meaningful, or majority, shareholder support while still providing shareholders with the opportunity to build support for their proposals."  Id. at 66,471–72.

The Commission stated that "the proposed amendments to Rule 14a-8[ were] [ ] informed by [prior] public input [they] have received" and encouraged the submission of comments through the notice-and-comment process in response to the proposed amendments.  Id. at 66,461.

In a footnote, the Commission revealed that "[it] received some non-public retail share ownership data from a market participant who requested confidential treatment for the data."  Id. at 66,498 n.245.  The Commission noted that "[this] data provide[d] some information about level and duration of ownership but d[id] not allow [the Commission] to identify those shareholders that have submitted or are likely to submit shareholder proposals."  Id.  As to this deficiency of data regarding level and duration of ownership, the Commission "welcome[d]

empirical data to assist in estimating the number of excludable proponents under the proposed thresholds, and . . . [data] that [would] allow [the Commission] to aggregate holdings to the shareholder level, identify shareholders likely to submit shareholder proposals, and that span a sufficiently long time period."  Id.

### 2.  The Public Comment Period and the Broadridge Data

In response to the Commission's notice, the proposed amendments garnered a significant number of comments.  See generally Certified List Describing the Record in Rulemaking Proceedings Before the Securities and Exchange Commission, ECF No. 15 (listing over one thousand comments submitted during the notice-and-comment period for the proposed amendments).  After the public comment period ended, a memorandum was released by the Commission revealing that it had received data from Broadridge Financial Solutions, Inc. ("Broadridge"), which contained "holding periods and other information for an enormous sample of investor accounts[.]"  Pls.' Mem. at 12.

It was at that time that the Commission explicitly noted that on August 14, 2020, before the public comment period ended, the Commission "placed a preliminary staff analysis and memorandum from the Chief Economist" of the Commission that explained a data set provided by Broadridge "in the public comment file" to allow the public the opportunity to comment on and analyze the data.  Def.'s Mem. at 10; see Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, 85 Fed. Reg. 70,240, 70,263–64 (Nov. 4, 2020) (the "Final Rule").[2]  The Commission represents that "[the Broadridge] data set include[d] account-level security holding information at U.S. companies that held annual shareholder meetings from 2015 through 2017."  Def.'s Mem. at 9.  On that same date, the Commission also

---

[2] As the parties both note, Broadridge requested that the Commission not disclose its identity when it first submitted the data set for the Commission's consideration.  See Pls.' Mot. at 12; Def.'s Mem. at 9.

provided to the public its own preliminary staff analysis—produced by the Commission's Chief Economist—that was conducted to "determine whether analysis of the [Broadridge] data could reliably inform the Commission's decision-making, including [by] assessing limitations in the data and [the] assumptions regarding the data that would be necessary or appropriate as well as its analytical value to the proposed rulemaking in light of those limitations and assumptions." 85 Fed. Reg. at 70,268. Upon analyzing the data, the Commission's Chief Economist concluded that "it was [his] view that the preliminary draft analysis was not relevant to the economic question central to the proposal and that the data had limitations that reduced its potential value [to the Commission's] analy[sis of its] [ ] proposal." Joint App'x, Exhibit ("Ex.") A1278 (Analysis of Data Provided by Broadridge Financial Solutions, Inc. by S.P. Kothari, Chief Economist (Aug. 14, 2020) ("Kothari Memo")) at 3. Thus, "[he] did not believe the analysis would reliably inform consideration of the proposal." Id., Ex. A1278 (Kothari Memo) at 3.

According to the Commission, the preliminary analysis of the Broadridge data set received just two comments—relevant here, one which "asserted that the Commission should have provided the [earlier] public notice of and an opportunity to comment on the [p]reliminary [s]taff [a]nalysis in the Proposing Release." 85 Fed. Reg. at 70,268. Although the Commission received the data in August 2019, see Def.'s Mem. at 9, and it was briefly referenced in the Proposing Release, see 84 Fed. Reg. at 66,498 n.245, the Commission nonetheless did not provide any further opportunity to comment on the Chief Economist's memorandum or the preliminary staff analysis, see 85 Fed. Reg. at 70,268. It was the Commission's conclusion that "due to the significant limitations in the [Broadridge] data and the extent and nature of the related assumptions that would be necessary to make use of it, neither the data set nor the associated [p]reliminary [s]taff [a]nalysis could be used to reliably assess the potential impact of

[the] rule amendments on retail shareholders and accordingly, neither the [Broadridge] data nor the related analysis were included in the Proposing Release." Id.

### 3. The Final Rule

On November 4, 2020, the Commission adopted the Final Rule. See id. at 70,240. The Commission noted that "[a]fter taking into consideration the [numerous] public comments, as well as the feedback received as part of the Commission's 2018 Roundtable on the Proxy Process . . . [, it] [ ] adopt[ed] the amendments substantially as proposed with the exception of the [m]omentum [r]equirement[.]"[3] Id. at 70,241. Thus, the Commission adopted the resubmission threshold proposal which allows companies to exclude a shareholder proposal from its proxy statement if the most recent vote occurred within the preceding three calendar years and the most recent vote was:

> [(1)] Less than [five] percent of the votes cast if previously voted on once;
> [(2)] Less than [fifteen] percent of the votes cast if previously voted on twice; or
> [(3)] Less than [twenty-five] percent of the votes cast if previously voted on three or more times.

Id. at 70,258. None of the other proposed amendments were altered or substantially changed.

See id. at 70,241. Overall, the Commission concluded that

> [together, t]he amendments are intended to modernize and enhance the efficiency and integrity of the shareholder-proposal process for the benefit of all shareholders, including to help ensure that a shareholder-proponent has demonstrated a meaningful 'economic stake or investment interest' in a company before the shareholder may draw on company resources to require the inclusion of a proposal in the company's proxy statement, and before the shareholder may use the company's proxy statement to command the attention of other shareholders to consider and vote on the proposal.

---

[3] The momentum requirement "would [have] allow[ed] companies to exclude proposals previously voted on by shareholders three or more times in the preceding five calendar years" under certain conditions. See 85 Fed. Reg. at 70,289. However, the Commission declined to adopt this requirement as it "would have imposed costs on shareholder-proponents and companies because it would have made the determination of shareholder proposal eligibility more complex." Id. Accordingly, the plaintiffs do not challenge this requirement.

Id. at 70,241.  After adopting all of the above identified amendments to the Final Rule, it went into effect on January 4, 2021.  See id. at 70,240.

## B.    Procedural Background

On June 15, 2021, the plaintiffs initiated this case, challenging the adopted amendments to Rule 14a-8 and requesting that the Court "issue a permanent injunction and prohibit[] the Commission from enforcing the [F]inal [R]ule[.]"  Compl. at 47.  The plaintiffs contend that the Commission violated the APA in its promulgation of the amendments to Rule 14a-8 when it (1) failed to conduct an adequate economic analysis, see id. ¶¶ 132–43, (2) imposed "sharp new restrictions[,]" id. ¶ 145, on the aggregation of shareholdings and the utilization of representatives, see id. ¶¶ 144–53, (3) acted in excess of its statutory authority provided to it under the Securities and Exchange Act, see id. ¶¶ 154–61, (4) failed to comply with the APA, see id. ¶¶ 162–67, and (5) provided pretextual justifications for the promulgation of the rule, see id. ¶¶ 168–71.  In support of the Complaint, on September 20, 2021, the plaintiffs filed their motion for summary judgment.  See Pls.' Mot. at 1–2.  However, the plaintiffs only moved for summary judgment on Counts I through IV of their Complaint and not Count V.  See id. at 1.

In response to the plaintiffs' motion, on November 19, 2021, the Commission filed its combined cross motion for summary judgment and opposition to the plaintiffs' motion for summary judgment.  See Def.'s Mot. at 1.  And, the Commission represents that it moves for summary judgment on all five counts of the plaintiffs' Complaint.  See id.; Def.'s Mem. at 43 n.12.  Subsequently, on December 17, 2021, the plaintiffs filed a reply in support of their motion for summary judgment.  See Pls.' Reply at 1.[4]  On March 10, 2025, the parties appeared remotely for a motion hearing regarding only Count V of the plaintiffs' Complaint, see Minute

---

[4] The Commission did not file a reply in support of their cross-motion for summary judgment.

("Min.") Entry (Mar. 10, 2025), which was only superficially addressed in footnotes of the

parties' opposition and reply briefs, <u>see</u> Def.'s Mem. at 43 n.12; Pls.' Reply at 25 n.7.  Following

the hearing, on March 14, 2025, the parties filed supplemental memoranda to better explain their

respective positions regarding Count V of the Complaint.  <u>See</u> Pls.' Suppl. Mem. at 1; Def.'s

Suppl. Mem. at 1.

## II.    STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  In the APA context, summary judgment is the mechanism for

deciding whether, as a matter of law, an agency action is supported by the administrative record

and is otherwise consistent with the standard of review under the APA.  <u>See, e.g.</u>, <u>Citizens to</u>

<u>Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415–16 (1971).  But, because the district

court's role is limited to reviewing the administrative record, the typical summary judgment

standards set forth in Federal Rule of Civil Procedure 56 are not applicable.  <u>See</u> <u>Stuttering</u>

<u>Found. of Am. v. Springer</u>, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).  Rather, "[u]nder the APA,

it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the

administrative record, whereas 'the function of the district court is to determine whether or not as

a matter of law the evidence in the administrative record permitted the agency to make the

decision it did.'"  <u>Id.</u> (quoting <u>Occidental Eng'g Co. v. Immigr. & Naturalization Serv.</u>, 753 F.2d

766, 769–70 (9th Cir. 1985)).  In other words, "when a party seeks review of agency action

under the APA, the district judge sits as an appellate tribunal[,]" and "[t]he 'entire case' on

review is a question of law."  <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir.

2001).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness[.]" Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (citing Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 545–49 (1978)). It requires a district court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law[,]" 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity[,]" id. § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" id. § 706(2)(C). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). However, the district "[c]ourt[] 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

## III.    ANALYSIS

The plaintiffs argue that "[t]he [Commission]'s amendments severely impair shareholders' access to the proposal process[,]" Pls.' Mem. at 1, because

> [t]hey dramatically increase the amount of stock a shareholder must own to submit a proposal, including a more than ten-fold increase for investments held for only one year. They make it much more difficult to resubmit a proposal that was submitted in an earlier year. And they arbitrarily prohibit shareholders from aggregating their holdings or relying on experienced and knowledgeable representatives to draft and submit proposals on their behalf,

id.  Specifically, as noted earlier, the plaintiffs argue that "[the Commission] provide[d] a

[ deficient] economic analysis of the costs and benefits of the proposed rule" because "it made no

meaningful effort to analyze the number of proposals that would be excluded by its new

ownership requirements[.]"  Id.  In that regard, the plaintiffs believe the Commission wrongfully

"concealed th[e Broadridge] data from the public, belatedly disclosed it only after the comment

period ended, and then arbitrarily asserted that the data contained no useful information about

holding periods based on minor [concerns] that were both unfounded and inadequate to justify

the Commission's decision."  Id. at 2.  The plaintiffs also argue that "[t]he Commission's cost-

benefit analysis was also deficient" because it "refused to quantify th[e] benefits [that the

commenters provided during the notice-and-comment period]."  Id. at 2.  Finally, the plaintiffs

argue that "the Commission imposed arbitrary limits on ownership aggregation and the use of

representatives."  Id.  Consequently, the plaintiffs argue that "[t]he Commission's rule was

arbitrary, capricious, and not in accordance with [the] law."  Id.  Moreover, the plaintiffs contend

that "[t]he Commission also disregarded basic procedural requirements by concealing the [ ]

Broadridge data until long after the comment period ended, and it exceeded its authority by

intruding on state agency law without any statutory mandate to do so."  Id.

       The Commission responds that the plaintiffs "primarily advance meritless challenges

predicated on purported shortcomings in the Commission's economic analysis."  Def.'s Mem.

at 3.  The Commission argues that it satisfied its obligation to consider and evaluate the potential

economic consequences of the final amendments and "reasonably explained why it determined

that it could not draw any more meaningful conclusions from plaintiffs' preferred data."  Id.

Further, the Commission contends that it reasonably justified its decisions to prohibit

aggregation of holdings, to apply the one-proposal limit to representatives, and to better facilitate

engagement between companies and shareholder-proponents because each decision was based on a "rationally determined [conclusion] that each would help to safeguard the integrity of the shareholder-proposal process or advance other regulatory goals." Id.  Additionally, the Commission argues that it acted within its statutory authority because "there is no serious risk that [it] could federalize state agency law if it is permitted to limit the number of proposals a representative may submit per meeting under the rule or condition eligibility on a proponent's willingness to engage in a discussion with the company." Id. at 3–4.

The Court will first address whether the Commission wrongfully concealed the Broadridge data, the Chief Economist's memorandum and the preliminary staff analysis, or, at a minimum, whether it should have allowed additional time for notice and comment regarding the Broadridge data and those documents analyzing that data.  The Court will then examine whether the Commission's economic analysis was arbitrary and capricious in regards to the impact the Final Rule would have on the number of shareholder proposals, followed by whether the Commission failed to adequately quantify the costs and benefits of adopting the Final Rule. Finally, the Court will consider whether the Commission's aggregation amendment regarding shareholder ownership thresholds was arbitrary and capricious and whether the amendment otherwise exceeds the Commission's statutory authority.

## A.    Whether the Commission Should Have Earlier Disclosed the Broadridge Data, the Chief Economist's Memorandum and Preliminary Staff Analysis or Reopened the Notice-and-Comment Period

The Court first considers whether the Commission should have earlier disclosed the Broadridge data and allowed for the public to comment on the data despite the fact that the data was not ultimately considered by the Commission in its decision to adopt the amendments to the proxy rules.  The plaintiffs argue that "[t]he Commission's treatment of the Broadridge data [ ]

violated the APA's procedural requirements [regarding making data available under 5 U.S.C. § 553(b)(3) and (c)]." Pls.' Mem. at 26. Specifically, the plaintiffs contend that "[t]he Commission failed to comply with required procedures here because it revealed the critical Broadridge data more than six months after the comment period closed, and only a month before it issued its [F]inal [R]ule." Id. The Commission responds that it satisfied its obligations under the APA because "[it] 'did not rely' at all on the Broadridge data or [the] preliminary staff analysis[ assessing the utility of the data]." Def.'s Mem. at 32 (quoting 85 Fed. Reg. at 70,268).

Under the APA, an agency must publish notice in the Federal Register of "either the terms or substance of [a] proposed rule or a description of the subjects and issues involved[,]" 5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule[-]making through submission of written data, views, or arguments[,]" see id. § 553(c). Important, here, is the statutory requirement that an agency "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules[.]" Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 199 (D.C. Cir. 2007) (quoting Solite Corp. v. Env't Prot. Agency, 952 F.2d 473, 484 (D.C. Cir. 1991)). The "[d]isclosure of [studies or data such as] staff reports allows the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." Am. Radio Relay League, Inc. v. Fed. Commc'ns Comm'n, 524 F.3d 227, 236 (D.C. Cir. 2008) (citation omitted). This is because "[p]ublic notice and comment regarding relied-upon technical analysis . . . are '[t]he safety valves in the use of . . . sophisticated methodology.'" Id. (second alteration in original) (quoting Sierra Club v. Costle, 657 F.2d 298, 334, 397–98, 398 n.484 (D.C. Cir. 1981)).

By requiring the 'most critical factual material' used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that

agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review.

Id. (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv. Sys., 745 F.2d 677, 684 (D.C. Cir. 1984)).

"An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." Conn. Light & Power Co. v. Nuclear Regul. Comm'n, 673 F.2d 525, 530–31 (D.C. Cir. 1982). However, "the [C]ourt will not set aside a rule absent a showing by the p[laintiff]s that they suffered prejudice from the agency's failure to provide an opportunity for public comment, . . . in sufficient time so that the agency's decisions . . . [may be] framed with . . . comment in full view[.]" Am. Radio Relay League, Inc., 524 F.3d at 237 (third alteration in original) (internal quotation marks and citation omitted).

Here, the Commission clearly stated that "[it] did not rely on th[e Broadridge] data or [the memorandum and preliminary staff] analysis in determining to propose the amendments." 85 Fed. Reg. at 70,268; see Def.'s Mem. at 32. The plaintiffs contend that "[t]he Commission, however, clearly relied on its Chief Economist's analysis in determining whether the Broadridge data contained meaningful information about holding periods." Pls.' Reply at 14 (emphasis omitted). The plaintiffs further argue that "[t]he Commission analyzed and agreed with its Chief Economist's assessment and, on that basis, proceeded with its [ ] three-fold increase to [ownership] holding periods even though it [allegedly] had no idea how many proposals the increase would exclude." Id. Thus, the critical question for the Court is whether the reliance on the Chief Economist's memorandum and the preliminary staff analysis of the Broadridge data,

but not on the data <u>itself</u>, shields the Commission from its notice and opportunity for public

comment obligations under the APA.

The Court concludes that the Commission should have timely revealed the Chief

Economist's memorandum and the accompanying preliminary staff analysis, which would have

disclosed the Broadridge data, thereby at a minimum, providing the public adequate opportunity

to comment on it.  This is because the Commission did "rely" on the memorandum and

preliminary staff analysis by concurring with the conclusions in them, even though it concluded

that the Broadridge data could not be used in assessing the adoption of the Final Rule.  <u>See</u> 85

Fed. Reg. at 70,263 ("We <u>concur</u> with the conclusions of the Commission's Chief Economist set

forth in the . . . memorandum accompanying the [p]reliminary [s]taff [a]nalysis[, despite the fact

that] . . . the data set . . . could [not] be used to reliably assess the potential impact of our rule

amendment on retail shareholders." (emphasis added)).  As the Commission represents, "as a

result of [the Broadridge data']s significant limitations, neither the data set nor the associated

[p]reliminary [s]taff [a]nalysis could be used to reliably assess the potential impact of our rule

amendments on retail shareholders."  <u>Id.</u>  However, the Commission could not, on the other

hand, use the preliminary staff analysis as support for its position that it could not rely on the

Broadridge data, without considering the analysis that caused it to reach that conclusion.

Accordingly, the Commission should not have withheld the Chief Economist's memorandum

and preliminary staff analysis until when it did, thereby depriving the public of a complete

picture of the challenges it faced in quantifying the effects of the ownership thresholds on the

number of shareholder proposals that it otherwise projected would be submitted.

The District of Columbia Circuit in <u>American Radio Relay League</u> encountered a similar

question in assessing whether the agency in that case should have disclosed redacted portions of

its own internal staff analysis that it at least "rel[ied on] in part." 524 F.3d at 237. There, the court opined that "[i]t appear[ed] to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rule[-]making [process] in order to afford interested persons meaningful notice and an opportunity for comment." Id. The redactions in American Radio Relay League "indicate[d] that a study's core scientific recommendations may [have] reveal[ed] the limitations of [the agency's] own data and that its conclusions may [have] reveal[ed] methodology or illuminate strengths and weaknesses of certain data or the study as a whole." Id. at 238. In that case, the court remanded the case to the agency to allow the public the opportunity to comment on the unredacted versions of the internal studies on which the agency in part relied on when promulgating the rule that was at issue. See id. at 242.

Although not directly on point, the Court finds the reasoning in American Radio Relay League persuasive and analogous for two primary reasons. First, "[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency." Id. at 237 (second alteration in original) (quoting Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 393 (D.C. Cir. 1973)). Indeed, although "an agency's determination is based upon a complex mix of controversial and uncommented upon data and calculations, there is no APA precedent allowing an agency to cherry-pick a study on which it has chosen to rely [or not rely] in part." Id. (internal quotation marks omitted) (quoting Solite Corp. v. Env't Prot. Agency, 952 F.2d 473, 500 (D.C. Cir. 1991)). Thus, although the Commission represents that it did not directly rely on the Broadridge data, the Chief Economist's memorandum, or the preliminary staff analysis "in determining to propose the amendments[,]" 85 Fed. Reg. at 70,268, because it opined significantly about those

documents, and subsequently included the memorandum and analysis in the public record, the

Commission seemingly conceded that the information included therein was relevant to its final

determination to substantially adopt the proposed amendments, at least to some degree, see, e.g.,

MCI Telecommc'ns Corp. v. Fed. Commc'ns Comm'n, 57 F.3d 1136, 1142 (D.C. Cir. 1995)

("[A]n agency may not turn the provision of notice into a bureaucratic game of hide and seek.");

see also Oceana, Inc. v. Ross, 290 F. Supp. 3d 73, 80 (D.D.C. 2018) ("The use of a document to

justify an assertion or proposition indicates that the [agency] consulted and thought about—and

therefore considered—that document directly[.]").  Consequently, the Commission's decision

regarding whether to ultimately rely on the Broadridge data in proposing the amendments could

only be arrived at by considering the memorandum and preliminary staff analysis which aided in

the evaluation of the economics of shareholder proposals on the proxy process.

       Second, although Broadridge initially requested that its identity not be disclosed to the

public when it submitted its data to the Commission, "[i]n June 2020, Broadridge agreed to be

identified as the source of the data."  Joint App'x, Ex. A1278 (Kothari Memo) at 1 n.3.  Because

the Commission was unable to disclose the data or the identity of Broadridge before June 2020—

two months before the Commission finally disclosed the Chief Economist's memorandum and

the preliminary staff analysis in the public register—the reason for that delay should have been

made known to the public at that time.  After all, "the 'dialogue' between administrative

agencies and the public 'is a two-way street."  Northside Sanitary Landfill, Inc. v. Thomas, 849

F.2d 1516, 1520 (D.C. Cir. 1988) (quoting Home Box Off. v. Fed. Commc'ns Comm'n, 567

F.2d 9, 35 (D.C. Cir. 1977)).  Therefore, as the plaintiffs and at least one commenter correctly

assert, "the Commission should have provided the public notice of and an opportunity to

comment on [both] the [p]reliminary [s]taff [a]nalysis [and the Chief Economist's memorandum]

in the Proposing Release[,]" 85 Fed. Reg. at 70,268; <u>see</u> Pls.' Reply at 14, or as soon as

practicable, rather than in the final weeks before the adoption of the Final Rule.  <u>See, e.g.</u>, <u>CTS</u>

<u>Corp. v. Env't Prot. Agency</u>, 759 F.3d 52, 65 (D.C. Cir. 2014) (suggesting that the petitioner

should have "petitioned the [agency] for either reconsideration or a new rulemaking or [to]

reopen the notice-and-comment period" to afford the opportunity for public comment on a staff

analysis that was not ultimately used by the agency (internal citation omitted)).  A timely

disclosure of the Broadridge data could possibly have provided an opportunity to better test the

Commission's analysis of its purported deficiencies "through [more] exposure to public

comment, . . . thereby [] enhanc[ing] the quality of judicial review."  <u>Am. Radio Relay League,</u>

<u>Inc.</u>, 524 F.3d at 236 (internal quotation marks omitted).

Finally, the Court is unpersuaded by the Commission's secondary argument that "[t]he

Chief Economist's assessment does not implicate Section 553 because it was not 'central'—or

even relevant—to the Commission's decision to adopt the [amendments]."  Def.'s Mem. at 33

(internal quotation marks omitted) (quoting <u>Owner-Operator Indep. Drivers Ass'n</u>, 494 F.3d

at 201).  As the Court already indicated, <u>supra</u> Section III.A at 19, the Chief Economist's

memorandum and the accompanying analysis were all "relevant" to some extent to the

Commission's decision not to rely on the Broadridge data when it substantially adopted the

amendments from the Proposing Release in the Final Rule.  Moreover, the Commission was

required to "identify and make available technical studies and data that it has employed in

reaching the decisions to propose particular rules."  <u>Owner-Operator Indep. Drivers Ass'n</u>, 494

F.3d at 199.  Whether the data was "central" to the Commission's decision to promulgate the rule

is immaterial.  <u>See id.</u> ("[T]he agency[ has a] duty to identify and make available technical

studies and data that it has employed in reaching the decisions to propose particular rules[.]"

(internal quotation marks omitted)).  Therefore, the Court concludes that the Commission should have disclosed the Chief Economist's memorandum and the preliminary staff analysis or provided the public more time to address the documents, given the Commission's stated concerns with using the Broadridge data to inform its own analysis regarding the potential impacts on the number of shareholder proposals that would result from the adoption of the amendments.

Having concluded that the Chief Economist's memorandum and the preliminary staff analysis should have been disclosed earlier, the Court must now consider whether the Commission committed "prejudicial error[,]" 5 U.S.C. § 706, by not earlier disclosing that information.  As noted earlier, "the [C]ourt will not set aside a rule absent a showing by the p[laintiff]s that they suffered prejudice from the agency's failure to provide an opportunity for public comment[.]"  Am. Radio Relay League, Inc., 524 F.3d at 237 (internal quotation marks omitted).  "The burden to demonstrate prejudicial error is on the party challenging agency action."  Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 1121 (D.C. Cir. 2010).  "To show that error was prejudicial, a plaintiff must 'indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity.'"  Gerber v. Norton, 294 F.3d 173, 182 (D.C. Cir. 2002) (internal quotation marks omitted) (quoting McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1323–24 (D.C. Cir. 1988)).

Based on the existing record, the Court concludes that the Commission did not commit prejudicial error by improperly withholding the Chief Economist's memorandum and preliminary staff analysis until the disclosure was made because "[n]o substantive challenges which differ in kind from the original comments have been raised."  Fla. Power & Light Co. v.

23

United States, 846 F.2d 765, 772 (D.C. Cir. 1988).  Here, the Commission did provide some

opportunity for public comment—albeit brief—and comments regarding the Broadridge data

were received and considered by the Commission.  See Joint App'x, Ex. A1224 (Comment

Letter from Amy Borrus, Executive Director, Council of Institutional Investors, et al. (September

4, 2020) ("Borrus Letter")) at 1 (explaining the commenter's concerns with "the [eleventh]-hour

submission by the Chief Economist . . . long after the February 3, 2020, public comment

deadline" and the concerns with the figures provided therein); see also 85 Fed. Reg. at 70,268–69

(responding in detail to the Borrus Letter's concerns regarding why the analysis and Broadridge

data were unusable).  Because the plaintiffs' core argument on this procedural issue was

addressed by the Commission in the Final Rule—viz., that "[t]he Commission [unlawfully]

concealed th[e Broadridge] data from the public," Pls.' Mem. at 2, and the Commission

explained why it did not rely on the data in promulgating the Final Rule, see 85 Fed. Reg. at

70,268–69, the Commission has satisfied its obligation to provide the public "opportunity to

address the staff [analysis] . . . [and] frame[] [its determination] with adversarial comment in full

view."  Nat'l Ass'n of Regul. Util. Comm'nrs. v. Fed. Commc'ns Comm'n, 737 F.2d 1095, 1121

(D.C. Cir. 1984).

 Although the Court does not consider this untimely disclosure a mere "technical

argument," Fla. Power & Light Co., 846 F.2d at 772, as the Commission's notice and comment

obligations serve an important function in the rule-making process, it must nonetheless conclude

that the error was "[e]ssentially . . . rendered harmless[,]" Nat'l Ass'n of Regul. Util. Comm'rs,

73 F.2d at 1121, in light of the Commission addressing the concerns outlined in the comment

that was received, and additionally, the Commission's "request[] that commenters submit data

that would allow the Commission to reliably assess the impact of the [amendment] proposal[ as

initially raised in the Proposing Release,]" 85 Fed. Reg. at 70,268; see 84 Fed. Reg. at 66,498

n.245 (inviting comments to better assess the impact on the number of shareholder proposals

rather than what was supplied in the "confidential" data later disclosed to have been supplied by

Broadridge). Accordingly, the Court concludes that even though the Commission erred by

withholding disclosure of the Chief Economist's memorandum and the preliminary staff analysis

which both analyzed the Broadridge data, the error was harmless and, therefore, the Court must

decline to set aside the Final Rule on this basis.

## B. Whether the Commission Conducted an Adequate Economic Analysis of the Impact of the Final Rule on the Number of Shareholder Proposals

The Court next considers whether the Commission conducted an adequate economic

analysis of the impact the Final Rule would have on the number of shareholder proposals that

would be submitted. On this issue, the plaintiffs argue that "[t]he Commission failed to conduct

any reasonable [economic] analysis" because it failed to understand "how many formerly eligible

proposals would be excluded by its more stringent ownership requirements." Pls.' Mem. at 20

(emphasis omitted). The plaintiffs further argue that because the Commission failed to quantify

the economic impact the rule amendment would have on the number of shareholder proposals,

despite having the ability to consider the Broadridge data, the adoption of the amendment was

arbitrary and capricious. See id. at 25. In response, the Commission argues that its economic

analysis was not arbitrary or capricious because its only requirement was to "determine as best it

c[ould] the economic implications of the rule, but it need not conduct a rigorous, quantitative

economic analysis of every cost and benefit." Def.'s Mem. at 15 (internal quotation marks

omitted) (quoting Lindeen v. Sec. & Exch. Comm'n, 825 F.3d 646, 658 (D.C. Cir. 2016)).

"To survive review under the arbitrary and capricious standard, an agency must examine

the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." Sierra Club v. Salazar, 177 F. Supp.

3d 512, 531 (D.D.C. 2016) (Walton, J.) (quoting Tripoli Rocketry Ass'n v. Bureau of Alcohol,

Tobacco, Firearms & Explosives, 437 F.3d 75, 81 (D.C. Cir. 2006)).  "When the [Securities and

Exchange] Commission engages in rulemaking under the Exchange Act [which] requires it to

consider 'whether an action is necessary or appropriate in the public interest,' it must also

consider 'the protection of investors' as well as 'whether the action will promote efficiency,

competition, and capital formation.'" Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n,

34 F.4th 1105, 1111 (D.C. Cir. 2022) (quoting 15 U.S.C. § 78c(f)).  Although "[a]n agency's

duty to consider economic impacts does not necessarily require a precise cost-benefit analysis,"

id., "th[e District of Columbia Circuit] has recognized that the Commission 'need not . . . base its

every action upon empirical data," id. (quoting Chamber of Com. v. Sec. & Exch. Comm'n, 412

F.3d 133, 142 (D.C. Cir. 2005) ("Chamber I")), "and [the Commission] may reasonably conduct

'a general analysis based on informed conjecture,'" id. (quoting Chamber I, 412 F.3d at 142).  In

other words, "the Commission [has a] statutory obligation to determine as best as it can the

economic implications of the rule it has proposed[.]" Bloomberg L.P. v. Sec. & Exch. Comm'n,

45 F.4th 462, 475 (D.C. Cir. 2022) (quoting Chamber I, 412 F.3d at 143).

 Here, the Commission "estimated the reduction in the number of shareholder proposals

assuming no change in shareholder-proponent behavior as a result of the rule amendments."  85

Fed. Reg. at 70,270; see 84 Fed. Reg. at 66,497–99.  In doing so, the Commission "only

estimate[d] the range, and not a precise number, of the reduction in shareholder proposals

associated with changes to the ownership thresholds because [it did] not have data on duration of

holdings for shareholder-proponents."  85 Fed. Reg. at 70,270.  The plaintiffs argue that "[t]he

Commission's final rule [that] provides an 'estimate of the percentage of excludable proposals'

as falling somewhere between [zero percent] and [fifty-six percent]—[is] an utterly

indeterminate range that provides no meaningful economic guidance at all."  Pls.' Mem. at 23;

see 85 Fed. Reg. at 70,271 tbl. 1.  Moreover, the plaintiffs contend that the conclusion reached

by the Commission "was false and contrary to the administrative record" because "[it] had

obtained [the Broadridge] data over a year earlier . . . showing holding periods for over

[twenty-eight] million retail accounts."  Pls.' Mem. at 24.  As explained in the preliminary staff

analysis, "[Commission] staff had found that similar increased ownership requirements would

result in a reduction in shareholder proposals of up to [seventy-eight percent]."  Id.; see Joint

App'x, Ex. A1278 (Kothari Memo) at 1.  Thus, the plaintiffs argue that "the Commission needed

to know how many formerly eligible proposals would now be excluded[,]" Pls.' Mem. at 22

(emphasis omitted), in order to conduct an adequate economic analysis of the impact on the

number of shareholders, and it failed to do so because it failed to consider the Broadridge data.

See id. at 24.

       For the following reasons, the Court concludes that the Commission adequately analyzed

the potential impact the proposed rule would have on the number of shareholder proposals.  First,

the Commission's analysis and conclusion is entitled to "defer[ce because this] matter[]

implicat[es] predictive judgments."  Inv. Co. Inst. v. Commodity Futures Trading Comm'n, 891

F. Supp. 2d 162, 186 (D.D.C. 2012) (quoting Rural Cellular Ass'n v. Fed. Commc'ns Comm'n,

588 F.3d 1095, 1105 (D.C. Cir. 2009)).  The Commission considered adopting amendments that

had not previously existed, and thus lacked a substantial amount of data capturing ownership

duration beyond one year upon which it could rely.  See 63 Fed. Reg. at 29,111–12

(implementing the prior rule requiring only two thousand dollars or one percent of ownership for

at least a year for a shareholder-proponent's proposal to be included on a company proxy

statement); see also 84 Fed. Reg. at 66,498 n.245 (soliciting "empirical data to assist in estimating the number of excludable proponents under the proposed thresholds, . . . aggregate holdings to the shareholder level, identify shareholders likely to submit shareholder proposals, and that span a sufficiently long time period.").  Because, "[the] agency [wa]s obliged to make policy judgments where no factual certainties exist[ed,] [n]or w[ere] facts . . . provide[d] to support] [an] answer, [the Court's] role is more limited; [the Court may therefore only] require [ ] that the agency [ ] state [its reasoning] and go on to identify the considerations it found persuasive."  Chamber I, 412 F.3d at 142 (quoting Bellsouth Corp. v. Fed. Commc'ns Comm'n, 162 F.3d 1215, 1221 (D.C. Cir. 1999)).  The Commission identified those considerations, see 85 Fed. Reg. at 70,268 (indicating "[t]he magnitude of the overall reduction will determine the magnitude of the benefits and costs [to the number of shareholder proposals].");  id. at 70,267–72, and "determine[d] as best it c[ould] the economic implications of the rule it [ ] proposed[,]" Chamber I, 412 F.3d at 143.

Second, the Commission reasonably analyzed the amendments' impact based on what it concluded to be the proper data, and adequately explained the limitations of using that data.  As the Commission noted, "[it] chose to use ownership data specific to shareholder-proponents (with no duration information beyond one year) rather than ownership data from a general pool of shareholders [as the Broadridge data used] (with some additional duration information)."  Def.'s Mem. at 18–19; see 84 Fed. Reg. at 66,497 ("[The Commission] analyze[d shareholder-] proponents' ownership information using data from proxy statements[.]"); see also 85 Fed. Reg. at 70,270–71 (adopting the methodology used in the Proposing Release to calculate the impact on shareholder proposals).  Although the Commission did "lack data on [the] proponents' duration of ownership [ beyond the prior one year requirement]," 84 Fed. Reg. at 66,498,

sufficient to determine the number of proposals that would be excludable following the adoption

of the Final Rule, the Commission was able to "derive" the zero-to-fifty-six percent impact range

based upon "estimates of the percentage of currently eligible proposals[—at the time of the

Proposing Release—]that would be excludable by assuming that all or none of currently eligible

proponents satisfied the duration requirements[,]" Def.'s Mem. at 16–17; see 84 Fed. Reg.

at 66,497.  In response, comments were received that provided general statistics on shareholder

duration, but the Commission noted that "it [wa]s difficult to infer duration of holdings of

shareholder-proponents from these [commenters and] studies [they identified] because they d[id]

not separately consider holdings of shareholders that already submitted or are likely to submit

shareholder proposals."  85 Fed. Reg. at 70,270 n.320. Moreover, the Commission ultimately

opined that it

> d[id] not expect the final amendments relating to the one-percent ownership
> threshold and shareholder engagement or the final amendment requiring certain
> documentation when using a representative to meaningfully impact the number of
> shareholder proposals included in companies' proxy statements, because the one-
> percent ownership threshold currently is <u>rarely</u> utilized in light of the $2,000/one-
> year threshold and the majority of shareholders that submit a proposal through a
> representative already provide much of the documentation that is mandated by the
> final amendments, consistent with existing staff guidance.

Id. at 70,270–71 (emphasis added).  Therefore, the Commission found that drawing conclusions

about the statistics provided by commenters "would [have] be[en] inherently speculative because

shareholder-proponents constitute[d] a very small[,] . . . non-random set of shareholders."  Id.

at 70,270 n.320.

Finally, the Commission adequately explained why it did not consider the Broadridge

data.  The Commission specifically noted that

> [it] was unable to determine with reasonable accuracy from the data set whether
> the snapshot of account holdings provided by Broadridge could be used to
> determine whether individual investors in fact met ownership and duration

> thresholds under the current or revised eligibility requirements (and therefore was
> unable to determine with reasonable accuracy the potential impact), because the
> data set does not identify account holdings as of the deadline to submit a
> shareholder proposal or as of the annual meeting date.

Id. at 70,269.  "Rather, [the Commission continued,] it only include[d] data points as of the

record date, which do not extend sufficiently in time to capture the minimum holding

requirements."  Id.  While the plaintiffs contend that the Commission did not "meaningfully

estimate the impact of the rule's significant increases to the required holding periods[,]" Pls.'

Mem. at 23, the Commission is not required to conduct such a rigorous analysis.  See Lindeen,

825 F.3d at 658.  Rather, "[t]he agency's job is to exercise its expertise to make tough choices

about which of the competing estimates [or available data sets] is most plausible, and to hazard a

guess as to which is correct, even if . . . the estimate [of the impact] will be imprecise."  Pub.

Citizen v. Fed. Motor Carrier Safety Admin., 374 F.3d 1209, 1221 (D.C. Cir. 2004).

Thus, although the Commission noted that its "efforts to provide a quantitative analysis

[was] inherently limited[,]" 85 Fed. Reg. at 70,270, its ultimate decision to "estimate the range,

and not a precise number, of the reduction in shareholder proposals[,]" id., based on

extrapolating from the "limited data on duration of ownership from proxy statements or proof-of-

ownership letters," 84 Fed. Reg. at 66,498, satisfies its statutory obligation, see 15 U.S.C.

§ 78c(f), to determine the economic impact on the number of shareholder proposals that would

result from adoption of the Final Rule.  Accordingly, the Court concludes that the Commission's

economic analysis adequately quantified the impact the Rule amendments would have on the

number of shareholder proposals that would be submitted.

**C.    Whether the Commission Adequately Quantified the Costs and Benefits of the Final
         Rule**

The Court next considers whether the Commission adequately quantified the costs and benefits to several different groups when it promulgated the Final Rule.  The plaintiffs argue that "the Commission's [first flaw in its] cost-benefit analysis was its refusal to quantify the benefits of shareholder proposals."  Pls.' Mem. at 29.  As support for their position, the plaintiffs argue that although "[t]he Commission recognized that it was required to 'quantify the costs, benefits, and effects on efficiency' of its rule if possible to do so—for 'companies,' 'non-proponent shareholders,' and 'proponents of shareholder proposals' alike[,]" id. (quoting 85 Fed. Reg. at 70,263, 70,266–67), "the Commission quantified the impact only for the first category— companies—and not the other two[,]" id.  Thus, the plaintiffs contend, "[t]he result was a nonsensical cost-benefit analysis where the Commission touted the supposed cost savings of its rule for companies but had nothing to weigh those cost savings against."  Id.  The Commission responds that it "specifically 'recognize[d] that shareholder proposals may bring benefits to companies and that their shareholders and that the potential loss of those benefits resulting from the exclusion of certain proposals that are not otherwise proposed by other shareholders would be a cost of the rule.'"  Def.'s Mem. at 22 (quoting 85 Fed. Reg. at 70,264).  Moreover, "the Commission [argues that it] reasonably explained that it 'did not have the data necessary to quantify [the costs or benefits] precisely,' and thus its extensive qualitative discussion 'fulfill[ed] its statutory obligation to consider and evaluate potential costs and benefits.'"  Id. at 20–21 (internal quotation marks omitted) (quoting Lindeen, 825 F.3d at 658).

Courts "review [an agency's] cost-benefit analysis deferentially."  Inv. Co. Inst., 891 F. Supp. 2d at 189 (quoting Nat'l Ass'n of Home Builders v. Env't Prot. Agency, 682 F.3d 1032, 1040 (D.C. Cir. 2012)).  Therefore, in reviewing agency cost-benefit analyses, "[a reviewing] court is not to substitute its judgment for that of the agency[.]"  Consumer Elecs. Ass'n v. Fed.

Commc'ns Comm'n, 347 F.3d 291, 303 (D.C. Cir. 2003) (quoting State Farm, 463 U.S. at 43).

This is because "cost-benefit analyses epitomize the types of decisions that are most

appropriately entrusted to the expertise of an agency[.]" Off. of Commc'n of United Church of

Christ v. Fed. Commc'ns Comm'n, 707 F.2d 1413, 1440 (D.C. Cir. 1983).  "The Court's role,

instead, is 'to determine whether the decision was based on a consideration of the relevant

factors and whether there has been a clear error [of] judgment.'" Inv. Co. Inst., 891 F. Supp. 2d

at 189 (citations and internal quotation marks omitted) (quoting Ctr. for Auto Safety v. Peck, 751

F.2d 1336, 1342 (D.C. Cir. 1985)).

Furthermore, "in view of the complex nature of economic analysis typical in the

regulation promulgation process, [the plaintiffs'] burden to show error is high." Nat'l Ass'n of

Home Builders, 682 F.3d at 1040.  As to this factor, "[t]he APA imposes no general obligation

on agencies to produce empirical evidence[—r]ather, an agency has to justify its rule with a

reasoned explanation." Stilwell v. Off. of Thrift Supervision, 569 F.3d 514, 519 (D.C. Cir.

2009).  "Where an agency has acknowledged public comments regarding costs of the new rule

and concluded that such costs are 'justified by gains in other areas,' the agency has sufficiently

taken into consideration these facts." Inv. Co. Inst., 891 F. Supp. 2d at 189 (quoting Owner-

Operator Indep. Drivers Ass'n, 494 F.3d 188 at 211).

In resolving this dispute between the parties, the Court will first address whether the

Commission adequately considered the costs of the Final Rule that would be incurred by

companies and shareholder-proponents before addressing whether the Commission adequately

considered the benefits of shareholder proposals.

**1.  Whether the Commission Properly Weighed the Cost Savings Data to Companies**

The Court first considers whether the Commission properly weighed the cost savings data

impact on companies that would be affected by the Final Rule.  The plaintiffs argue that it did

not, noting that "[t]he Commission solicited estimates from the public that resulted in an extremely broad range of [cost-saving] estimates." Pls.' Mem. at 34. The plaintiffs contend that "[t]he Commission then made no serious effort to scrutinize those numbers, instead simply declaring that the cost savings would fall somewhere in that enormous range[,]" which "was an abdication of [its] responsibility to conduct [a] meaningful analysis of the information it received." Id. The Commission responds that the plaintiffs' "objection lacks merit" because "[the p]laintiffs challenge the Commission's analysis of direct cost-savings to companies, but do not address the Commission's discussion of other significant cost-savings." Def.'s Mem. at 26.

In adopting the Final Rule, the Commission "use[d] the estimate of $18,982 . . . rounded up to $20,000, as the lower bound for [its] direct cost estimates in the economic analysis[ for a single shareholder proposal]." 85 Fed. Reg. at 70,274. The Commission then "use[d] $150,000 as the upper bound for [its] direct cost estimates in the economic analysis, which [it] believe[d] represents a reasonable upper end of potential costs of processing a shareholder proposal[.]" Id. Totaling all of the potential savings from the amendments collectively, the Commission "estimate[d] that all Russell 3000 [Index[5]] companies may experience an upper bound of annual cost savings ranging from $1.16 million to $78.53 million per year, assuming no change in [the] proponents' behavior as a result of the final amendments." Id. The Commission reached this range based on the following calculations:

> $332,400 = $20,000 ([citing] note 344) x 2% (i.e., minimum upper bound percentage of excludable proposals as a result of the amendments to Rules 14a-8(b) and 14a-8(c)[)] . . . x 831 (i.e., all proposals submitted to be considered at 2018 shareholders' meetings).

---

[5] "The Russell 3000 Index measures the performance of 3,000 stocks" and is "designed to represent approximately 98% of investable U[nited ]S[tates] equities by market capitalization." Russell US Indexes, FTSE Russell, https://www.lseg.com/en/ftse-russell/indices/russell-us#t-russell-3000 (last visited June 5, 2025).

> $72.30 million = $150,000 ([citing] note 344) x 58% (i.e., maximum upper bound percentage of excludable proposals as a result of the amendments to Rules 14a-8(b) and 14a-8(c)[)] . . . x 831 (i.e., all proposals submitted to be considered at 2018 shareholders' meetings).

Id. at 70,274 n.347.

> $831,000 = $20,000 ([citing] note 344) x 5% (i.e., upper bound percentage of excludable proposals as a result of the amendments to Rule 14a-8(i)(12)[)] . . . x 831 (i.e., all proposals submitted to be considered at 2018 shareholders' meetings).

> $6.23 million = $150,000 ([citing] note 344) x 5% (i.e., upper bound percentage of excludable proposals as a result of the amendments to Rule 14a-8(i)(12)[)] . . . x 831 (i.e., all proposals submitted to be considered at 2018 shareholders' meetings).

Id. at 70,274 n.348.  Adding together $332,400 and $831,000 equals $1.16 million, the low end of the potential cost savings, while adding together $72.30 million and $6.23 million equals $78.53 million, the higher end of the potential cost savings from the Final Rule amendments, assuming there would be no change in the behavior of shareholder-proponents.  See id. at 70,274.

The plaintiffs argue that "[this] approach was an abdication of the Commission's responsibility to 'make tough choices about which of the competing estimates is most plausible' and to 'hazard a guess as to which is correct.'"  Pls.' Mem. at 34 (quoting Bus. Roundtable v. Sec. & Exch. Comm'n, 647 F.3d 1144, 1150 (D.C. Cir. 2011)).  However, this again is a misunderstanding of the Commission's APA obligations, under which it is merely expected to "justify its rule with a reasoned explanation."  Stilwell, 569 F.3d at 519; see Nasdaq Stock Mkt. LLC, 34 F.4th at 1113 ("Th[e Circuit] has 'never required anything more' of an agency than to weigh costs and benefits and to make 'reasonable trade-offs[.]'"  (quoting Covad Commc'ns Co. v. Fed. Commc'ns Comm'n, 450 F.3d 528, 543 (D.C. Cir. 2006))).  The Court concludes that the Commission has done just that for several reasons.  As the Commission pointed out, "the cost

34

estimates used in the economic analysis [we]re informed by the Commission's decades-long experience with Rule 14a-8 and the various forms of outreach on the proxy process that the Commission has conducted over the years[,]" 85 Fed. Reg. at 70,273 n.338, such as "hosting the Proxy Process Roundtable and soliciting public input on the Rule 14a-8 ownership thresholds[,]" id. at 70,274 n.346; see id. at 70,245 n.63 (listing the company-commenters that provided the Commission "estimates of the costs associated with a company's receipt of a shareholder proposal"); see also Chamber of Com. Br. at 4 ("Whether valid or frivolous, in the aggregate shareholder proxy proposals cost companies, and ultimately other shareholders, tens of millions of dollars each year.").  As the Commission contends, "[it] was 'entitled to rely on these representations by parties who were uniquely in a position to know' the costs that they or their members have previously incurred."  Def.'s Mem. at 29 (quoting Nat'l Ass'n of Regul. Util. Comm'nrs, 737 F.2d at 1125).  The Commission further noted that it was not "aware of additional sources of information[, including comments from the public,] that would further inform these cost estimates."  Id. at 28 (quoting 85 Fed. Reg. at 70,274 n.346).

The law in this Circuit does not conflict with the Commission's position.  For instance, in Chamber I, the Circuit concluded that the range of costs estimated by the Commission was legally permissible where "particular difficult[ies]" resulted in the Commission being able to "determine only the range within which a[n affected entity]'s cost of compliance will fall, depending upon how it responds to the condition [imposed by the new amendment at that time.]" 412 F.3d at 143.  And, in Business Roundtable, the Circuit ruled that the Commission's proposed amendment there was unlawful only because "it did nothing to estimate and quantify the costs it expected companies to incur[,] nor did it claim estimating those costs was not possible, [as] empirical evidence about expenditures . . . was readily available."  647 F.3d at 1150.  That is not

the case here, where the Commission "considered all of th[e] information thoroughly, leveraging [their] decades of experience with Rule 14a-8, [to determine] . . . [that] the available information [wa]s reliable and sufficient."  85 Fed. Reg. at 70,274 n.346.

The Court is also unpersuaded by the plaintiffs' argument that "the Commission failed to grasp the significance of th[e] difference" between initial and resubmitted proposals which they argue is a separate factor that should have been considered.  Pls.' Mem. at 36.  Although the Commission did acknowledge that the costs for initial proposals are generally higher than those incurred for resubmitted proposals, see 85 Fed. Reg. at 70,272 n.332, it counterbalanced that analysis by also opining that "resubmissions could be costlier than initial submissions[ because] . . . companies might decide to challenge a resubmission or to make a concession to the proponent in exchange for the proposal being dropped and incur the associated costs following low support for the initial submission[,]" id. at 70,266 n.288.  In any event, the Commission correctly noted that it "did not receive any data—and [the] plaintiffs point to none—enabling it to quantify a different upper bound estimate for resubmissions, let alone the 'correct' estimate" that would alter the cost range in any way.  Def.'s Mem. at 30.  Accordingly, the Court must conclude that the Commission's cost-benefit analysis of the cost savings to companies upon the adoption of the Final Rule was reasonable.

**2.  Whether the Commission Properly Considered the Costs Incurred by Shareholder-Proponents**

The Court next considers whether the Commission properly considered the costs that would be incurred by shareholder-proponents due to the adoption of the Final Rule amendments. The plaintiffs argue that "[t]he Commission acknowledged that its rule will require shareholders either to purchase more shares to satisfy the increased ownership requirements or to hold the stock for multiple years before submitting a proposal[,]" Pls.' Mem. at 36, and "it admitted that

shareholders may have to 'sell other assets to raise cash to buy shares or incur borrowing costs to raise cash to buy shares[,]'" id. (quoting 85 Fed. Reg. at 70,278).  The plaintiffs argue that despite these recognitions, the Commission nonetheless failed "to quantify any of those costs." Id.  The Commission responds that "[the p]laintiffs' argument that [it] [ ] was required to conduct a quantitative rather than qualitative analysis of the costs to shareholder-proponents" fails because "[t]he Commission identified and discussed a variety of potential costs to proponents" that satisfy its obligation to conduct a reasonable cost-benefit analysis.  Def.'s Mem. at 25.  Again, the Commission is correct.

The Commission identified numerous potential costs that the Final Rule amendments may impose on shareholders who desire to or actually submit proposals, but addressing the essence of the plaintiffs' arguments, the Court focuses on the costs imposed on shareholder-proponents by the ownership requirement amendment.  See Pls.' Mem. at 36 (identifying costs that will be incurred specifically in regard to the Final Rule's new ownership threshold). Engaging in a more qualitative, rather than quantitative discussion, the Commission first noted that

> costs may arise as a result of a currently eligible proponent either having to invest additional funds to immediately submit a proposal or having to wait to submit a shareholder proposal and thus forgo the potential benefits associated with the immediate inclusion of the proposal in a company's proxy statement at the expense of other shareholders and the company.

85 Fed. Reg. at 70,277.  The Commission further opined on the possible investments a shareholder-proponent may have to make to satisfy the new ownership thresholds, observing that "[a] shareholder-proponent that chooses to reallocate assets to meet the new ownership thresholds may incur transaction costs to buy shares and, depending on the shareholder-proponent's liquidity, may incur transaction costs to sell other assets to raise cash to buy shares

or incur borrowing costs to raise cash to buy shares." See id. at 70,278. But, the Commission dismissed these concerns, noting that "a negligible number of shareholders [would] incur these costs because, as discussed elsewhere in th[e Final Rule] release, most investors do not submit proposals." Id. The Commission also considered that the "amended ownership thresholds . . . may deter proponents from submitting proposals[,]" but concluded that "the aggregate benefit to all shareholders exceeds the cost to the proponent of submitting a proposal." Id. at 70,277. Ultimately, the Commission found that despite the attention given to the various potential costs, "[it] lack[ed] sufficient data to quantify the[ possible effects] because [it] lack[ed] data on [shareholder-]proponents' portfolio holdings, investment preferences and resources." Id. at 70,278.

The Commission, as is its obligation under the APA, "provided substantial detail on the benefits of the rule, and the reasons why quantification was not possible." Cigar Ass'n of Am. v. Food & Drug Admin., 480 F. Supp. 3d 256, 276 (D.D.C. 2020) (quoting Nicopure Labs, LLC v. Food & Drug Admin., 266 F. Supp. 3d 360, 406 (D.D.C. 2017)); see supra Section III.C.1 (identifying the costs saved by companies and other shareholders by adopting the Final Rule). And similarly, as the Court indicated, supra Section III.B, it appears that the Commission was making a predictive judgment based upon the limited data available to it, which is entitled to a considerable level of deference. See Inv. Co. Inst., 891 F. Supp. 2d at 186–87. Thus, the Court cannot "substitute its judgment for that of the agency[,]" Consumer Elecs. Ass'n, 347 F.3d at 303, where, as here, the Commission has reasonably explained all of the potential costs that might result from the adoption of the Final Rule on shareholder-proponents. Furthermore, it is significant that "[the p]laintiffs do not cite any relevant evidence that the Commission failed to consider or that refutes its analysis." Def.'s Mem. at 26.

Although the plaintiffs again identify <u>Business Roundtable</u> and <u>Chamber I</u> as support for their arguments, <u>see</u> Pls.' Reply at 4 ("Those precedents squarely foreclose the Commission's assertion that it need not perform a 'quantified cost-benefit analysis.'" (quoting Def.'s Mem. at 15)), a plain reading of those cases does not support their position.  In <u>Business Roundtable</u>, the court concluded that the Commission "failed adequately to quantify . . . certain costs <u>or</u> to explain why those costs could not be quantified."  647 F.3d at 1149 (emphasis added).  So importantly there, the Commission failed to adequately explain the basis for its position even though "empirical evidence . . . was <u>readily</u> available[ to it]."  <u>Id.</u> at 1150 (emphasis added).  Similarly, in <u>Chamber I</u>, the Circuit concluded that the Commission's cost-benefit analysis was inadequate because it "<u>readily</u> could have estimated the cost to an [affected entity and such an] estimate would be pertinent to its assessment of the effect the condition would have [had.]"  412 F.3d at 144 (emphasis added).  The law in this Circuit is clear that "[t]he Court's role . . . is to determine whether the [Commission's] decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."  <u>Inv. Co. Inst.</u>, 891 F. Supp. 2d at 189 (internal quotation marks omitted).  Where, as here, the Commission concluded that it did not have information "readily" available to aid in quantifying the costs affected parties will sustain from the adoption of the Final Rule amendments, the Court may not disturb the Commission's analysis, provided that the Commission considered <u>all</u> "of the relevant factors[,]" <u>id.</u>, and thus, its qualitative analysis of the cost-benefits is sufficient to survive review under the APA, <u>see</u> <u>Lindeen</u>, 825 F.3d at 658 ("[W]e do not require [the Commission] to conduct a rigorous, quantitative economic analysis unless [a] statute explicitly directs it to do so." (internal quotation marks omitted)) (quoting <u>Nat'l Ass'n of Mfrs. v. Sec. & Exch. Comm'n</u>, 748 F.3d 359,

369 (D.C. Cir. 2014)); see also Nat'l Ass'n of Mfrs., 748 F.3d at 359 ("An agency is not required to measure the immeasurable[.]" (internal quotation marks omitted)).[6]

Accordingly, the Court must conclude that the Commission considered the information available to it and reasonably explained its decision in weighing the cost-benefits of its Final Rule and its impact on shareholder-proponents.

### 3. Whether the Commission Reasonably Considered the Benefits of Shareholder Proposals

The plaintiffs' final argument regarding the Commission's cost-benefit analysis concerns whether the Commission reasonably considered the benefits of shareholder proposals. Specifically, the plaintiffs argue that the Commission "refus[ed] to quantify the benefits of shareholder proposals" despite "a substantial [amount] of academic literature show[ing] that shareholder proposals create value for corporations and their shareholders." Pls.' Mem. at 29 (citing 85 Fed. Reg. at 70,284–85). As the Court noted above, the Commission contends that "[it] specifically 'recognize[d] that shareholder proposals may bring benefits to companies and their shareholders and that the potential loss of those benefits resulting from the exclusion of certain proposals that are not otherwise proposed by other shareholders would be a cost of the rule.'" Def.'s Mem. at 22 (emphasis omitted) (quoting 85 Fed. Reg. at 70,264).

Thus, while it "recognize[d] that shareholder proposals may bring benefits to companies and their shareholders[,]" the Commission nonetheless stated that "to the extent that the [F]inal [R]ule amendments may exclude proposals that may bring benefits to companies and their shareholders, [it also] qualitatively describe[d] the cost that may arise." 85 Fed. Reg. at 70,264.

---

[6] The Court notes that other circuits have directly reached the same conclusion in upholding prior Commission cost-benefit analyses. See Chamber of Com. v. Sec. & Exch. Comm'n, 85 F.4th 760, 773 (5th Cir. 2023) ("We agree with the [Commission] that, as a general matter, it is not required to undertake a quantitative analysis to determine a proposed rule's economic implications."); Chamber of Com. v. Sec. & Exch. Comm'n, 115 F.4th 740, 754 (6th Cir. 2024) ("The qualitative assessment [that was conducted] was sufficient, given that the Commission lacked data enabling it to conduct a quantitative analysis.").

The Commission "d[id] not focus on specific types of shareholder proposals or attempt to quantify whether excluded proposals would have resulted in economically beneficial changes" because "those evaluations are properly left to the company's owners—the shareholders." Id. Additionally, the Commission explained that "[the] regulation of shareholder proposals under Rule 14a-8 has not been, nor [is] it [ ] under the final amendments, designed to judge the economic value of any particular shareholder proposal, or intended to take a position on the merits of any shareholder proposal topic." Id. at 70,264–65.

The Commission acknowledged the perspectives of several commenters who discuss the various benefits of shareholder proposals and information that was provided in support of their perspectives. See Joint App'x, Ex. A84 (Letter from Tom Shaffner, Dec. 17, 2019 ("Shaffner Letter")) at 9–10 (estimating that environmental, social, and governance—or "ESG"—proposals can add between $223.9 million and $129.7 billion in savings or value to Russell 3000 Index companies); id., A816 (Letter from Interfaith Center on Corporate Responsibility, January 27, 2020 ("ICCR Letter")) at 6–7 ("An influential 2003 study found that companies whose governance provisions provided the strongest shareholder rights and lowest management power . . . outperformed those with the weakest shareholder rights and highest management power by . . . 8.5% per year."); id., Ex. A1170 (Letter from Lucian Bebchuk, Feb. 3, 2020 ("Bebchuk Letter")) at 5–6 ("[P]roposals receiving significant minority support have brought many companies to change their practices with respect to disclosure of political spending and disclosure of environmental and climate change effects."); id., Ex. A1175 (Letter from As You Sow, February 3, 2020 ("As You Sow Letter")) at 6 ("Numerous studies support the conclusion that the shareholder proposal process increases market valuation for companies, and there is evidence in the record that inclusion of shareholder proposals from individual investors tends to

be associated with long-term value increases." (emphasis omitted)).  In sum, the plaintiffs argue

that the studies that have explained these potential benefits and other sources of information were

not properly considered by the Commission.  See Pls.' Mem. at 30–31.

For the following reasons, the Court agrees with the Commission that disregarding these

"readily available" studies was reasonable.  See Def.'s Mem. at 23.  Indeed, as the Commission

notes, it did "recognize that shareholder proposals may bring benefits to companies and their

shareholders and that the potential loss of those benefits . . . would be a cost of the rule."  Def.'s

Mem. at 22 (emphasis omitted) (quoting 85 Fed. Reg. at 70,264).  In recognizing the potential

benefits, the Commission responded that it would be inappropriate to focus on any "particular

proposal" since it is the shareholders who ultimately "determine the value of a proposal to a

particular company."  85 Fed. Reg. at 70,265.  Rather, "the rule focuses on setting thresholds at

which it is appropriate for a shareholder proposal—regardless of its substance—to be included in

the company's proxy materials at the expense of the other shareholders (directly and indirectly as

owners of the company)[.]"  Id.  Because the Commission considered these comments and

directly responded to some of them, it considered all of the factors as required to conduct a

reasonable qualitative analysis, even though it concluded that it could not rely on the comments

and studies provided to them by the several commenters.  See Inv. Co. Inst., 891 F. Supp. 2d at

189.

For example, in assessing specific commenters and the studies referenced by them, see,

e.g., Joint App'x, Ex. A84 (Shaffner Letter) at 9–11, the Commission stated that "this type of

study [does not] accurately predict[] the economic effects of the amendments because

[environmental, social, and governance or] [('ESG['])] policies could be implemented for

reasons other than the submission of shareholder proposals, including shareholder engagement

that does not involve the submission of shareholder proposals[,]" 85 Fed. Reg. at 70,284.

Moreover, "the studies cited by [Shaffner] [ ] do not provide evidence of a causal relation

between governance, environmental, and social provisions and firm value." Id.  As to this study

and others that the Commission responded to in its cost-benefit analysis, the plaintiffs "do not

[otherwise] identify any data that was before the [Commission] at the time of the [amendments'

adoption] that would have enabled it to quantify [the potential benefits of shareholder

proposals.]" Cigar Ass'n of Am., 480 F. Supp. 3d at 276.  Because the Commission explained

that "there [were] significant methodological and empirical challenges to quantifying whether

excluded proposals would have resulted in economically beneficial changes to the [affected]

compan[ies,]" 85 Fed. Reg. at 70,265, the Court agrees that "[t]he Commission's conclusion that

it could not draw reliable inferences from the studies was therefore reasonable[,]" Def.'s Mem.

at 23; see Chamber I, 412 F.3d at 143 ("[Where] the Commission made clear enough the

limitations of the stud[ies submitted], [ ] [courts] have no cause to disturb its ultimate judgment

that the stud[ies] w[ere] 'unpersuasive evidence.'"  (quoting Hüls Am. Inc. v. Browner, 83 F.3d

445, 452 (D.C. Cir. 1996)).

At bottom, the Commission's cost-benefit analysis was required to determine only

"whether [its] action will promote efficiency, competition, and capital formation[,]" Nasdaq

Stock Mkt. LLC, 34 F.4th at 1111 (quoting 15 U.S.C. § 78c(f)), and it did so through its

reasoning for the adoption of the Final Rule at issue here.  Upon careful consideration of the

parties' arguments, the Court does not find it necessary to disturb the Commission's analysis of

the costs and benefits considered in adopting the Final Rule.  Accordingly, the Court must

conclude that the Commission reasonably considered the potential benefits of shareholder

proposals.

**D.** **Whether the Adoption of the Restrictions on Aggregation and Representatives Was Arbitrary and Capricious**

The Court next considers the plaintiffs' argument that the adoption of the Final Rule's restrictions on aggregation of shareholdings and the use of representatives were arbitrary and capricious and not in accordance with the APA. Specifically, the plaintiffs argue that the "Commission violated the Administrative Procedure Act by abandoning its longstanding policy allowing aggregation of shareholdings and imposing arbitrary new restrictions on the use of representatives[,]" while not "provid[ing] [ ] coherent justification[s] for any of those changes." Pls.' Mem. at 38. In response, the Commission argues that its reasoning for adopting "policy choices to prohibit aggregation of holdings, limit representatives to one proposal per meeting, and require that proponents specify their availability to engage with the company" are "ignore[d] or mischaracterize[d]" by the plaintiffs. Def.'s Mem. at 35. The Court will first address whether the Commission's adoption of the aggregation prohibition was arbitrary and capricious before then making that assessment regarding the adoption of the shareholder representative amendments.

**1.** **Whether the Adoption of the Prohibition on Aggregating Ownership Shares Was Arbitrary and Capricious**

On this issue, the plaintiffs argue that the Commission's "sole justification for the change" was arbitrary and capricious because it only stated "that 'allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that each shareholder who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in the company.'" Pls.' Mem. at 38 (quoting 85 Fed. Reg. at 70,248). The Commission responds that (1) the plaintiffs forfeited challenging the aggregation issue because "issues not raised in comments before the agency are waived[,]" Def.'s Mem. at 37 (quoting Covad Commc'ns Co., 450 F.3d at 549); and (2) the new restrictions

on aggregation and the use of representatives were introduced to guarantee that a representative is not "the driving force . . . with only an acquiescent interest by the shareholder[,]" id.

As already noted, the Commission previously allowed shareholders to aggregate their holdings to satisfy prior ownership thresholds.  See 48 Fed. Reg. at 38,219 n.5.  However, the Commission's prior allowance did not explain the rationale for doing so, and in considering adoption of the Final Rule, the Commission revisited its prior position.  Although the Commission concluded that "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring" that shareholder-proponents had "sufficient economic stake or investment interest in the compan[ies in which they have ownership,]" the Commission "recognize[d] [that the] limitation [under consideration] could affect the ability of shareholders with smaller investments to submit shareholder proposals[.]" 85 Fed. Reg. at 70,248.  Nonetheless, the Commission concluded that "each shareholder-proponent should have a meaningful ownership stake in a company before being permitted to draw on company resources to include a proposal in the company's proxy statement as well as draw on the time, attention, and other resources of non-proponent shareholders." Id.

The Commission disagreed with those commenters' position that "a group of shareholders that collectively, but not individually, satisfies an ownership requirement is functionally the same as a single shareholder that satisfies the requirement." Id.  The Commission further disagreed with those commenters' position which "suggested that aggregated holdings are indicative of a long-term investment interest, [ ] or that a proposal submitted by a group of shareholders aggregating their holdings is 'more worthy of consideration' than a proposal submitted by a single shareholder." Id.  To the contrary, the Commission found that

> [c]onsistent with the views of several commenters, we believe that allowing
> shareholders to aggregate their securities to meet the new thresholds would
> undermine the goal of ensuring that each shareholder who wishes to use a
> company's proxy statement to advance a proposal has a sufficient economic stake
> or investment interest in the company.

Id.  Accordingly, the Commission concluded that this objective was achieved by requiring that

shareholder-proponents "satisfy one of the three ownership thresholds to be eligible to submit or

co-file a proposal."  Id.  The Commission further added that "[s]hareholders whose shares are

held in joint tenancy may submit proposals individually or jointly.  However, the one-proposal

limit will apply collectively to all persons having an interest in the same shares."  Id. at 70,248

n.88.

     As an initial matter, the Court agrees with the Commission that commenters did not take

issue with proposals by shareholders with joint accounts during the notice-and-comment period

and that position is therefore waived.  See Def.'s Mem. at 37 ("[T]his argument is waived

because neither [the] plaintiffs nor any other commenter raised it before the Commission[.]");

see also Nat'l Wildlife Fed'n v. Env't Prot. Agency, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is

well established that issues not raised in comments before the agency are waived and [ ] [c]ourts

[may] not consider them.").  And, "the [plaintiff]s cannot point to a single place in the record—

and [the Court] could not find one—in which anyone objected[,]"  Covad Commc'ns Co., 450

F.3d at 549, to the Commission's conclusion that shareholders may submit proposals

individually even if they hold shares in joint tenancy with another shareholder.  Therefore, the

Court concludes that to the extent the plaintiffs are arguing that adopting the aggregation

prohibition was arbitrary and capricious because of the Commission's position on shareholder-

proponents utilizing joint tenancy of ownership to meet the new ownership thresholds, that

argument was waived for purposes of the Court's review of the Commission's actions.  See Nat'l Wildlife Fed'n, 286 F.3d at 562.

In regards to the plaintiffs' other arguments concerning the aggregation prohibition, the Court is equally unpersuaded.  As noted previously, the Commission is not required under the APA "to conduct or commission their own empirical or statistical studies."  Fed. Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 427 (2021).  Rather, the Commission is required merely to "articulate[] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice[s] made."  Lindeen, 825 F.3d at 658 (internal quotation marks omitted) (second alteration in original).  The Commission found that the aggregation prohibition promotes the new ownership threshold because "allowing shareholders to aggregate their securities to meet the new thresholds would undermine the goal of ensuring that each shareholder who wishes to use a company's proxy statement to advance a proposal has a sufficient economic stake or investment interest in a company."  85 Fed. Reg. at 70,248; see id. at 70,241 ("The amendments are intended to modernize and enhance the efficiency and integrity of the shareholder-proposal process for the benefit of all shareholders[.]").  Accordingly, the Commission found that "[a]lthough the total dollar amount may be the same[,] . . . [it] d[id] not believe that group ownership (where each member of the group does not individually satisfy one of the ownership requirements) represents an equivalent economic stake or investment interest as a single shareholder who satisfies the ownership requirements."  Id. at 70,248.  Thus, the Commission has complied with the APA by articulating its reasoning and showing a rational connection between the facts found and the decision to adopt the prohibition on aggregation in amending Rule 14a-8.  See N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin., 878 F.3d 271, 306 (D.C. Cir. 2017) ("[A]s long as the agency's path may reasonably be

discerned, [courts must] uphold the decision[.]").  Accordingly, the Court concludes that the Commission's adoption of the aggregation prohibition was not arbitrary nor capricious.

2. **Whether the Adoption of the Amendment Restricting the Use of Representatives Was Arbitrary and Capricious or Otherwise Unlawful**

The Court next considers whether the amendments adopted by the Commission regarding the use of representatives by shareholder proponents were arbitrary and capricious.  As to this restriction, the plaintiffs take issue with two new amendments to Rule 14a-8: (1) "prohibit[ing] multiple shareholders from engaging the same representative to submit proposals for the same meeting[,]" and (2) "prohibit[ing] shareholders from relying on their representatives to discuss their proposals with management, instead requiring shareholders to perform that task themselves."  Pls.' Mem. at 40 (citing 85 Fed. Reg. at 70,255–56).  The plaintiffs also argue that the new restrictions are "in excess of [the Commission's] statutory jurisdiction, authority, or limitations . . . because it effectively seeks to regulate traditional questions of state agency law" in violation of the APA.  Id. at 42 (quoting 5 U.S.C. § 706(2)(C)).  The Commission responds that "[it] reasonably explained the risk of abuse [resulting from shareholder proponents seeking to avoid the newly clarified one-proposal limit through the use of representatives] and rationally determined that 'permitting representatives to submit multiple proposals for the same shareholders' meeting can give rise to the same concerns' that justif[ied] limiting shareholders to one proposal per meeting.'"  Def.'s Mem. at 38 (quoting 85 Fed. Reg. at 70,255).  The Commission further contends that "requiring the shareholder's personal participation (either in person or via teleconference) is appropriate because, in its view, 'a shareholder-proponent who elects to require a company to include a proposal in its proxy statement, requiring the company and other shareholders to bear the related costs, should be willing and available to discuss the proposal with the company and not simply rely on its representative to do so.'"  Id. at 39

(quoting 85 Fed. Reg. at 70,254).  The Commission also contends that it had the statutory authority to promulgate both amendments because they "likewise fall squarely within the Commission's uncontested authority to shape the parameters of Rule 14a-8."  Id. at 41.

The Court will first consider whether the Commission had the statutory authority to promulgate the representative amendments before then considering whether the adoption of the representative amendments was arbitrary and capricious.

### a.    Whether the Commission Acted in Excess of Its Statutory Authority

As to whether the Commission acted in excess of its statutory authority by imposing the representation limitation, the plaintiffs argue that "[s]tate agency law traditionally determines whether multiple parties may engage the same representative or whether there is some numerical limit on how many clients an agent may represent[,]" Pls.' Mem. at 43 (citing Restatement (Third) of Agency § 3.14 (2006)), and that "[s]tate agency law also determines the scope of a representative's authority to engage with someone on behalf of a client without the client's personal involvement[,]" id. (citing Restatement (Third) of Agency § 2.02).  The plaintiffs further argue that the Commission "conceded that principle . . . [by] acknowledging when proposing its rule that '[s]tate law . . . governs shareholders' ability to submit a proposal through a representative."  Id. (quoting 84 Fed. Reg. at 66,474).  Thus, the plaintiffs contend, Congress did not "empower[] the [Commission] to rewrite those traditional state agency principles."  Id.

In response, the Commission contends that "[t]here is no risk that the Commission's authority to determine the contours of Rule 14a-8 could be used to 'federalize' a 'substantial portion' of state agency law."  Def.'s Mem. at 41 (quoting Pls.' Mem. at 42).  Specifically, the Commission argues that the "regulations adopted pursuant to the authority [it] invoked . . . would apply only in the narrow context of shareholder-proposal submissions under Rule 14a-8."  Id.

49

The Commission therefore contends that it was not acting in excess of its statutory authority and that the "plaintiffs [have] fail[ed] to identify any evidence that Congress intended to permit overlap with state corporate law but not state agency law."  See Def.'s Mem. at 42.

Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" if they are found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(C).  And under Section 14(a) of the Exchange Act, the Commission is empowered to "prescribe as necessary or appropriate in the public interest or for the protection of investors" rules that govern the solicitation of shareholder proxies.  15 U.S.C. § 78n(a)(1).  However, "the Exchange Act cannot be understood to include regulation of an issue that is so far beyond matters of disclosure (such as are regulated under § 14 of the Act)[.]"  Bus. Roundtable v. Sec. & Exch. Comm'n, 905 F.2d 406, 408 (D.C. Cir. 1990). And, "it is not seriously disputed that Congress's central concern was with disclosure[,]" id. at 410, because "[t]he purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation[,]" id. (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964)).

For the following reasons, the Court agrees with the Commission that it acted within its statutory authority when it promulgated the limits on the use of representatives.  Indeed, merely because parts of the Exchange Act may overlap with state agency law does not necessarily result in a conflict where the Commission promulgates new rules on the same matter.  See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning, 578 U.S. 374, 391–92 (2016) (explaining that state law securities actions "[could] raise issues coinciding, overlapping, or intersecting with those under the [Exchange] Act itself").  The Commission originally adopted the one-proposal limit as it applied to shareholder-proponents in 1976, and explained that "the submission of

multiple proposals by a single proponent 'constitute[s] an unreasonable exercise of the right to submit proposals at the expense of other shareholders' and also may 'tend to obscure other material matters in the proxy statement of issuers, thereby reducing the effectiveness of such documents.'" 85 Fed. Reg. at 70,255 (quoting 41 Fed. Reg. at 52,994). In promulgating the Final Rule at issue here, the Commission clarified that the spirit of the one-proposal limit "applies equally to representatives who submit proposals on behalf of shareholders they represent" because such conduct by representatives "can give rise to the same concerns about the expense and obscuring effect of including multiple proposals in the company's proxy materials, thereby undermining the purpose of the one-proposal limit." Id.; see Bus. Roundtable, 905 F.2d at 410. Although the representative limitation arguably overlaps with state agency law, as the Commission explains, "Rule 14a-8 itself[, as enacted by Congress,] deals with matters [also] regulated by state law[,]" Def.'s Mem. at 42, and thus, the clarification of the representative limitation in the Final Rule cannot be understood to seek "to alter the clearly expressed intent of Congress[,]" Bd. of Governors of the Fed. Rsrv. Sys. v. Dimension Fin. Corp., 474 U.S. 361, 368 (1986); see Roosevelt v. E.I. Du Pont de Nemours & Co., 958 F.2d 416, 421 (D.C. Cir. 1992) (R.B. Ginsburg, J.) ("Congress [ ] entrusted to the [Commission] the prescription of rules and regulations governing proxy solicitations 'in the public interest or for the protection of investors.'" (quoting Va. Bankshares v. Sandberg, 501 U.S. 1083, 1086 n.1 (1991)). Where, as here, the Commission has prescribed a rule under its clear authority to regulate the proxy process, it cannot be said that "the [Commission]'s assertion of authority directly invades the 'firmly established' state jurisdiction over corporate governance and shareholder voting rights." Bus. Roundtable, 905 F.3d at 413 (quoting CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 89 (1987)).

Here, the Commission has acted within its long-established statutory authority under "Section 14(a) of the Exchange Act—which authorizes the Commission to promulgate rules, governing 'any person' who 'solicit[s] any proxy,' that it finds 'necessary or appropriate in the public interest or for the protection of investors.'"  Def.'s Mem. at 40; see 15 U.S.C. § 78n(a)(1) ("[T]he Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his [or her] name to solicit any proxy or consent or authorization in respect of any security[ registered under the Act.]"); see also 17 C.F.R. § 240.14a-8 (listing the circumstances where shareholder proposals may be excludable by companies in their proxy statements).  Indeed, the Commission's representative restriction is narrow and careful not to tread on the use of representatives beyond the offering of proposals by shareholder-proponents seeking inclusion in company proxy statements.  See 85 Fed. Reg. at 70,254 ("[S]hareholder-proponents may seek assistance and advice from lawyers, investment advisers, or others to help them draft shareholder proposals and navigate the shareholder-proposal process."); id. at 70,256 ("The amendment is not intended to limit a representative's ability to present [a] proposal[] on behalf of multiple shareholders at the same shareholders' meeting."); id. ("[T]he substantive eligibility requirements of amended Rule 14a-8(c) will appropriately address the [Commission's] concerns . . . with respect to the one proposal limit, and . . . the designation of a representative for the purpose of presenting a proposal at the shareholder meeting [does not] raise[] similar concerns.").  Under this amendment in the Final Rule, representatives are now—just as shareholder-proponents have been for decades—"subject to the one-proposal limit and will not be permitted to submit more than one proposal in total to the same company for the same meeting."  Id.  The Commission promulgated the new amendments at issue here pursuant to the authority granted to it under the Exchange Act, and

therefore, the Court concludes that the adoption of the representative restrictions falls within the statutory authority of the Commission.

> **b.**     **Whether the Commission's Adoption of the Personal Engagement Amendment Was Arbitrary and Capricious**

Having concluded that the Commission acted within its statutory authority in adopting the representative restrictions, the Court next considers the plaintiffs' position that "[t]he Commission . . . failed to justify its new rule that shareholders must personally engage with management rather than relying on their representatives to act on their behalf." Pls.' Mem. at 41. Specifically, the plaintiffs argue that "[t]he Commission cannot impose additional costs and inconvenience on certain shareholders[, as it has done through this amendment,] merely because it thinks they should be willing to bear those costs[,]" as its position is essentially, "no justification at all." Id. The Commission contends that the plaintiffs "fail to engage with the Commission's rationale for that policy choice[,]" Def.'s Mem. at 38, arguing that "[it] emphasized in response to comments raising these concerns, [that] representatives may participate in any company-shareholder discussions—and nothing in the rule would prevent a representative from speaking for the shareholder (and handling any subsequent discussions)[,]" id. at 39.

The Commission justified its adoption of the shareholder engagement amendment because it anticipated that it "w[ould] facilitate dialogue between shareholders and companies in the shareholder-proposal process, and may lead to more efficient and less costly resolution of these matters." 85 Fed. Reg. at 70,252–53. The Commission explained that "a shareholder-proponent who elects to require a company to include a proposal in its proxy statement, requiring the company and other shareholders to bear the related costs, should be willing and available to discuss the proposal with the company and not simply rely on its representative to do so." Id.

at 70,254. Importantly, however, the Commission noted that "[t]he shareholder-proponent's representative also may participate in any discussions between the company and the shareholder[,]" and "[t]hus, shareholder-proponents will be able to continue to seek and utilize the assistance of a representative." Id.

The Court finds that this amendment is reasonably justified by the Commission because it is consistent with the Commission's stated goals for adopting the Final Rule. As the Court indicated, supra Section III.D.1, the Commission has rationally explained that it sought to modernize the rules regarding shareholder proposals to ensure that shareholders have an adequate economic stake in the proxy voting process. See id. at 70,241. In that same vein, the Commission further explained that "early engagement [with shareholder-proponents] may help avoid the time and expense of the no-action process[,]" whereby companies seek an opinion from Commission staff on whether they are in compliance with the Commission's rules. Id. at 70,253. Additionally, "[a] shareholder-proponent's representatives also may [still] participate in any discussions between the company and the shareholder." Id. at 70,254.

Moreover, for several reasons, the Court disagrees that the costs to shareholders resulting from their personal involvement are outweighed by the other benefits of the amendment. First, in a similar context regarding the representative limitation, the Commission explained that "[w]hen a representative speaks and acts for a shareholder, there may be a question as to whether the shareholder has a genuine and meaningful interest in the proposal, or whether the proposal is instead primarily of interest to the representative, with only an acquiescent interest by the shareholder." Id. at 70,250. The concern regarding rogue representatives acting on their own accord—rather than on behalf of shareholder-proponents—strikes at the heart of Rule 14a, the purpose of which "is to prevent management or others from obtaining authorization for corporate

actions by means of deceptive or inadequate disclosure in the proxy solicitation process." Borak, 377 U.S. at 431; see 17 C.F.R. § 240.14a-8 ("[I]n order to have [a] shareholder proposal included on a company's proxy card, and included along with any supporting statement in its proxy statement, [a shareholder] must be eligible and follow certain procedures [outlined in Rule 14-a8]."); see also Trinity Wall St. v. Wal-Mart Stores, Inc., 792 F.3d 323, 335 (3d Cir. 2015) ("[Rule 14a-8] mandates subsidized shareholder access to a company's proxy materials[ and] requir[es] 'reporting companies . . . to print and mail with management's proxy statement, and [ ] place on management's proxy ballot, any 'proper' proposal submitted by a qualifying shareholder.'" (quoting Alan R. Palmiter, The Shareholder Proposal Rule: A Failed Experiment in Merit Regulation, 45 Ala. L. Rev. 879, 886 (1994)) (emphasis added); cf. Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc., 821 F. Supp. 877, 882 (S.D.N.Y. 1993) (noting similarly that "Rule 14a-9 . . . prohibits 'false or misleading' statements made in any proxy statement, form of proxy, notice of meeting or other communication" (quoting 17 C.F.R. § 240.14a-9(a))).  Thus, the Commission's justification for ensuring engagement between the shareholder-proponents themselves and company management is well-supported by the record, and the associated costs to shareholder-proponents is outweighed by the benefit to all shareholders.  See Roosevelt, 958 F.2d at 422 ("It is obvious to the point of banality . . . that Congress intended by its enactment of [S]ection 14 . . . to give true vitality to the concept of corporate democracy." (quoting Med. Comm. for Hum. Rights v. Sec. & Exch. Comm'n, 432 F.2d 659, 676 (D.C. Cir. 1970)).

To be sure, although "[s]hareholder-proponents will also be required to provide their contact information" to companies and to make themselves available for a meeting with management, 85 Fed. Reg. at 70,253, the Commission clarified that "the times [that the

shareholder-proponent chooses to meet] should be during the regular business hours of the company's principal executive offices[,]" id. "If the shareholder-proponent's availability changes, the company [need only be] notified and alternative date(s) and times(s) should be provided to the company." Id. Thus, the Court agrees with the Commission that "an indication that the proponent has a genuine and meaningful interest in the proposal [that the shareholder-proponent seeks to have included in a company's proxy materials] and in the company, [are] justif[ied by] the burdens associated with processing the proposal." Def.'s Mem. at 39.

Accordingly, because the shareholder personal engagement amendment does not impose costs that are outweighed by the benefits of the amendment, and the Commission has "articulated a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made[,]" Lindeen, 825 F.3d at 658 (citations and quotation marks omitted), the Court must conclude that the adoption of the amendment was not arbitrary and capricious.

### c. Whether Adoption of the Representation Limitation Was Arbitrary and Capricious

The plaintiffs argue that "[t]he Commission's sole justification for prohibiting multiple shareholders from engaging the same representative . . . does not explain why proposals should be singled out for exclusion merely because two shareholders with different proposals happen to use the same representative." Pls.' Mem. at 40. In sum, the plaintiffs argue that "the Commission's [representation] limitation is simply an arbitrary means of reducing the number of proposals—a rule that singles out certain proposals for exclusion without any rational reason to treat them less favorably than others." Id. at 40–41. The Commission responds that it "reasonably explained the risk of abuse [that could occur from circumventing the one-proposal rule] and rationally determined that 'permitting representatives to submit multiple proposals for

the same shareholders' meeting can give rise to the same concerns' that justify limiting shareholders to one proposal per meeting."  Def.'s Mem. at 38 (quoting 85 Fed. Reg. at 70,255).

The Commission reasoned that "apply[ing] the one-proposal rule to 'each person' rather than 'each shareholder' who submits a proposal[,]" 85 Fed. Reg. at 70,254, would curb "the [long-held concern about the] possibility that some proponents may attempt to evade the new limitations through various maneuvers, such as having other persons whose securities they control submit . . . proposals each in their own names[,]" id. at 70,255 (quoting 41 Fed. Reg. at 52,996).  To address this concern, "[u]nder the new rule, a shareholder-proponent will not be permitted to submit one proposal in his or her own name and simultaneously serve as a representative to submit a different proposal on another shareholder's behalf for consideration at the same meeting."  Id. at 70,256.  "Likewise, a representative will not be permitted to submit more than one proposal to be considered at the same meeting, even if the representative were to submit each proposal on behalf of different shareholders."  Id.  However, the Commission clarified that "[t]he amendment is not intended to limit a representative's ability to present [a single] proposal[] on behalf of multiple [eligible] shareholders at the same shareholders' meeting."  Id.

The Court concludes that the Commission has reasonably explained its justification for the one proposal limit on representatives.  The new amendment is not inconsistent with the Commission's prior concerns that the one proposal rule should "'apply collectively to all persons having an interest in the same securities (e.g., the record owner and the beneficial owner, and joint tenants).'"  Id. (quoting 41 Fed. Reg. at 52,996).  Thus, "the Commission[, seeking] to make 'precautionary or prophylactic responses to perceived risks[,]'" Chamber I, 412 F.3d at 141 (quoting Certified Color Mfrs. Ass'n v. Mathews, 543 F.2d 284, 296 (D.C. Cir. 1976)), by

clarifying its prior rule is reasonably justified, see 85 Fed. Reg. at 70,255 ("[The Commission] believe[s] permitting representatives to submit multiple proposals for the same shareholders' meeting can give rise to the same concerns about the expense and obscuring effect of including multiple proposals in the company's proxy materials, thereby undermining the purpose of the one-proposal limit.").  The Commission's decision is further supported by its clarification that "[t]he amendment is not intended to limit a representative's ability to present proposals on behalf of multiple shareholders at the same shareholders' meeting."  Id. at 70,256.  Indeed, the Commission addressed the possible cost and concern of shareholder-proponents by indicating that "[w]here multiple shareholders co-file a proposal, the company receives only one proposal and, therefore, the submission does not raise the types of concerns that Rule 14a-8(c) is intended to address."  Id.  Moreover, as the Commission made clear, "a representative could still assist [a] shareholder with drafting [a] proposal, advising on steps in the submission process, and engaging with the company."  Id.  Thus, the Court cannot conclude that the possible costs to shareholder-proponents are not outweighed by the reasonably explained rationale for the amendment.  Accordingly, the Court concludes that the adoption of the amendment extending the one proposal limit to representatives of shareholders was not arbitrary and capricious.

E.    **Count V: Pretextual Justification**

Finally, the Court addresses Count V of the plaintiffs' Complaint, which alleges that the Commission's stated rationale for adopting the Final Rule was pretextual justification for its "true reason" of supporting "corporate management opposition to the substance of many types of shareholder proposals, particularly those addressing environmental and social issues."  Compl. ¶ 171.  In their summary judgment motion, the plaintiffs did not address this Count in their Complaint, see generally Pls.' Mem., and the Commission merely indicated in a footnote that

"[the p]laintiffs ha[d] waived arguments in their [C]omplaint not raised on summary judgment (e.g., Count V)[,]" Def.'s Mem. at 43 n.12 (citing Pub. Emps. for Env't Resp. v. Beaudreau, 25 F. Supp. 3d 67, 129 (D.D.C. 2014)).  In their reply brief, the plaintiffs respond—also in a footnote—that "[they] do not seek summary judgment on Count V of the Complaint, but they have not abandoned the claim either."  Pls.' Reply at 25 n.7.  The plaintiffs explain that "while the [Commission] nominally moves for summary judgment on Count V, it offers no argument or explanation as to why it is entitled to that relief."  Id.  The plaintiffs opine that "[t]he Commission has therefore forfeited the argument[ that they are entitled to summary judgment on Count V,]" id. (citing City of Waukesha v. Env't Prot. Agency, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003)), and, accordingly, "[t]here is no proper basis for granting summary judgment to either party on that claim[,]" id.  After the Court held a hearing as to Count V, the parties then submitted supplemental briefing to better explain their respective positions.  See generally Pls.' Suppl. Mem.; Def.'s Suppl. Mem.

As an initial matter, whether the Commission properly moved for summary judgment prior to the Court's hearing regarding Count V is no longer a relevant inquiry because there now exists a basis upon which the Court may consider whether summary judgment should be granted to the defendant.  Pursuant to Federal Rule 56(f),

> [a]fter giving notice and a reasonable time to respond, the [C]ourt may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f).  Once the Court has provided the parties notice and a reasonable opportunity to respond to a claim in a complaint, the typical summary judgment procedures under Federal Rule 56(c) then apply.  See Fed. R. Civ. P. 56(c).  Here, the Court provided the parties notice of its concern as to whether Count V was properly briefed, ordered a hearing to

hear arguments from the parties, see Min. Entry (Mar. 10, 2025), and then provided the parties a reasonable amount of time—and the opportunity—to respond to the Court's questions regarding Count V when it ordered supplemental briefing, see Order at 1 (Mar. 10, 2025), ECF No. 36 (ordering the parties to supplement their arguments on Count V by March 14, 2025). Therefore, the Court concludes that it can now assess whether summary judgment on Count V should be granted.

**1.  Whether the Plaintiffs Abandoned Count V**

As to the defendant's abandonment position, the plaintiffs maintain that they have not abandoned Count V. The plaintiffs argue that they "did not abandon or forfeit Count V merely by moving for summary judgment on the other four counts." Pls.' Suppl. Mem. at 5. "Rather, [the plaintiffs continue,] the decision to file only a partial summary judgment motion reflects the unique nature of Count V[,]" id., which the plaintiffs contend exists here because "[Count V] raises factual disputes that are not amenable to summary judgment[,]" id. On the other hand, the Commission argues that "[c]ourt[s in this Circuit] routinely hold[] that claims raised in a complaint but not pursued on summary judgment are abandoned[,]" Def.'s Suppl. Mem. at 2, and that its abandonment position "is reinforced by the way the plaintiffs chose to litigate this case[,]" id. (noting that the parties represented to the Court "[p]ursuant to Local Rule 16.3(d) and this Court's General Order for Civil Cases" that "this matter can be most efficiently resolved solely through the filing of dispositive motions"); see Joint Statement and Proposed Scheduling Order ("Joint Statement") at 1, ECF No. 12.

Based on these representations and the substance of the plaintiffs' summary judgment filing, the Court finds that the plaintiffs appear to have abandoned Count V of their Complaint. Although the plaintiffs indicated in their motion that they were moving for summary judgment on Counts I through IV, see Pls.' Mot. at 1, the motion and its accompanying memorandum are

silent on their position regarding Count V, see generally Pls.' Mem., and the plaintiffs did not

otherwise explain why they did not move for summary judgment on Count V until prompted to

do so by the defendant's opposition and cross-motion.  And, "[w]hile it is true that a party does

not abandon a claim by not briefing it in a partial motion to dismiss[,]" Pub. Emps. For Env't

Resp., 25 F. Supp. 3d at 129, on the other hand, as is the case here, "an issue raised in the

complaint but ignored at summary judgment may be deemed waived[,]" id. (quoting Grenier v.

Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995)); Noble Energy, Inc. v. Salazar, 691 F.

Supp. 2d 14, 23 n.6 (D.D.C. 2010) (same).

        In any event, the Court need not definitively decide whether the plaintiffs abandoned

Count V because for several reasons the plaintiffs have not carried their burden to show that the

Commission's rationale for adopting the Final Rule amendments was a pretextual justification

for the factually unsupported reasons they advance, even after being afforded the opportunity to

do so by the Court.  First, the law is clear that "in order to permit meaningful judicial review, an

agency must 'disclose the basis' of its action."  Dep't of Com. v. New York, 588 U.S. 752, 780

(2019) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–69 (1962)); see

Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of

the process of review requires that the grounds upon which the administrative agency acted be

clearly disclosed and adequately sustained.").  Typically, "in reviewing agency action, a court is

ordinarily limited to evaluating the agency's contemporaneous explanation in light of the

existing administrative record."  Dep't of Com., 588 U.S. at 780.  This limitation "reflects the

recognition that further judicial inquiry into 'executive motivation' represents 'a substantial

intrusion' into the workings of another branch of [g]overnment and should normally be avoided."

Id. at 780–81 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 n.18

(1977)).  And, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." <u>Id.</u> at 781.  However, there is a "'narrow exception to th[at] general rule' that applies where the challengers to the agency's action make a 'strong showing of bad faith or improper behavior' on the part of the agency." <u>Biden v. Texas</u>, 597 U.S. 785, 811 (2022) (quoting <u>Dep't of Com.</u>, 588 U.S. at 781).  "On a 'strong showing of bad faith or improper behavior,' such an inquiry may be warranted and may justify extra-record discovery." <u>Dep't of Com.</u>, 588 U.S. at 781 (quoting <u>Overton Park</u>, 401 U.S. at 420).

Here, the plaintiffs have not made the requisite showing of bad faith or improper behavior that would entitle them to the consideration of extra-record evidence as to Count V. The plaintiffs argue that the Commission showed a "pattern of crediting anecdotal evidence from corporate interests while downplaying the extensive empirical data that investors submitted[,]" Pls.' Suppl. Mem. at 1; however, "the agency's subjective desire to reach a particular result [does not] necessarily invalidate the result," <u>Dep't of Com.</u>, 588 U.S. at 781 (quoting <u>Jagers v. Fed. Crops Ins. Corp.</u>, 758 F.3d 1179, 1185–1186 (10th Cir. 2014)).  The Commission was clear that it adopted its amendments "for the benefit of all shareholders," 85 Fed. Reg. at 70,241, as is its obligation entrusted to it by Congress, and the rationale it provided in the Final Rule was similarly clear, despite being at odds at times with the commentary provided by individual investors.  Alternatively, the Commission at times agreed with individual investors—for instance, when it declined to adopt the momentum requirement in the Final Rule.  <u>See id.</u> at 70,289 (recognizing the "imposed costs on shareholder-proponents and companies" when it declined to adopt the momentum requirement).

Upon the Court affording the plaintiffs the opportunity to make a showing that the Commission engaged in bad faith or improper behavior, the plaintiffs identified a single

comment by former Commissioner Allison Lee, who issued a statement in dissent in response to the Commission's vote on the Final Rule.  See Comm'r Allison Herren Lee, Statement on the Amendments to Rule 14a-8 (Sept. 23, 2020), https://tinyurl.com/4fkmje2c ("Lee's Statement").  However, the former Commissioner did not "question[] the majority's motives" as the plaintiffs suggested in their Complaint.  Compl. ¶ 97.  Rather, she expressed her "concern [ ] with the majority's policy choice in finalizing the[] [F]inal [R]ule[.]"  Lee's Statement.  And, as both the Supreme Court and this Circuit have concluded, policy choices are agency actions that courts may not disturb.  See Dep't of Com., 588 U.S. at 781 ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an [a]dministration's [policy] priorities."  (quoting Sierra Club v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981)).  Therefore, based on the existing administrative record, the plaintiffs do not make a sufficient showing that supports the Court inquiring further beyond the Commission's stated reasons for adopting the Final Rule.  See, e.g., Dallas Safari Club v. Bernhardt, 518 F. Supp. 3d 535, 538 (D.D.C. 2021) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  (quoting Camp v. Pitts, 411 U.S. 138, 143 (1973)).  Accordingly, the Court concludes that it must grant summary judgment to the Commission on Count V.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the Commission's cross-motion for summary judgment and deny the plaintiffs' motion for summary judgment.

**SO ORDERED** this 5th day of June, 2025.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.